## EXHIBIT A

**Motion**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| | ) | |
| In re: | ) | Chapter 11 |
| | ) | |
| CLAIRE'S HOLDINGS LLC, *et al.*,[1] | ) | Case No. 25-11454 (___) |
| | ) | |
| Debtors. | ) | (Joint Administration Requested) |
| | ) | |

**MOTION OF
DEBTORS FOR ENTRY
OF INTERIM AND FINAL ORDERS
(I) AUTHORIZING THE DEBTORS TO PAY
PREPETITION CLAIMS OF CERTAIN (A) CRITICAL
VENDORS, (B) FOREIGN VENDORS, (C) 503(b)(9) CLAIMANTS,
AND (D) LIEN CLAIMANTS, AND (II) GRANTING RELATED RELIEF**

The above-captioned debtors and debtors in possession (collectively, the "Debtors") state

as follows in support of this motion:[2]

**Relief Requested**

1.      The Debtors seek entry of interim and final orders, substantially in the forms

attached hereto as **Exhibit A** and **Exhibit B** (the "Interim Order" and "Final Order," respectively),

(a) authorizing, but not directing, the Debtors to pay prepetition amounts owing on account of

(i) Critical Vendor Claims, (ii) Foreign Vendor Claims, (iii) 503(b)(9) Claims, and (iv) Lien

---

[1]     The Debtors in these chapter 11 cases, along with the last four digits of their federal tax identification numbers, to the extent applicable, are:  Claire's Holdings LLC (9619); BMS Distributing Corp. (4117); CBI Distributing Corp. (5574); Claire's (Gibraltar) Holdings Limited (4273); Claire's Boutiques, Inc. (5307); Claire's Canada Corp. (7936); Claire's Intellectual LLC (5274); Claire's Puerto Rico Corp. (6113); Claire's Stores, Inc. (0416); Claire's Swiss Holdings II LLC (7980); Claire's Swiss Holdings LLC (2299); CLSIP Holdings LLC (1950); CLSIP LLC (9769); and CSI Canada LLC (2343).  The Debtors' mailing address is 2400 West Central Road, Hoffman Estates, IL 60192.

[2]     A detailed description of the Debtors and their business, including the facts and circumstances supporting the motion, is set forth in the *Declaration of Chris Cramer, Chief Executive Officer, Chief Operating Officer, and Chief Financial Officer of Claire's Holdings LLC and Certain of Its Affiliates, in Support of the Debtors' Chapter 11 Petitions and First Day Motions* filed contemporaneously herewith (the "First Day Declaration"). Capitalized terms used but not defined in this motion shall have the meanings ascribed to them in the First Day Declaration.

Docket No. 8
Date Filed: 8/6/25

Claims (each as defined herein and collectively, the "<u>Specified Trade Claims</u>," and the claimants holding each Specified Trade Claim, the "<u>Specified Trade Claimants</u>"); and (b) granting related relief.  In addition, the Debtors request that the Court schedule a final hearing within approximately 21 days of the commencement of these chapter 11 cases to consider approval of this motion on a final basis.

<u>**Jurisdiction and Venue**</u>

2.      The United States Bankruptcy Court for the District of Delaware (the "<u>Court</u>") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated February 29, 2012.  This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2), and the Debtors confirm their consent, pursuant to rule 9013-1(f) of the Local Rules of the United States Bankruptcy Court for the District of Delaware (the "<u>Local Rules</u>"), to the entry of a final order by the Court in connection with this motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

3.      Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

4.      The statutory bases for the relief requested herein are sections 105(a), 363, 503, 1107(a), and 1108 of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the "<u>Bankruptcy Code</u>"), rules 6003 and 6004 of the Federal Rules of Bankruptcy Procedure (the "<u>Bankruptcy Rules</u>"), and Local Rules 2002-1 and 9013-1.

<u>**Background**</u>

5.      On August 6, 2025 (the "<u>Petition Date</u>"), each Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  The Debtors are operating their business and managing their property as debtors in possession pursuant to sections 1107(a) and 1108 of the

Bankruptcy Code.  Concurrently with the filing of this motion, the Debtors filed a motion requesting procedural consolidation and joint administration of these chapter 11 cases pursuant to Bankruptcy Rule 1015(b) and Local Rule 1015-1.  No request for the appointment of a trustee or examiner has been made in these chapter 11 cases, and no official committees have been appointed or designated.

### The Debtors' Supply Chain

6.      The Debtors, together with their non-Debtor affiliates (collectively the "Company"), are a leading specialty retailer of jewelry and accessories and provider of world-leading piercing services.  The Company operates (a) approximately 2,300 brick and mortar stores, consisting of (i) approximately 1,970 Claire's® stores located in 17 countries throughout North America and Europe, (ii) approximately 210 *Claire's*® "Store-in-Store" locations inside Walmart stores in North America, and (iii) approximately 120 *Icing*® stores in North America, and (b) approximately 9,000 Concessions locations throughout North America and Europe. In addition, Claire's franchisees operate approximately 230 franchised stores, primarily located in the Middle East and South Africa.[3]  The Debtors' business depends on the uninterrupted flow of inventory and other goods and services through its supply chain and distribution network, including the purchase, importation, storage, and shipment of the Debtors' inventory and merchandise ("Merchandise").  The Debtors' sale and monetization efforts and related chapter 11 objectives depend on the Debtors' ability to quickly respond to shifting market trends and customer preferences by keeping their stores inventoried with the latest fashions.  Accordingly, at any given

---

[3]     The Company's foreign entities, other than Debtor Claire's (Gibraltar) Holdings Limited, are not debtors in these Chapter 11 Cases.

store location, the Debtors keep on hand up to approximately 7,500 different stock keeping units, or "SKUs."

7.    The Debtors rely on a global supply chain of Critical Vendors, Foreign Vendors, and Lien Claimants (each as defined below) for the receipt, distribution, and delivery of Merchandise that the Debtors sell in their stores and e-commerce platforms. Introducing a product and/or replacing a vendor in the Debtors' supply chain is a multistep process that requires significant lead time and can take 10 months or more.

8.    Each supplier is subject to rigorous quality control and screening protocols established by the Debtors before they can be admitted into the supply chain, adding additional barriers and costs to replacing suppliers.[4] Additionally, many existing vendors throughout the Debtors' supply chain offer highly customized products and services, and certain license partners require the Debtors to sole source their products through a specific vendor. Accordingly, it is not feasible for the Debtors to replace the Specified Trade Claimants without significant disruption to the supply chain.

### Overview of the Specified Trade Claims

| Relief Requested | | | |
|---|---|---|---|
| *Category* | *Description* | *Approximate Interim Amount* | *Approximate Final Amount* |
| Critical Vendors | Suppliers of goods and services that are critical to maintain the Debtors' day-to-day operations, or which are sole or limited source providers of the goods and services necessary for the uninterrupted operations of the Debtors' business. | $8 million | $14 million |

---

[4]    Such quality control and screening includes, among other things: (i) testing products for a variety of chemicals, metals, and other potential contaminants; (ii) auditing factories for working conditions and employee practices, health and safety, and security; (iii) evaluating the vendor's design and production capabilities; and (iv) evaluating pricing, other customers of the vendor, and other commercial considerations.

| Foreign Vendors | Suppliers of essential goods or services that are based outside of the United States. | $7 million | $13 million |
|---|---|---|---|
| 503(b)(9) Claimants | Suppliers that provided goods to the Debtors that were received within 20 days before the Petition Date, which may give rise to claims under section 503(b)(9) of the Bankruptcy Code. | $2 million | $2 million |
| Lien Claimants | Suppliers of goods or services utilized by or provided to the Debtors that may assert shipper's liens, mechanic's liens, or other similar liens. | $2 million | $2 million |
| **Total Amount of Specified Trade Claims** | | $19 million | $31 million |

9.      Some Specified Trade Claims may be properly categorized as more than one type of claim or as a different type of claim.  The Debtors are seeking relief to pay the Specified Trade Claims regardless of how they are categorized.  The amounts that the Debtors seek authority, but not direction, to satisfy pursuant to the relief requested in this motion represent the Debtors' best estimate as to what aggregate amounts must be paid to the Specified Trade Claimants to continue an uninterrupted supply of critical goods and services.  For the avoidance of doubt, the Debtors intend to pay the Specified Trade Claims only where they believe, in their business judgment, that the benefits to their estates from making such payments will exceed the costs.

**I.      Critical Vendor Claims.**

10.      Prior to filing these chapter 11 cases, the Debtors and their advisors carefully reviewed and analyzed the Debtors' books and records and consulted with key personnel to identify the Critical Vendors, each of whom supplies essential goods and services necessary for the Debtors to maximize the value of their estates.  As part of this analysis, the Debtors considered numerous factors, including:

a.    whether a vendor is critical to maximizing the value of property of the estates during these chapter 11 cases;

b.    whether a vendor is a sole- or limited-source or high-volume supplier for goods or services critical to the Debtors' business operations;

c.    whether alternative vendors are available that can provide requisite volumes of similar goods or services on equal (or better) terms and, if so, whether the Debtors would be able to transition business thereto;

d.    the degree to which replacement costs (including, pricing, transition expenses, professional fees, and lost sales or future revenue) exceed the amount of a vendor's prepetition claim;

e.    whether certain specifications or contract requirements prevent, directly or indirectly, the Debtors from obtaining goods or services from alternative sources;

f.    whether, if a vendor is not a sole source supplier, the Debtors have sufficient product in inventory to continue their operations while a replacement vendor is put in place;

g.    whether the business relationship between the Debtors and the supplier is governed by a contract that will remain enforceable during these chapter 11 cases; and

h.    whether a vendor meeting the foregoing criteria is able or likely to refuse to ship product to, or perform services for, the Debtors postpetition if the Debtors fail to pay their prepetition claims.

11.    In sum, the Debtors' selection process balanced the need to ensure that these chapter 11 cases do not disrupt their operations, adversely affect their market share, or injure their customer relationships, with the need to limit the expenditure of estate resources. As more fully described below, the Critical Vendors consist of (a) Merchandise Vendors and (b) Non-Merchandise Vendors (each as defined below).[5]

---

[5]    Certain Critical Vendors provide the Debtors with both Merchandise and non-Merchandise goods and services and, accordingly, could be categorized as both a Merchandise Vendor and a Non-Merchandise Vendor.

A.      **Merchandise Vendors.**

12.     The Debtors' business relies on the sale of Merchandise, which in turn requires a steady supply of Merchandise from numerous key suppliers (the "Merchandise Vendors").  The Merchandise Vendors provide, among other things, the goods that the Debtors sell, such as jewelry, fashion accessories, toys, tech accessories, and makeup and beauty accessories.  A number of the Merchandise Vendors are the exclusive distributors of products with valuable brand identities.  Importantly, as set forth above, the Debtors undertake a rigorous quality control process with respect to Merchandise Vendors, which generally takes significant lead time (*i.e.*, months) before a new vendor may be approved by the Debtors.  Such a delay makes it prohibitively difficult for the Debtors to transition to a replacement vendor.

13.     The Debtors generally do not have long-term contractual arrangements with the Merchandise Vendors.  Instead, the Debtors primarily engage with the Merchandise Vendors on purchase order payment terms or under short-term agreements subject to renewal. The Merchandise Vendors also provide the Debtors with Merchandise on favorable trade terms (such as volume and other discounts), which contribute to the Debtors' overall profitability and liquidity.

B.      **Non-Merchandise Vendors.**

14.     The Debtors also rely on a variety of other vendors to, among other things, provide (i) goods that the Debtors use in their corporate offices and distribution centers, (ii) ear-piercing technology, equipment, and other supplies that the Debtors utilize in their stores to provide services to their customers, and (iii) technical support for store equipment or ear-piercing operations and critical on-site maintenance (the "Non-Merchandise Vendors" and, together with the Merchandise Vendors, the "Critical Vendors").  In many instances, the Non-Merchandise Vendors are the only

vendors able to provide their services, either for practical (*e.g.*, expertise) or for contractual reasons (*e.g.*, certain of the Debtors' contracts require designated service providers).    Certain Non-Merchandise Vendors also facilitate the Debtors' ability to move inventory between stores to maximize operational efficiency.    These key services are essential for the Debtors to build customer loyalty and promote brand awareness, all of which inure to the benefit of the Debtors' estates and all stakeholders.

15.    Failure to pay prepetition claims held by the Critical Vendors and accrued in the ordinary course of business (the "Critical Vendor Claims") could cause such Critical Vendors to refuse to provide the goods and services necessary for the Debtors' business.    Accordingly, the ability to pay the Critical Vendor Claims is essential for maintaining the value of the Debtors' businesses and minimizing operational degradation as the Debtors seek to effectuate their sale and monetization efforts and related chapter 11 objectives. Such harm would likely far outweigh the cost of paying the Critical Vendor Claims.

16.    As of the Petition Date, the Debtors estimate that approximately $14 million on account of Critical Vendor Claims is outstanding, approximately $8 million of which will become due and payable prior to the final hearing.    Accordingly, the Debtors request authority, but not direction, to make payments on account of Critical Vendor Claims in the ordinary course of business and consistent with past practice in an aggregate amount not to exceed $14 million, of which $8 million shall be available upon entry of the Interim Order and the remaining $6 million upon entry of the Final Order.

## II.    Foreign Vendors.

17.    The Debtors primarily utilize essential vendors who are based outside of the United States (collectively, the "Foreign Vendors").    The Foreign Vendors provide, among other things, a significant portion of the merchandise (*e.g.*, toys, jewelry, accessories, and beauty and cosmetic

products) that the Debtors sell in their stores and e-commerce online platforms. Specifically, of its vendor base comprised of nearly 2,000 vendors, the Company purchased approximately 70% of its inventory for North America from suppliers located outside of the United States between November 2024 and April 2025—largely in mainland China, as well as in Vietnam, Thailand, Cambodia, Bangladesh, Taiwan, and India.

18.     The Debtors engage with certain of the Foreign Vendors directly. The Debtors engage with other Foreign Vendors indirectly though RSI International, Ltd. ("RSI"), a non-Debtor affiliate organized under the laws of Hong Kong. In the ordinary course of business, the Debtors place purchase orders with Foreign Vendors. In certain situations, RSI acts as a buying agent and Debtors' representative that interfaces with the Foreign Vendor. The Foreign Vendor will issue an invoice to RSI and then RSI will issue an invoice to the Debtors. As further described in the Cash Management Motion,[6] when a Debtor agrees to purchase inventory from a particular Foreign Vendor (particularly vendors located in mainland China), RSI will ultimately aggregate and disburse funds to that Foreign Vendor on a consolidated basis for purchases made by the Debtors and certain of their non-Debtor affiliates.

19.     The Debtors believe there is a significant and material risk that the nonpayment of prepetition invoices could cause the Foreign Vendors to stop shipping goods or providing supplies to the Debtors on a timely basis and/or completely sever its business relationship with the Debtors. Indeed, prior to the Petition Date, certain Foreign Vendors threatened to discontinue producing and shipping inventory to the Debtors on account of unpaid prepetition invoices. Suppliers and

---

[6]     *Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Continue to Operate the Cash Management System, (B) Honor Certain Prepetition Obligations Related Thereto, (C) Maintain Existing Business Forms, (D) Continue to Perform Intercompany Transactions, and (II) Granting Related Relief* filed contemporaneously herewith (the "Cash Management Motion").

vendors located in foreign countries are also often unfamiliar with the chapter 11 process and react skeptically to its debtor protections.  With respect to the significant portion of the Foreign Vendors who are based in China, the Debtors' chapter 11 cases will likely exacerbate already existing uncertainties given tensions in the U.S.–China trade relationship.  Short of severing their relations with the Debtors, nonpayment of prepetition amounts owed to Foreign Vendors (the "Foreign Vendor Claims") may also cause Foreign Vendors to take other harmful actions, including delaying shipments of goods or refusing to render services.  Timely shipment of inventory and maintaining services are critical to the Debtors' business, and the Debtors can ill afford any delays or interruptions of this nature.  The ability to pay Foreign Vendor Claims is therefore imperative to preserve the value of the Debtors' estates and avoid adverse consequences to the Debtors' business.

20.    The Debtors do not believe that they can readily or easily replace such Foreign Vendors without materially impairing their ability to deliver the variety and quality of products their customers have come to expect.  As noted above, the Debtors' supply chain is subject to an ongoing and rigorous quality control process that makes it prohibitively difficult for the Debtors to transition to replacement vendors.

21.    As of the Petition Date, the Debtors estimate that approximately $13 million on account of Foreign Vendor Claims is outstanding, approximately $7 million of which will become due and payable prior to the final hearing.  Accordingly, the Debtors request authority, but not direction, to make payments on account of Foreign Vendor Claims in the ordinary course of business and consistent with past practice in an aggregate amount not to exceed $13 million, of which $7 million shall be available upon entry of the Interim Order and the remaining $6 million upon entry of the Final Order.

**III.    503(b)(9) Claimants.**

22.    The Debtors may have received certain goods from various vendors (collectively, the "503(b)(9) Claimants") within the 20-day period immediately preceding the Petition Date, thereby giving rise to claims that may be accorded administrative priority under section 503(b)(9) of the Bankruptcy Code (the "503(b)(9) Claims").  Many of the Debtors' relationships with the 503(b)(9) Claimants are not governed by long-term contracts.  Rather, the Debtors obtain inventory, goods, or other materials from such claimants on an order-by-order basis.  As a result, a 503(b)(9) Claimant may refuse to supply new orders without payment of its 503(b)(9) Claims. Such refusal would negatively affect the Debtors' estates, as the Debtors' business is dependent on the steady flow of inventory to stock its stores.

23.    As of the Petition Date, the Debtors estimate that approximately $2 million on account of 503(b)(9) Claims is outstanding, all of which will become due and payable prior to the final hearing and the value of which may be entitled to administrative priority under section 503(b)(9) of the Bankruptcy Code.  Accordingly, the Debtors request authority, but not direction, to make payments on account of the undisputed 503(b)(9) Claims in an aggregate amount not to exceed $2 million, all of which shall be available upon entry of the Interim Order.

**IV.    Lien Claimants.**

24.    The Debtors rely on the uninterrupted flow of goods through their supply chain and distribution network, including the purchase, importation, shipment, and storage of the Debtors' inventory.  To maintain their extensive distribution network, the Debtors rely on various freight vendors, logistics providers, ocean carriers, truckers, common or contract carriers, and other shipping services providers for the receipt, distribution, and delivery of the Debtors' products to their retail locations or to wholesale purchasers.  As a result, these Lien Claimants regularly have possession of the Debtors' inventory and such Lien Claimants' continued services are critical to

the Debtors' ability to access their products.[7]  Additionally, the Debtors also rely on services of certain vendors for facility management and maintenance services to maintain the Debtors' facilities and support their sale and monetization efforts.

25.     Under certain non-bankruptcy laws, Lien Claimants may be able to assert a variety of statutory, common law, or possessory liens that secure the charges or expenses incurred in relation to the transportation of goods, the supply of labor, and other related charges (the "Lien Claims").[8]  Thus, if the Lien Claims are not satisfied, certain Lien Claimants are likely to attempt to assert such possessory liens and may refuse to deliver or release the Debtors' property until their claims are satisfied and their liens are redeemed.  Other Lien Claimants may be able to assert liens against the Debtors' property for the costs of labor and materials incurred in completing services, maintenance, repairs, and similar services for the Debtors.  The Lien Claimants' retention of the Debtors' property or assertion of other common law or statutorily-arising liens, as applicable, would disrupt the Debtors' business operations and negatively affect the Debtors' ability to generate revenue and administer these chapter 11 cases.[9]  The Debtors intend to pay prepetition Lien Claims only where they believe, in their business judgment, that the benefits to their estates

---

[7]   The Debtors utilize certain customs brokers for the import and export of goods, who regularly have possession of the Debtors' inventory for a short period.  The Debtors seek relief with respect to customs brokers in the *Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing the Payment of Certain Prepetition and Postpetition Taxes and Fees and (II) Granting Related Relief*, filed contemporaneously herewith.

[8]   For example, section 7-307 of the Uniform Commercial Code provides, in pertinent part, that a "carrier has a lien on the goods covered by a bill of lading or on the proceeds thereof in its possession for charges after the date of the carrier's receipt of the goods for storage or transportation, including demurrage and terminal charges, and for expenses necessary for preservation of the goods incident to their transportation or reasonably incurred in their sale pursuant to law."  *See* U.C.C. § 7-307(a) (2005); U.C.C. § 7-209(a) ("A *warehouse* has a lien against the bailor on the *goods* covered by a warehouse receipt or storage agreement or on the proceeds thereof in its possession for charges for storage or transportation, including demurrage and terminal charges, insurance, labor, or other charges, present or future, in relation to the goods, and for expenses necessary for preservation of the goods or reasonably incurred in their sale pursuant to law.") (emphasis added).

[9]   By this motion, the Debtors do not concede that any liens (contractual, common law, statutory, or otherwise) described in this motion are valid, and the Debtors expressly reserve the right to contest the extent, validity, and perfection of any and all such liens, and to seek avoidance thereof.

from making such payments will exceed the costs, including the expenses and delay of contesting asserted liens.

26.    As of the Petition Date, the Debtors estimate that approximately $2 million on account of Lien Claims is outstanding, all of which will become due and payable prior to the final hearing.  Accordingly, the Debtors request authority, but not direction, to make payments on account of Lien Claims in the ordinary course of business and consistent with past practice in an aggregate amount not to exceed $2 million, all of which shall be available upon entry of the Interim Order.

**V.    Customary Trade Terms.**

27.    Subject to Court approval, the Debtors intend to pay the Specified Trade Claims only to the extent necessary to preserve the value of their business.  In return for paying such Specified Trade Claims either in full or in part, the Debtors propose that they be authorized, in their sole discretion, to require the Specified Trade Claimants, as applicable, to provide favorable trade terms for the postpetition procurement of goods and services.

28.    Specifically, the Debtors seek authority, but not direction, to condition payment of the Specified Trade Claims upon such claimant's agreement (a) to continue—or recommence—supplying such products and services to the Debtors pursuant to trade terms at least as favorable to the Debtors as those practices and programs (including credit limits, discounts, pricing, timing of payments, availability, and other terms) consistent with the parties' ordinary course practice or as otherwise agreed by the Debtors in their reasonable business judgment (the "Customary Trade Terms"), (b) that they shall not be permitted to cancel, without the Debtors' consent, any contract, agreement, or arrangement pursuant to which they provide such goods and/or services to the Debtors during the course of these chapter 11 cases.  The Debtors reserve the right to require, at their discretion, that the Customary Trade Terms be commemorated in writing, including by email

13

or through a trade agreement, substantially in the form attached to the Interim Order as <u>Exhibit 1</u> (the "<u>Trade Agreement</u>"), as a condition to payment.

29.     In addition, the Debtors request that if any party accepts payment pursuant to the relief requested by this motion and thereafter does not continue or recommence providing goods or services on Customary Trade Terms, then:  (a) any payment on account of a prepetition claim received by such party shall be deemed, in the Debtors' sole discretion, an improper postpetition transfer and, therefore, immediately recoverable in cash upon written request by the Debtors; (b) upon recovery by the Debtors, any prepetition claim of such party shall be reinstated as if the payment had not been made; (c) if there exists an outstanding postpetition balance due from the Debtors to such party, the Debtors may elect to recharacterize and apply any payment made pursuant to the relief requested by this motion to such outstanding postpetition balance, and such supplier or vendor will be required to repay to the Debtors such paid amounts that exceed the postpetition obligations then outstanding, without the right of any setoffs, claims, provisions for payment of any claims, or otherwise; and (d) the Debtors may pursue any other remedy available to them under applicable law or any executed writing with such party.

## Basis for Relief

**I.     The Court Should Grant the Relief Requested in this Motion Pursuant to Sections 105(a), 363(b), and 1107(a) of the Bankruptcy Code.**

30.     Courts have recognized that it is appropriate to authorize the payment of prepetition obligations where necessary to protect and preserve the estate.  *See, e.g.*, *In re Just for Feet, Inc.*, 242 B.R. 821, 825–26 (D. Del. 1999); *see also In re CoServ, L.L.C.*, 273 B.R. 487, 497 (Bankr. N.D. Tex. 2002); *In re Ionosphere Clubs, Inc.*, 98 B.R. 174, 175–76 (Bankr. S.D.N.Y. 1989); *In re James A. Phillips, Inc.*, 29 B.R. 391, 398 (S.D.N.Y. 1983).  Several legal theories rooted in

sections 105(a), 363(b), and 1107(c) of the Bankruptcy Code support the payment of prepetition claims.

31.     Section 363(b) of the Bankruptcy Code permits a bankruptcy court, after notice and a hearing, to authorize a debtor to "use, sell, or lease, other than in the ordinary course of business, property of the estate[.]"  11 U.S.C. § 363(b)(1).  "In determining whether to authorize the use, sale or lease of property of the estate under this section, courts require the debtor to show that a sound business purpose justifies such actions."  *In re Montgomery Ward Holding Corp.*, 242 B.R. 147, 153 (D. Del. 1999) (collecting cases); *see also James A. Phillips, Inc.*, 29 B.R. at 397 (relying on section 363 to allow contractor to pay prepetition claims of suppliers who were potential lien claimants because the payments were necessary for general contractors to release funds owed to debtors); *Ionosphere Clubs*, 98 B.R. at 175 (finding that a sound business justification existed to justify payment of certain prepetition wages); *In re Phx. Steel Corp.*, 82 B.R. 334, 335–36 (Bankr. D. Del. 1987) (requiring the debtor to show a "good business reason" for a proposed transaction under section 363(b)).  In addition, under section 1107(a) of the Bankruptcy Code, a debtor in possession has, among other things, the "implied duty of the debtor in possession to 'protect and preserve the estate, including an operating business' going concern value[.]'"  *In re CEI Roofing, Inc.*, 315 B.R. 50, 59 (Bankr. N.D. Tex. 2004) (quoting *CoServ*, 273 B.R. at 497).

32.     Courts also authorize payment of prepetition claims in appropriate circumstances based on section 105(a) of the Bankruptcy Code, which codifies a bankruptcy court's inherent equitable powers to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title."  11 U.S.C. § 105(a).  Under section 105(a) of the Bankruptcy Code, courts may authorize pre-plan payments of prepetition obligations when essential to the continued

operation of a debtor's business.  *See Just for Feet*, 242 B.R. at 825–26.  Specifically, a court may

use its power under section 105(a) of the Bankruptcy Code to authorize payment of prepetition

obligations pursuant to the "necessity of payment" rule (also referred to as the "doctrine of

necessity").  *See, e.g.*, *Ionosphere Clubs*, 98 B.R. at 176; *In re Lehigh & New England Ry. Co.*,

657 F.2d 570, 581 (3d Cir. 1981) (stating that courts may authorize payment of prepetition claims

when there "is the possibility that the creditor will employ an immediate economic sanction, failing

such payment"); *see also In re Columbia Gas Sys., Inc.*, 171 B.R. 189, 191–92 (Bankr. D. Del.

1994) (noting that, in the Third Circuit, debtors may pay prepetition claims that are essential to the

continued operation of the business).  A bankruptcy court's use of its equitable powers to

"authorize the payment of prepetition debt when such payment is needed to facilitate the

rehabilitation of the debtor is not a novel concept."  *Ionosphere Clubs*, 98 B.R. at 175–76 (citing

*Miltenberger v. Logansport, C. & S.W. Ry. Co.*, 106 U.S. 286 (1882)).  Indeed, at least one court

has recognized that there are instances when a debtor's fiduciary duty can "only be fulfilled by the

preplan satisfaction of a prepetition claim."  *CoServ*, 273 B.R. at 497.

33.    The relief requested herein represents a sound exercise of the Debtors' business

judgment and is appropriate and warranted under the circumstances.  The authority to satisfy the

Specified Trade Claims in the initial days of these cases without disrupting the Debtors' operations

will maintain the integrity of the Debtors' supply chain, facilitate the sale of the Debtors' products,

and allow the Debtors to efficiently administer these chapter 11 cases and effectuate their

chapter 11 objectives.  Failure to pay these Specified Trade Claimants could potentially destroy

value that would otherwise inure to the benefit of the Debtors' estates.  Where, as here, a debtor

has shown that the payment of prepetition claims is critical to maximize the value of their estates,

courts in this district have routinely authorized payments to vendors.  *See, e.g.*, *In re Marelli Auto.*

*Lighting USA LLC*, No. 25-11034 (CTG) (Bankr. D. Del. July 11, 2025) (authorizing the debtors

to pay certain prepetition and postpetition trade claims); *In re At Home Grp. Inc.*, No. 25-11120

(JKS) (Bankr. D. Del. July 14, 2025) (same); *In re Liberated Brands LLC*, No. 25-10168 (JKS)

(Bankr. D. Del. Feb. 28, 2025) (same); *In re JOANN Inc.*, No. 25-10068 (CTG) (Bankr.  D. Del.

Feb. 7, 2025) (same); *In re Am. Tire Distribs., Inc.*, No. 24-12391 (CTG) (Bankr. D. Del. Nov. 18,

2024) (same).[10]

**II.    The Court Should Authorize the Payment of Critical and Foreign Vendor Claims.**

34.    The Debtors require a steady provision of goods and services provided by the

Critical Vendors and Foreign Vendors in order to continue operating their business and maintain

operational stability.  Any disruption to the Debtors' supply chain would frustrate these efforts,

decreasing the value of the Debtors' business and impairing stakeholder value at the outset of these

chapter 11 cases.

35.    Allowing the Debtors to pay the Critical Vendor Claims and Foreign Vendor

Claims pursuant to all or some of the above-referenced Bankruptcy Code provisions is especially

appropriate where, as here, doing so is consistent with the "two recognized policies" of chapter 11

of the Bankruptcy Code:  preserving and maximizing the value of property available to satisfy

creditors.  *See Bank of Am. Nat'l Trust & Savs. Ass'n v. 203 N. LaSalle St. P'Ship*, 526 U.S. 434,

453 (1999).  Indeed, recognizing that payment of prepetition claims of certain essential vendors is,

in fact, both critical to a debtor's ability to preserve value and maximize creditor recovery, courts

in this district regularly grant relief consistent with that which the Debtors are seeking in this

motion.  *See, e.g.*, *In re Marelli Auto. Lighting USA LLC*, No. 25-11034 (CTG) (Bankr. D. Del.

---

[10]    Because of the voluminous nature of the orders cited herein, such orders have not been attached to this Motion.
Copies of these orders are available upon request of the Debtors' proposed counsel.

July 11, 2025) (authorizing the debtors to pay certain vendor claims); *In re At Home Grp. Inc.*, No. 25-11120 (JKS) (Bankr. D. Del. July 14, 2025) (same); *In re Liberated Brands LLC*, No. 25-10168 (JKS) (Bankr. D. Del. Feb. 28, 2025) (same); *In re JOANN Inc.*, No. 25-10068 (CTG) (Bankr. D. Del. Feb. 7, 2025) (same); *In re Am. Tire Distribs., Inc.*, No. 24-12391 (CTG) (Bankr. D. Del. Nov. 18, 2024) (same).

36.    Additionally, if the Debtors do not pay certain of the Foreign Vendor Claims, certain Foreign Vendors may refuse to do business with the Debtors unless and until they receive payment on account of their prepetition claims.  The Foreign Vendors may also take other actions against the Debtors based on the incorrect belief that they are not bound by the automatic stay. As a result, the Debtors would be unable to procure necessary products and services from such vendors.    As mentioned previously, Foreign Vendors have historically accounted for approximately 70% of the Company's merchandise purchases for North America, and any disruption to their supply likely would have significant negative consequences for the Debtors and their estates.  Courts in this jurisdiction routinely grant authorization for debtors to pay claims owing to foreign entities against which the automatic stay cannot be enforced readily in the United States and as to which it would be unduly time-consuming and expensive to seek enforcement of an order of the bankruptcy court in the creditor's home country.  *See, e.g.*, *In re Am. Tire Distribs., Inc.*, No. 24-12391 (CTG) (Bankr. D. Del. Nov. 18, 2024) (authorizing the debtors to pay certain foreign vendor claims); *In re Accuride Corp.*, No. 24-12289 (JKS) (Bankr. D. Del. Nov. 13, 2024) (same); *In re Wheel Pros, LLC*, No. 24-11939 (JTD) (Bankr. D. Del. Oct. 10, 2024) (same); *In re Vyaire Med., Inc.*, No. 24-11217 (BLS) (Bankr. D. Del. July 9, 2024); *In re Express, Inc.*, No. 24-10831 (KBO) (Bankr. D. Del. May 14, 2024) (same).

37.     The Debtors depend on the goods and services provided by the Critical Vendors and Foreign Vendors and will continue to do so postpetition as the Debtors seek to preserve and maximize the value of their estates.  Should any of the Critical Vendors or Foreign Vendors delay or cease providing goods or services to the Debtors, even on a temporary basis, the Debtors' business could face severe consequences.  Aside from payment to the Critical Vendors and Foreign Vendors, no practical alternative exists by which Debtors can protect the value of their estates. Ensuring these Critical Vendors and Foreign Vendors continue to provide critical goods and services is therefore vital to the success of these chapter 11 cases.  Accordingly, for the reasons set forth herein, it is appropriate for the Court to authorize the Debtors to satisfy the Critical Vendor Claims and Foreign Vendor Claims.

### III.    The Court Should Authorize the Payment of 503(b)(9) Claims.

38.     Section 503(b)(9) of the Bankruptcy Code provides administrative priority for "the value of any goods received by the debtor within 20 days before the date of commencement of a case under this title in which the goods have been sold to the debtor in the ordinary course of such debtor's business."  Generally, the 503(b)(9) Claims must be paid in full for the Debtors to confirm a chapter 11 plan.  *See* 11 U.S.C. § 1129(a)(9)(A).  Consequently, paying such claims now only provides such parties with what they would be entitled to receive under a chapter 11 plan.

39.     The Bankruptcy Code does not prohibit a debtor from paying such claims prior to pursuit of confirmation of a plan.  As administrative claims incurred in the ordinary course of business, the Debtors believe they may pay such claims in an exercise of their business judgment pursuant to section 363(c)(1) of the Bankruptcy Code.  *See, e.g.*, October 31, 2006 Hr'g Tr. at 49; *In re Dura Auto. Sys., Inc.*, No. 06-11202 (Bankr. D. Del. Nov. 6, 2006) ("THE COURT:  I think arguably the debtor could pay its 503(b)(9) claimants without court approval.").  Moreover, the timing of such payments lies squarely within the Court's discretion.  *See In re Glob. Home Prods.,*

*LLC*, No. 06-10340, 2006 WL 3791955, at *3 (Bankr. D. Del. Dec. 21, 2006) (agreeing with parties that "the timing of the payment of that administrative expense claim is left to the discretion of the Court"). Absent this relief, the Debtors could be denied access to goods necessary to maximize the value of their estates.

40. For these reasons, courts in this district regularly authorize the payment of claims arising under section 503(b)(9) of the Bankruptcy Code in the ordinary course of business. *See, e.g.*, *In re JOANN Inc.*, No. 25-10068 (CTG) (Bankr. D. Del. Feb. 7, 2025) (authorizing payment to parties with section 503(b)(9) claims); *In re Am. Tire Distribs., Inc.*, No. 24-12391 (CTG) (Bankr. D. Del. Nov. 18, 2024) (same); *In re Accuride Corp.*, No. 24-12289 (JKS) (Bankr. D. Del. Nov. 13, 2024) (same); *In re Wheel Pros, LLC*, No. 24-11939 (JTD) (Bankr. D. Del. Oct. 10, 2024) (same); *In re SunPower Corp.*, No. 24-11649 (CTG) (Bankr. D. Del. Aug. 28, 2024) (same). Accordingly, it is appropriate for the Court to authorize, but not direct, the Debtors to satisfy the 503(b)(9) Claims as set forth herein.

**IV.    The Court Should Authorize the Payment of Lien Claims.**

41. Certain Lien Claimants may be entitled under applicable non-bankruptcy law to assert possessory or other statutory liens on the Debtors' goods or other property in their possession (notwithstanding the automatic stay under section 362 of the Bankruptcy Code) in an attempt to secure payment of their prepetition claim. Under section 362(b)(3) of the Bankruptcy Code, the act of perfecting such liens, to the extent consistent with section 546(b) of the Bankruptcy Code, is expressly excluded from the automatic stay.[11] 11 U.S.C. § 362(b)(3). As a result, the Debtors anticipate that certain Lien Claimants may assert or perfect liens, refuse to turn over goods in their

---

[11]    *See* 11 U.S.C. § 546(b)(1)(A) (providing that a debtor's lien avoidance powers "are subject to any generally applicable law that . . . permits perfection of an interest in property to be effective against an entity that acquires rights in such property before the date of perfection.").

possession, or stop performing their ongoing obligations.  Even absent a valid lien, to the extent that certain Lien Claimants have possession of the Debtors' inventory, mere possession or retention would disrupt the Debtors' operations.

42.     Additionally, pursuant to section 363(e) of the Bankruptcy Code, the Lien Claimants may be entitled to adequate protection of a valid possessory lien to the extent that the Debtors use or sell the estate property against which a Lien Claim is asserted.  Given that the value of such property generally far exceeds the value of the related Lien Claim, creditors will not be harmed—and, in fact, will be benefited—by satisfying certain amounts owed to the Lien Claimants.  Such payments will facilitate the sale of estate property against which liens may otherwise be asserted, helping to preserve value for the benefit of all stakeholders.

43.     Moreover, paying the Lien Claims should not impair unsecured creditor recoveries in these chapter 11 cases.  In instances where the amount owed to a Lien Claimant is less than the value of the goods that could be held to secure a Lien Claimant's claim, such party may be a fully-secured creditor of the Debtors' estates.  In such instances, payment now only provides the Lien Claimants with what they might be entitled to receive under a chapter 11 plan, without any interest costs that might otherwise accrue during these chapter 11 cases.  Conversely, all creditors will benefit from the seamless transition of the Debtors' operations into bankruptcy.

44.     For these reasons, courts in this jurisdiction have authorized the payment of prepetition lien claims under similar circumstances in recent chapter 11 cases.  *See, e.g.*, *In re Marelli Auto. Lighting USA LLC*, No. 25-11034 (CTG) (Bankr. D. Del. July 11, 2025) (authorizing payment of certain lienholder claims); *In re At Home Grp. Inc.*, No. 25-11120 (JKS) (Bankr. D. Del. July 14, 2025) (same); *In re Liberated Brands LLC*, No. 25-10168 (JKS) (Bankr. D. Del. Feb. 28, 2025) (same); *In re JOANN Inc.*, No. 25-10068 (CTG) (Bankr. D. Del.

Feb. 7, 2025) (same); *In re Am. Tire Distribs., Inc.*, No. 24-12391 (CTG) (Bankr. D. Del. Nov. 18, 2024) (same). Accordingly, for the reasons set forth herein, it is appropriate for the Court to authorize the Debtors to satisfy the Lien Claims.

### Processing of Checks and Electronic Fund Transfers Should Be Authorized

45. The Debtors have sufficient funds to pay the amounts described in this motion in the ordinary course of business by virtue of expected cash flows from ongoing business operations and anticipated access to cash collateral. In addition, under the Debtors' existing cash management system, the Debtors can readily identify checks or wire transfer requests as relating to any authorized payment in respect of the relief requested herein. Accordingly, the Debtors do not believe that checks or wire transfer requests, other than those relating to authorized payments, will be inadvertently honored. Therefore, the Debtors request authority to authorize all applicable financial institutions, when requested by the Debtors, to receive, process, honor, and pay any and all checks or wire transfer requests in respect of the relief requested in this motion.

### The Requirements of Bankruptcy Rule 6003 Are Satisfied

46. Bankruptcy Rule 6003 empowers a court to grant certain relief within the first 21 days after the petition date only to the extent that relief is "needed to avoid immediate and irreparable harm." Fed. R. Bankr. P. 6003(a). For the reasons set forth above, the Debtors believe an immediate and orderly transition into chapter 11 is critical to the viability of the Debtors' operations. Failure to receive the requested relief during the first 21 days of these chapter 11 cases would severely disrupt the Debtors' operations at this critical juncture and cause immediate and irreparable harm. The requested relief is necessary for the Debtors to operate their business in a value-maximizing manner for the benefit of all stakeholders. The Debtors have demonstrated that the requested relief is "needed to avoid immediate and irreparable harm," as contemplated by Bankruptcy Rule 6003, and request that the Court grant the requested relief.

**Reservation of Rights**

47.     Notwithstanding anything to the contrary herein, nothing contained in this motion or any actions taken pursuant to any order granting the relief requested in this motion, and no action taken by the Debtors pursuant to the relief requested or granted (including any payment made in accordance with any such order), is intended as or shall be construed or deemed to be: (a) an implication or admission as to the amount, validity, or priority of, or basis for, any claim against the Debtors under the Bankruptcy Code or other applicable nonbankruptcy law; (b) a  waiver of the Debtors' or any other party in interest's rights to dispute any claim on any grounds; (c) a promise or requirement to pay any particular claim; (d) an implication, admission, or finding that any particular claim is an administrative expense claim, other priority claim, or otherwise of a type specified or defined in this motion or any order granting the relief requested by this motion; (e) a request or authorization to assume, adopt, or reject any agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code; (f) an admission as to the validity, priority, enforceability, or perfection of any lien on, security interest in, or other encumbrance on property of the Debtors' estates; (g) a waiver or limitation of any claims, causes of action, or other rights of the Debtors or any other party in interest against any person or entity under the Bankruptcy Code or any other applicable law; (h) an approval, assumption, adoption, or rejection of any agreement, contract, lease, program, or policy under section 365 of the Bankruptcy Code; (i) a concession by the Debtors that any liens (contractual, common law, statutory, or otherwise) that may be satisfied pursuant to the relief requested in this Motion are valid, and the rights of all parties in interest are expressly reserved to contest the extent, validity, or perfection or seek avoidance of all such liens; (j) a waiver of the obligation of any party in interest to file a proof of claim; or (k) otherwise affecting the Debtors' rights under section 365 of the Bankruptcy Code to assume or reject any executory contract or unexpired lease.  If the Court grants the relief sought

herein, any payment made pursuant to the Court's order is not intended and should not be construed as an admission as to the validity, priority, or amount of any particular claim or a waiver of the Debtors' rights to subsequently dispute such claim.

### Waiver of Bankruptcy Rule 6004(a) and 6004(h)

48.     To implement the foregoing successfully, the Debtors seek a waiver of the notice requirements under Bankruptcy Rule 6004(a) and the 14-day stay of an order authorizing the use, sale, or lease of property under Bankruptcy Rule 6004(h).

### Notice

49.     The Debtors will provide notice of this motion to the following parties or their respective counsel, as applicable:  (a) the Office of the United States Trustee for the District of Delaware (the "U.S. Trustee"); (b) the Priority Term Loan Agent; (c) the Existing Term Loan Agent; (d) the Agent under the ABL Facility; (e) the holders of the 30 largest unsecured claims against the Debtors (on a consolidated basis); (f) the United States Attorney for the District of Delaware; (g) the Internal Revenue Service; (h) the state attorneys general for states in which the Debtors conduct business; and (i) any party that is entitled to notice pursuant to Bankruptcy Rule 2002 (collectively, the "Notice Parties").  As this motion is seeking "first day" relief, within two business days of the hearing on this motion, the Debtors will serve copies of this motion and any order entered in respect to this motion as required by Local Rule 9013-1(m).  In light of the nature of the relief requested, no other or further notice need be given.

### No Prior Request

50.     No prior request for the relief sought in this motion has been made to this or any other court.

WHEREFORE, the Debtors request entry of the Interim Order and Final Order, substantially in the forms attached hereto as **Exhibit A** and **Exhibit B**, respectively, (a) granting the relief requested herein, and (b) granting such other relief as the Court deems appropriate under the circumstances.

Dated:  August 6, 2025
Wilmington, Delaware

*/s/ Zachary I. Shapiro*
**RICHARDS, LAYTON & FINGER, P.A.**
Daniel J. DeFranceschi (No. 2732)
Paul N. Heath (No. 3704)
Zachary I. Shapiro (No. 5103)
Clint M. Carlisle (No. 7313)
Colin A. Meehan (No. 7237)
One Rodney Square
920 N. King Street
Wilmington, Delaware 19801
Telephone:     (302) 651-7700
Facsimile:     (302) 651-7701
Email:          defranceschi@rlf.com
                heath@rlf.com
                shapiro@rlf.com
                carlisle@rlf.com
                meehan@rlf.com

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Joshua A. Sussberg, P.C. (*pro hac vice* pending)
Allyson B. Smith (*pro hac vice* pending)
601 Lexington Avenue
New York, New York 10022
Telephone:     (212) 446-4800
Facsimile:     (212) 446-4900
Email:          joshua.sussberg@kirkland.com
                allyson.smith@kirkland.com

- and -

Alexandra F. Schwarzman, P.C. (*pro hac vice* pending)
Robert A. Jacobson (*pro hac vice* pending)
333 West Wolf Point Plaza
Chicago, Illinois 60654
Telephone:     (312) 862-2000
Facsimile:     (312) 862-2200
Email:          alexandra.schwarzman@kirkland.com
                rob.jacobson@kirkland.com

*Proposed Co-Counsel for the Debtors and Debtors in Possession*

*Proposed Co-Counsel for the Debtors and Debtors in Possession*

**<u>Exhibit A</u>**

**Proposed Interim Order**

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| | ) | |
| In re: | ) | Chapter 11 |
| | ) | |
| CLAIRE'S HOLDINGS LLC, *et al.*,[1] | ) | Case No. 25-11454 (___) |
| | ) | |
| Debtors. | ) | (Joint Administration Requested) |
| | ) | |
| | ) | **Re:  Docket No. __** |

**INTERIM ORDER**
**(I) AUTHORIZING THE DEBTORS TO PAY**
**PREPETITION CLAIMS OF CERTAIN (A) CRITICAL**
**VENDORS, (B) FOREIGN VENDORS, (C) 503(b)(9) CLAIMANTS,**
**AND (D) LIEN CLAIMANTS, AND (II) GRANTING RELATED RELIEF**

Upon the motion (the "Motion")[2] of the above-captioned debtors and debtors in possession (collectively, the "Debtors") for entry of an interim order (this "Interim Order"), (a) authorizing, but not directing, the Debtors to pay, in the ordinary course of business, prepetition amounts owing on account of (i) Critical Vendor Claims, (ii) Foreign Vendor Claims, (iii) 503(b)(9) Claims, and (iv) Lien Claims; (b) scheduling a final hearing to consider approval of the Motion on a final basis, and (c) granting related relief; all as more fully set forth in the Motion; and upon the First Day Declaration; and this Court having jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated February 29, 2012; and this Court having found that this is a core

---

[1]  The Debtors in these chapter 11 cases, along with the last four digits of their federal tax identification numbers, to the extent applicable, are:  Claire's Holdings LLC (9619); BMS Distributing Corp. (4117); CBI Distributing Corp. (5574); Claire's (Gibraltar) Holdings Limited (4273); Claire's Boutiques, Inc. (5307); Claire's Canada Corp. (7936); Claire's Intellectual LLC (5274); Claire's Puerto Rico Corp. (6113); Claire's Stores, Inc. (0416); Claire's Swiss Holdings II LLC (7980); Claire's Swiss Holdings LLC (2299); CLSIP Holdings LLC (1950); CLSIP LLC (9769); and CSI Canada LLC (2343).  The Debtors' mailing address is 2400 West Central Road, Hoffman Estates, IL 60192.

[2]  Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Motion.

proceeding pursuant to 28 U.S.C. § 157(b)(2); and this Court having found that venue of this proceeding and the Motion in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and this Court having found that the relief requested in the Motion is in the best interests of the Debtors' estates, their creditors, and other parties in interest; and this Court having found that the Debtors' notice of the Motion and opportunity for a hearing on the Motion were appropriate under the circumstances and no other notice need be provided; and this Court having reviewed the Motion and having heard the statements in support of the relief requested therein, if any, at a hearing before this Court (the "Hearing"); and this Court having determined that the legal and factual bases set forth in the Motion and at the Hearing establish just cause for the relief granted herein; and upon all of the proceedings had before this Court; and after due deliberation and sufficient cause appearing therefor, it is HEREBY ORDERED THAT:

1.      The Motion is granted on an interim basis as set forth herein.

2.      Any objections to the entry of this Interim Order, to the extent not withdrawn or settled, are overruled.

3.      The final hearing (the "Final Hearing") on the Motion shall be held on _____, 2025, at__:__ .m., prevailing Eastern Time.  Any objections or responses to entry of a final order on the Motion shall be filed on or before 4:00 p.m., prevailing Eastern Time, on _____, 2025 and shall be served on: (a) the Debtors, Claire's Holdings LLC, 2400 West Central Road, Hoffman Estates, Illinois 60192, Attn.:  Brendan McKeough, Executive Vice President, Chief Legal Officer, and Secretary (brendan.mckeough@claires.com) and 3 SW 129th Avenue, Pembroke Pines, Florida 33027, Attn: Michele Reilly, Assistant Secretary (michele.reilly@claires.com); (b) proposed co-counsel to the Debtors, (i) Kirkland & Ellis LLP, 601 Lexington Avenue, New York, New York 10022, Attn.:  Joshua A. Sussberg, P.C. (joshua.sussberg@kirkland.com) and

Allyson B. Smith (allyson.smith@kirkland.com) and 333 West Wolf Point Plaza, Chicago, Illinois 60654, Attn.: Alexandra F. Schwarzman, P.C. (alexandra.schwarzman@kirkland.com) and Robert A. Jacobson (rob.jacobson@kirkland.com) and (ii) Richards, Layton & Finger, P.A., One Rodney Square, 920 N. King Street, Wilmington, Delaware 19801, Attn.: Paul N. Heath (heath@rlf.com) and Zachary I. Shapiro (shapiro@rlf.com); (c) the U.S. Trustee, 844 King Street, Suite 2207, Lockbox 35, Wilmington, Delaware 19801, Attn.: Benjamin A. Hackman (Benjamin.A.Hackman@usdoj.gov); (d) counsel to the Prepetition Priority Term Loan Agent and Existing Prepetition Term Loan Agent, Ankura Trust Company, LLC, Cahill Gordon & Reindell LLP, Attn.: Joel Moss (JMoss@cahill.com), Amit Trehan (ATrehan@cahill.com), and Sean Tierney (STierney@cahill.com); (e) counsel to the Prepetition ABL Agent, JPMorgan Chase Bank, N.A., Simpson Thacher & Bartlett LLP, Attn.: Elisha D. Graff (egraff@stblaw.com) and Zachary J. Weiner (zachary.weiner@stblaw.com) and Potter Anderson & Corroon LLP, Attn: L. Katherine Good (kgood@potteranderson.com) and Jeremy Ryan (jryan@potteranderson.com); and (f) any statutory committee appointed in these chapter 11 cases.

4.    The Debtors are authorized, but not directed, to pay all or part of, and discharge, on a case-by-case basis, the Critical Vendor Claims in an aggregate amount not to exceed $8 million on an interim basis, absent further order of the Court.[3]

5.    The Debtors are authorized, but not directed, to pay all or part of, and discharge, on a case-by-case basis, the Foreign Vendor Claims in an aggregate amount not to exceed $7 million on an interim basis, absent further order of the Court.

---

[3]    The amounts in this Interim Order are estimates of what the Debtors believe are necessary to pay each category of Specified Trade Claimant. In an exercise of their business judgement, however, the Debtors may decide that it is prudent to pay more or less to a specific category of Specified Trade Claimants and may allocate the amounts in their discretion; *provided* that the Debtors shall not exceed an aggregate amount of approximately $19 million under this Interim Order.

6.      The Debtors are authorized, but not directed, to pay all or part of, and discharge, on a case-by-case basis, the 503(b)(9) Claims in an aggregate amount not to exceed $2 million on an interim basis, absent further order of the Court.

7.      The Debtors are authorized, but not directed, to pay all or part of, and discharge, on a case-by-case basis, the Lien Claims in an aggregate amount not to exceed $2 million on an interim basis, absent further order of the Court.

8.      As a condition to receiving payment hereunder, the Debtors, in their sole discretion, may require, by written agreement, including by e-mail or through the Trade Agreement, such parties to continue supplying goods or services to the Debtors in accordance with Customary Trade Terms.  The Debtors reserve the right to require more favorable trade terms with any party as a condition to payment of any prepetition claim.

9.      The form of Trade Agreement, substantially in the form attached hereto as **Exhibit 1**, is approved in its entirety, and the Debtors are authorized, but not directed, to negotiate, modify, or amend such Trade Agreement in their reasonable business judgment.

10.     Regardless of whether an agreement has been executed, if any party accepts payment hereunder for a prepetition obligation of the Debtors premised on compliance with the above, and thereafter fails to comply with the Customary Trade Terms, or other such terms as agreed to by the Debtors, then, subject to entry of a final order on the Motion from this Court: (a) any payment on account of a prepetition claim received by such party shall be deemed, in the Debtors' sole discretion, an improper postpetition transfer and, therefore, immediately recoverable in cash upon written request by the Debtors; (b) upon recovery by the Debtors, any prepetition claim of such party shall be reinstated as if the payment had not been made; (c) if there exists an outstanding postpetition balance due from the Debtors to such party, the Debtors may elect to

recharacterize and apply any payment made pursuant to the relief requested by the Motion to such outstanding postpetition balance and such supplier or vendor will be required to repay to the Debtors such paid amounts that exceed the postpetition obligations then outstanding, without the right of any setoffs, claims, provisions for payment of any claims, or otherwise; and (d) the Debtors may pursue any other remedy available to them under applicable law or any executed writing with such party.

11.     Any Specified Trade Claimant that accepts payment from the Debtors on account of all or a portion of such party's claim pursuant to this Interim Order shall be deemed to (a) agree to the terms and provisions of this Interim Order and (b) have waived, to the extent so paid, Specified Trade Claims, of any type, kind, or priority (including any reclamation claim), against the Debtors, their assets, and properties.  The Debtors shall provide a copy of this Interim Order to any Specified Trade Claimant to whom a payment is made pursuant to this Interim Order.

12.     Nothing herein shall impair or prejudice the Debtors' ability to contest, in their sole discretion, the extent, perfection, priority, validity, or amounts of any claims held by any Specified Trade Claimant.  The Debtors do not concede that any claims satisfied pursuant to this Interim Order are valid, and the Debtors expressly reserve all rights to contest the extent, validity, or perfection, or to seek the avoidance of all such liens or the priority, of such claims.

13.     The banks and financial institutions on which checks were drawn or electronic payment requests made in payment of the prepetition obligations approved herein are authorized to receive, process, honor, and pay all such checks and electronic payment requests when presented for payment, and all such banks and financial institutions are authorized to rely on the Debtors' designation of any particular check or electronic payment request as approved by this Interim Order.

14.     Nothing contained in the Motion or this Interim Order, and no action taken pursuant to the relief requested or granted (including any payment made in accordance with this Interim Order), is intended as or shall be construed or deemed to be:  (a) an implication or admission as to the amount, validity, or priority of, or basis for, any claim against the Debtors under the Bankruptcy Code or other applicable nonbankruptcy law; (b) a waiver of the Debtors' or any other party in interest's right to dispute any claim on any grounds; (c) a promise or requirement to pay any particular claim; (d) an implication, admission, or finding that any particular claim is an administrative expense claim, other priority claim, or otherwise of a type specified or defined in the Motion or this Interim Order; (e) a request or authorization to assume, adopt, or reject any agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code; (f) an admission as to the validity, priority, enforceability, or perfection of any lien on, security interest in, or other encumbrance on property of the Debtors' estates; (g) a waiver or limitation of any claims, causes of action, or other rights of the Debtors or any other party in interest against any person or entity under the Bankruptcy Code or any other applicable law; (h) an approval, assumption, adoption, or rejection of any agreement, contract, lease, program, or policy under section 365 of the Bankruptcy Code; (i) a concession by the Debtors that any liens (contractual, common law, statutory, or otherwise) that may be satisfied pursuant to the relief requested in the Motion are valid, and the rights of all parties in interest are expressly reserved to contest the extent, validity, or perfection or seek avoidance of all such liens; (j) a waiver of the obligation of any party in interest to file a proof of claim; or (k) otherwise affecting the Debtors' rights under section 365 of the Bankruptcy Code to assume or reject any executory contract or unexpired lease.  Any payment made pursuant to this Interim Order is not intended and should not be construed as an admission as to the validity,

priority, or amount of any particular claim or a waiver of the Debtors' or any other party in interest's rights to subsequently dispute such claim.

15.     Notwithstanding anything to the contrary in this Interim Order, any payment to be made, obligation incurred or authorization contained herein shall be subject to and in compliance with the "Approved Budget" as defined in the orders of the Court approving the consensual use of cash collateral in these chapter 11 cases (including with respect to timing of payments thereunder).

16.     The Debtors are authorized to issue postpetition checks, or to effect postpetition fund transfer requests, in replacement of any checks or fund transfer requests that are dishonored as a consequence of these chapter 11 cases with respect to prepetition amounts owed in connection with the relief granted herein in accordance with this Interim Order.

17.     Nothing in this Interim Order authorizes the Debtors to accelerate any payments not otherwise due prior to the date of the Final Hearing.

18.     The contents of the Motion satisfy the requirements of Bankruptcy Rule 6003.

19.     Notice of the Motion as provided therein shall be deemed good and sufficient notice of the Motion, and the requirements of Bankruptcy Rule 6004(a) and the Local Rules are satisfied by such notice.

20.     Notwithstanding Bankruptcy Rule 6004(h), the terms and conditions of this Interim Order are immediately effective and enforceable upon its entry.

21.     The Debtors are authorized to take all actions necessary to effectuate the relief granted in this Interim Order in accordance with the Motion.

22.     This Court retains jurisdiction with respect to all matters arising from or related to the implementation, interpretation, and enforcement of this Interim Order

## Exhibit 1

### Trade Agreement

**THIS AGREEMENT IS NOT A SOLICITATION OF ACCEPTANCE OR REJECTION OF A CHAPTER 11 PLAN. ACCEPTANCE OR REJECTION OF A CHAPTER 11 PLAN MAY NOT BE SOLICITED UNTIL A DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT FOR ANY SUCH CHAPTER 11 PLAN. THE INFORMATION IN THIS AGREEMENT IS SUBJECT TO CHANGE. THIS AGREEMENT IS NOT AN OFFER TO SELL ANY SECURITIES AND IS NOT SOLICITING AN OFFER TO BUY ANY SECURITIES.**

## TRADE AGREEMENT

[●][1] (the "Company"), on the one hand, and the supplier identified in the signature block below ("Supplier") (the Company and the Supplier each, a "Party" and collectively, the "Parties") on the other hand, hereby enter into this agreement (as amended, supplemented, restated, or otherwise modified from time to time pursuant to the terms hereof, this "Agreement") dated as of the date in the Supplier's signature block below.

## Recitals

WHEREAS on August 6, 2025 (the "Petition Date"), the Company and certain of its direct and indirect subsidiaries and related entities (collectively, the "Debtors") filed voluntary petitions for relief under chapter 11 of the United States Bankruptcy Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code"), in the United States Bankruptcy Court for the District of Delaware (the "Court").

WHEREAS on [●], 2025, the Court entered the *Interim Order (I) Authorizing Debtors to Pay Prepetition Claims of Certain (A) Critical Vendors, (B) Foreign Vendors, (C) 503(b)(9) Claimants, and (D) Lien Claimants, and (II) Granting Related Relief* (the "Interim Order") [Docket No. [●]] authorizing the Debtors on an interim basis, under certain conditions, to pay the prepetition claims of certain Trade Claimants, including Supplier, subject to the terms and conditions set forth therein.[2]

WHEREAS prior to the Petition Date, Supplier delivered goods to the Company and/or performed services for the Company, and the Company paid the Supplier for such goods and/or services, according to Customary Trade Terms (as defined herein).

WHEREAS the Interim Order permits the Debtors to condition payment on account of certain prepetition claims the Supplier may hold against the Debtors on execution of this Agreement.

WHEREAS the Parties agree to the following terms as a condition of payment of the Agreed Supplier Payment (as defined below) in full and final satisfaction of the Prepetition Supplier Claim (as defined below).

---

[1]    To be vendor-facing Company entity (or entities).

[2]    Capitalized terms used but not defined herein shall have the meanings set forth in the Interim Order.

## Agreement

1.  <u>Recitals</u>.  The foregoing recitals are incorporated herein by reference as if set forth at length herein.

2.  <u>Agreed Supplier Payment</u>.  Supplier represents and agrees that, after due investigation, the sum of all amounts due and owing by the Company to Supplier as of the Petition Date is $[●] (the "<u>Prepetition Supplier Claim</u>").  Within 10 business days of execution of this Agreement, the Debtors shall pay the Supplier $[●] on account of, and in full and final satisfaction of, its Prepetition Supplier Claim (the "<u>Agreed Supplier Payment</u>") (without interest, penalties, or other charges).  For the avoidance of doubt, any amounts that become due and owing by the Debtors to the Supplier for goods or services provided after the Petition Date shall continue to be due and owing and shall be paid in the ordinary course pursuant to the Parties' agreed-upon payment terms.

3.  <u>Agreement to Supply</u>.

a.  Supplier shall supply goods to and/or perform services for the Company, and the Company shall accept and pay for goods and/or services from Supplier, for the Duration of the Debtors' Chapter 11 Cases[3] based on the following terms (collectively, the "<u>Customary Trade Terms</u>"):  those trade terms at least as favorable to the Company as those practices and programs (including credit limits, pricing, cash discounts, promotional credits, timing of payments and payment terms, allowances (as may be incorporated or contemplated by any agreements between the Parties or based on historic practice, as applicable), product mix, availability, and other programs) in place in the 12 months prior to the Petition Date, or are otherwise acceptable to the Debtors in light of customary industry practices.

b.  The Customary Trade Terms may not be modified, adjusted, or reduced in a manner adverse to the Debtors except as agreed to in writing by the Parties (email being sufficient).

c.  The Supplier shall continue to honor any existing allowances, credits, contractual obligations, or balances that were accrued as of the Petition Date and shall apply all such allowances, credits, or balances towards future orders in the ordinary course of business.

d.  The Supplier shall continue all shipments of goods or performance of services in the ordinary course and shall fill orders for goods or services requested by the Debtors in the ordinary course of business pursuant to the Customary Trade Terms.

e.  The Supplier shall not be permitted to cancel any contract, agreement, or arrangement pursuant to which Supplier provides services to the Debtors for the Duration of the Debtors' Chapter 11 Cases.

---

[3]  "Duration of the Debtors' Chapter 11 Cases" means until the earlier of:  (i) the effective date of a chapter 11 plan in the Debtors' chapter 11 cases; (ii) the closing of a sale of all or substantially all of the Debtors' assets pursuant to section 363 of the Bankruptcy Code, resulting in a cessation of the Debtors' business operations; (iii) the liquidation of the Debtors or conversion of the Debtor's chapter 11 cases to cases under chapter 7 of the Bankruptcy Code; or (iv) a termination event occurs that results in the Debtors losing access to cash collateral.

4.     <u>Other Matters</u>.

As long as the Agreed Supplier Payment is made in accordance with this Agreement, the Company does not exercise its rights in Section 5(a), and this Agreement is not terminated by either Party:

a.     Supplier agrees that it shall not require a lump-sum payment upon the effective date of a plan in the Company's chapter 11 cases on account of any outstanding administrative claims Supplier may assert arising from the delivery of postpetition goods or services, to the extent that payment of such claims is not yet due.  Supplier agrees that such claims will be paid in the ordinary course of business after confirmation of a plan pursuant to the Customary Trade Terms then in effect.

b.     Supplier will not separately seek payment from the Company on account of any prepetition claim (including, without limitation, any reclamation claim or any claim pursuant to section 503(b)(9) of the Bankruptcy Code) outside the terms of this Agreement or a plan confirmed in the Debtors' chapter 11 cases; *provided* that nothing in this Agreement shall prohibit Supplier from (a) filing a proof of claim with the Court or the Court-appointed claims agent or (b) filing with the Court, or otherwise seeking, a request for payment of an administrative expense claim.

c.     During the Duration of the Debtors' Chapter 11 Cases, Supplier will not file or otherwise assert against the Company, its assets, or any other person or entity or any of their respective assets or property (real or personal) any lien, regardless of the statute or other legal authority upon which the lien is asserted, related in any way to any remaining prepetition amounts allegedly owed to Supplier by the Company arising solely from prepetition agreements or transactions.  If Supplier has taken steps to file or assert such a lien prior to entering into this Agreement, upon Supplier's receipt of the Agreed Supplier Payment, Supplier will promptly take all necessary actions to remove such lien.

5.     <u>Breach</u>.

a.     In the event that the Company pays Supplier its Agreed Supplier Payment and Supplier is determined by the Court to have breached this Agreement (a "<u>Supplier Breach</u>"), upon written notice to Supplier describing the nature of the Supplier's defaults hereunder (which the Supplier shall have the right to dispute in accordance with Section 7(d)) and the Supplier's failure to cure such default within five (5) business days of such notice, Supplier shall promptly pay to the Company immediately available funds in an amount equal to, at the election of the Company, the Agreed Supplier Payment or any portion of the Agreed Supplier Payment which cannot be recovered by the Company from the postpetition receivables then owing to Supplier from the Company.

b.     In the event that the Company recovers the Agreed Supplier Payment pursuant to Section 5(a) hereof or otherwise, the full Prepetition Supplier Claim shall be reinstated as if the Agreed Supplier Payment had not been made, and Supplier shall be authorized to file a proof of claim on account of the Agreed Supplier Claim by the later of (i) any bar date set in these chapter 11 cases or (ii) 30 calendar days following the return of the Agreed Supplier Payment.

c.    Supplier acknowledges and agrees that irreparable damage would occur in the event of a Supplier Breach and remedies at law would not be adequate to compensate the Company.  Accordingly, Supplier agrees that the Company shall have the right, in addition to any other rights and remedies existing in its favor, to seek an injunction or injunctions to prevent breaches of the provisions of this Agreement and to enforce its rights and obligations hereunder not only by an action or actions for damages but also by an action or actions for specific performance, injunctive relief and/or other equitable relief.  The right to equitable relief, including specific performance or injunctive relief, shall exist notwithstanding, and shall not be limited by, any other provision of this Agreement.  Supplier hereby waives any defense that a remedy at law is adequate and any requirement to post bond or other security in connection with actions instituted for injunctive relief, specific performance, or other equitable remedies.

d.    In the event the Company fails to pay for goods or services produced, shipped, or delivered postpetition in accordance with this Agreement, and the Company fails to cure such default within five business days (or such longer period if the purported breach cannot be cured within five days but the Company is diligently pursuing cure) after receiving written notice of such default (which the Company shall have the right to dispute in accordance with Section 7(d)), the Supplier (a) may terminate this Agreement and shall have no obligation to continue to supply goods or provide services to the Company and (b) is authorized to file a proof of claim in the amount of the Prepetition Supplier Claim less any amount of the Agreed Supplier Payment paid by the Company to the Supplier by the later of (i) any bar date set in these chapter 11 cases or (ii) 30 calendar days following expiration of the cure period contemplated in this paragraph.  The Parties reserve all rights to dispute the relative priority of such claim.

6.    Notice.

If to Supplier, then to the person and address identified in the signature block hereto.

If to Company:

Claire's Holdings LLC
2400 West Central Road
Hoffman Estates, Illinois 60192
United States

Attention:  Brendan McKeough, Executive Vice President, Chief Legal Officer, and Secretary

with a copy (which shall not constitute notice) to:

Kirkland & Ellis LLP
601 Lexington Avenue, New York, New York 10022
Attn:    Allyson B. Smith
Email:  allyson.smith@kirkland.com
Facsimile:  (212) 446-4900

and

Kirkland & Ellis LLP
333 West Wolf Point Plaza, Chicago, Illinois 60654
Attn:   Alexandra F. Schwarzman, P.C. and Robert A. Jacobson
Email: alexandra.schwarzman@kirkland.com
Email: rob.jacobson@kirkland.com
Facsimile:  (312) 862-2200

and

Richards, Layton & Finger, P.A.
One Rodney Square, 920 N. King Street, Wilmington, Delaware 19801
Attn:   Paul N. Heath and Zachary I. Shapiro
Email: heath@rlf.com
         shapiro@rlf.com
Facsimile:  (302) 651-7701

7.     Representations and Acknowledgements.   The Parties agree, acknowledge, and represent that:

a.   the Parties have reviewed the terms and provisions of the Interim Order and this Agreement and consent to be bound by such terms and that this Agreement is expressly subject to the procedures approved pursuant to the Interim Order;

b.   any payments made on account of the Prepetition Supplier Claim, including the Agreed Supplier Payment, shall be subject to the terms and conditions of the Interim Order;

c.   if Supplier refuses to supply goods or services to the Company as provided herein or otherwise fails to perform any of its obligations hereunder, the Company may exercise all rights and remedies available under this Agreement, the Interim Order, the Bankruptcy Code, or applicable law; and

d.   in the event of disagreement between the Parties regarding whether a breach has occurred, either Party may apply to the Court for a determination of their relative rights, in which event no action may be taken by either Party, including, but not limited to, the discontinuing of shipment of goods from Supplier to the Company, or the Company's payment to the Supplier for such goods and services, until a ruling of the Court is obtained.

8.     Confidentiality.   In addition to any other obligations of confidentiality between Supplier and Company, Supplier agrees to hold in confidence and not disclose to any party: (a) this Agreement; (b) any and all payments made by the Company pursuant to this Agreement; (c) the terms of payment set forth herein; and (d) the Customary Trade Terms (collectively, the "Confidential Information"); *provided* that if any party seeks to compel Supplier's disclosure of any or all of the Confidential Information, through judicial action or otherwise, or Supplier intends to disclose any or all of the Confidential Information, Supplier shall immediately provide the Company with written notice so that the Company may seek an injunction, protective order or any other available remedy to prevent such disclosure; *provided*, *further*, that if such remedy is not obtained, Supplier shall furnish only such information as Supplier is legally required to provide.

9.      <u>Miscellaneous</u>.

a.      The Parties hereby represent and warrant that:  (a) they have full authority to execute this Agreement on behalf of the respective Parties; (b) the respective Parties have full knowledge of, and have consented to, this Agreement; and (c) they are fully authorized to bind that Party to all of the terms and conditions of this Agreement.

b.      This Agreement sets forth the entire understanding of the Parties regarding the subject matter hereof and supersedes all prior oral or written agreements between them.  This Agreement may not be changed, modified, amended, or supplemented, except in a writing signed by both Parties.

c.      Signatures by facsimile or electronic signatures shall count as original signatures for all purposes.

d.      This Agreement may be executed in counterparts, each of which shall be deemed to be an original, but all of which shall constitute one and the same agreement.

e.      The Parties hereby submit to the exclusive jurisdiction of the Court to resolve any dispute with respect to or arising from this Agreement.  The terms of this Agreement shall be governed by the Bankruptcy Code and the laws of the State of Delaware, each as may be applicable.

f.      This Agreement shall be deemed to have been drafted jointly by the Parties, and any uncertainty or omission shall not be construed as an attribution of drafting by any Party.

[*Signature Page Follows*]

AGREED AND ACCEPTED AS OF THE DATE SET FORTH BELOW:

**COMPANY**                                **[SUPPLIER]**

_____    _____
By:                                        By:
Title:                                     Title:
                                           Address for Notice:

                                           Date:

**<u>Exhibit B</u>**

**Proposed Final Order**

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| CLAIRE'S HOLDINGS LLC, *et al.*,[1] | ) | Case No. 25-11454 (___) |
| | ) | |
| Debtors. | ) | (Joint Administration Requested) |
| | ) | |
| | ) | **Re:  Docket No. __** |

**FINAL ORDER**
**(I) AUTHORIZING THE DEBTORS TO PAY**
**PREPETITION CLAIMS OF CERTAIN (A) CRITICAL**
**VENDORS, (B) FOREIGN VENDORS, (C) 503(b)(9) CLAIMANTS,**
**AND (D) LIEN CLAIMANTS, AND (II) GRANTING RELATED RELIEF**

Upon the motion (the "<u>Motion</u>")[2] of the above-captioned debtors and debtors in possession

(collectively, the "<u>Debtors</u>") for entry of a final order (this "<u>Final Order</u>"),  (a) authorizing, but not

directing, the Debtors to pay, in the ordinary course of business, prepetition amounts owing on

account of (i) Critical Vendor Claims, (ii) Foreign Vendor Claims, (iii) 503(b)(9) Claims, and

(iv) Lien Claims; and (b) granting related relief; all as more fully set forth in the Motion; and upon

the First Day Declaration; and this Court having jurisdiction over this matter pursuant to 28 U.S.C.

§§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District

Court for the District of Delaware, dated February 29, 2012; and this Court having found that this

is a core proceeding pursuant to 28 U.S.C. § 157(b)(2); and this Court having found that this Court

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of their federal tax identification numbers, to the extent applicable, are:  Claire's Holdings LLC (9619); BMS Distributing Corp. (4117); CBI Distributing Corp. (5574); Claire's (Gibraltar) Holdings Limited (4273); Claire's Boutiques, Inc. (5307); Claire's Canada Corp. (7936); Claire's Intellectual LLC (5274); Claire's Puerto Rico Corp. (6113); Claire's Stores, Inc. (0416); Claire's Swiss Holdings II LLC (7980); Claire's Swiss Holdings LLC (2299); CLSIP Holdings LLC (1950); CLSIP LLC (9769); and CSI Canada LLC (2343).  The Debtors' mailing address is 2400 West Central Road, Hoffman Estates, IL 60192.

[2]    Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Motion.

may enter a final order consistent with Article III of the United States Constitution; and this Court having found that venue of this proceeding and the Motion in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and this Court having found that the relief requested in the Motion is in the best interests of the Debtors' estates, their creditors, and other parties in interest; and this Court having found that the Debtors' notice of the Motion and opportunity for a hearing on the Motion were appropriate and no other notice need be provided; and this Court having reviewed the Motion and having heard the statements in support of the relief requested therein, if any, at a hearing before this Court (the "Hearing"); and this Court having determined that the legal and factual bases set forth in the Motion and at the Hearing establish just cause for the relief granted herein; and upon all of the proceedings had before this Court; and after due deliberation and sufficient cause appearing therefor, it is HEREBY ORDERED THAT:

1.      The Motion is granted on a final basis as set forth herein.

2.      Any objections to the entry of this Final Order, to the extent not withdrawn or settled, are overruled.

3.      The Debtors are authorized, but not directed, to pay all or part of, and discharge, on a case-by-case basis, the Specified Trade Claims on a final basis.

4.      As a condition to receiving payment hereunder, the Debtors at their discretion may require, by written agreement, including by e-mail or through the Trade Agreement, such parties to continue supplying goods or services to the Debtors in accordance with Customary Trade Terms. The Debtors reserve the right to require more favorable trade terms with any party as a condition to payment of any prepetition claim.

5.      The form of Trade Agreement, substantially in the form attached hereto as **Exhibit 1**, is approved in its entirety, and the Debtors are authorized, but not directed, to negotiate, modify, or amend such Trade Agreement in their reasonable business judgment.

6.      Regardless of whether an agreement has been executed, if any party accepts payment hereunder for a prepetition obligation of the Debtors premised on compliance with the above, and thereafter fails to comply with the Customary Trade Terms, or other such terms as agreed to by the Debtors, then:  (a) any payment on account of a prepetition claim received by such party shall be deemed, in the Debtors' sole discretion, an improper postpetition transfer and, therefore, immediately recoverable in cash upon written request by the Debtors; (b) upon recovery by the Debtors, any prepetition claim of such party shall be reinstated as if the payment had not been made; (c) if there exists an outstanding postpetition balance due from the Debtors to such party, the Debtors may elect to recharacterize and apply any payment made pursuant to the relief requested by the Motion to such outstanding postpetition balance and such supplier or vendor will be required to repay to the Debtors such paid amounts that exceed the postpetition obligations then outstanding, without the right of any setoffs, claims, provisions for payment of any claims, or otherwise; and (d) the Debtors may pursue any other remedy available to them under applicable law or any executed writing with such party.

7.      Any Specified Trade Claimant that accepts payment from the Debtors on account of all or a portion of such party's claim pursuant to this Final Order shall be deemed to (a) agree to the terms and provisions of this Final Order and (b) have waived, to the extent so paid, any and all prepetition claims, of any type, kind, or priority (including any reclamation claim), against the Debtors, their assets, and properties.  The Debtors shall provide a copy of this Final Order to any Specified Trade Claimant to whom a payment is made pursuant to this Final Order.

8. Nothing herein shall impair or prejudice the Debtors' ability to contest, in their sole discretion, the extent, perfection, priority, validity, or amounts of any claims held by any Specified Trade Claimant. The Debtors do not concede that any claims satisfied pursuant to this Final Order are valid, and the Debtors expressly reserve all rights to contest the extent, validity, or perfection, or to seek the avoidance of all such liens or the priority, of such claims.

9. The banks and financial institutions on which checks were drawn or electronic payment requests made in payment of the prepetition obligations approved herein are authorized to receive, process, honor, and pay all such checks and electronic payment requests when presented for payment, and all such banks and financial institutions are authorized to rely on the Debtors' designation of any particular check or electronic payment request as approved by this Final Order.

10. Nothing contained in the Motion or this Final Order, and no action taken pursuant to the relief requested or granted (including any payment made in accordance with this Final Order), is intended as or shall be construed or deemed to be: (a) an implication or admission as to the amount, validity, or priority of, or basis for, any claim against the Debtors under the Bankruptcy Code or other applicable nonbankruptcy law; (b) a waiver of the Debtors' or any other party in interest's right to dispute any claim on any grounds; (c) a promise or requirement to pay any particular claim; (d) an implication, admission, or finding that any particular claim is an administrative expense claim, other priority claim, or otherwise of a type specified or defined in the Motion or this Final Order; (e) a request or authorization to assume, adopt, or reject any agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code; (f) an admission as to the validity, priority, enforceability, or perfection of any lien on, security interest in, or other encumbrance on property of the Debtors' estates; (g) a waiver or limitation of any claims, causes of action, or other rights of the Debtors or any other party in interest against any person or entity

under the Bankruptcy Code or any other applicable law; (h) an approval, assumption, adoption, or rejection of any agreement, contract, lease, program, or policy under section 365 of the Bankruptcy Code; (i) a concession by the Debtors that any liens (contractual, common law, statutory, or otherwise) that may be satisfied pursuant to the relief requested in the Motion are valid, and the rights of all parties in interest are expressly reserved to contest the extent, validity, or perfection or seek avoidance of all such liens; (j) a waiver of the obligation of any party in interest to file a proof of claim; or (k) otherwise affecting the Debtors' rights under section 365 of the Bankruptcy Code to assume or reject any executory contract or unexpired lease.  Any payment made pursuant to this Final Order is not intended and should not be construed as an admission as to the validity, priority, or amount of any particular claim or a waiver of the Debtors' or any other party in interest's rights to subsequently dispute such claim.

11.     Notwithstanding anything to the contrary in this Final Order, any payment to be made, obligation incurred or authorization contained herein shall be subject to and in compliance with the "Approved Budget" as defined in the orders of the Court approving the consensual use of cash collateral in these chapter 11 cases (including with respect to timing of payments thereunder).

12.     The Debtors are authorized to issue postpetition checks, or to effect postpetition fund transfer requests, in replacement of any checks or fund transfer requests that are dishonored as a consequence of these chapter 11 cases with respect to prepetition amounts owed in connection with the relief granted herein in accordance with this Final Order.

13.     Nothing in this Final Order authorizes the Debtors to accelerate any payments not otherwise due.

14.     Notice of the Motion as provided therein shall be deemed good and sufficient notice of the Motion, and the requirements of Bankruptcy Rule 6004(a) and the Local Rules are satisfied by such notice.

15.     Notwithstanding Bankruptcy Rule 6004(h), the terms and conditions of this Final Order are immediately effective and enforceable upon its entry.

16.     The Debtors are authorized to take all actions necessary to effectuate the relief granted in this Final Order in accordance with the Motion.

17.     This Court retains jurisdiction with respect to all matters arising from or related to the implementation, interpretation, and enforcement of this Final Order.

## <u>Exhibit 1</u>

**Trade Agreement**

**THIS AGREEMENT IS NOT A SOLICITATION OF ACCEPTANCE OR REJECTION OF A CHAPTER 11 PLAN. ACCEPTANCE OR REJECTION OF A CHAPTER 11 PLAN MAY NOT BE SOLICITED UNTIL A DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT FOR ANY SUCH CHAPTER 11 PLAN. THE INFORMATION IN THIS AGREEMENT IS SUBJECT TO CHANGE. THIS AGREEMENT IS NOT AN OFFER TO SELL ANY SECURITIES AND IS NOT SOLICITING AN OFFER TO BUY ANY SECURITIES.**

## TRADE AGREEMENT

[●][1] (the "<u>Company</u>"), on the one hand, and the supplier identified in the signature block below ("<u>Supplier</u>") (the Company and the Supplier each, a "<u>Party</u>" and collectively, the "<u>Parties</u>") on the other hand, hereby enter into this agreement (as amended, supplemented, restated, or otherwise modified from time to time pursuant to the terms hereof, this "<u>Agreement</u>") dated as of the date in the Supplier's signature block below.

### Recitals

WHEREAS on August 6, 2025 (the "<u>Petition Date</u>"), the Company and certain of its direct and indirect subsidiaries and related entities (collectively, the "<u>Debtors</u>") filed voluntary petitions for relief under chapter 11 of the United States Bankruptcy Code, 11 U.S.C. §§ 101-1532 (the "<u>Bankruptcy Code</u>"), in the United States Bankruptcy Court for the District of Delaware (the "<u>Court</u>").

WHEREAS on [●], 2025, the Court entered the *Final Order (I) Authorizing Debtors to Pay Prepetition Claims of Certain (A) Critical Vendors, (B) Foreign Vendors, (C) 503(b)(9) Claimants, and (D) Lien Claimants, and (II) Granting Related Relief* (the "<u>Final Order</u>") [Docket No. [●]] authorizing the Debtors on a final basis, under certain conditions, to pay the prepetition claims of certain Trade Claimants, including Supplier, subject to the terms and conditions set forth therein.[2]

WHEREAS prior to the Petition Date, Supplier delivered goods to the Company and/or performed services for the Company, and the Company paid the Supplier for such goods and/or services, according to Customary Trade Terms (as defined herein).

WHEREAS the Final Order permits the Debtors to condition payment on account of certain prepetition claims the Supplier may hold against the Debtors on execution of this Agreement.

WHEREAS the Parties agree to the following terms as a condition of payment of the Agreed Supplier Payment (as defined below) in full and final satisfaction of the Prepetition Supplier Claim (as defined below).

---

[1]   To be vendor-facing Company entity (or entities).

[2]   Capitalized terms used but not defined herein shall have the meanings set forth in the Final Order.

## Agreement

1.    <u>Recitals</u>.  The foregoing recitals are incorporated herein by reference as if set forth at length herein.

2.    <u>Agreed Supplier Payment</u>.    Supplier represents and agrees that, after due investigation, the sum of all amounts due and owing by the Company to Supplier as of the Petition Date is $[●] (the "<u>Prepetition Supplier Claim</u>").  Within 10 business days of execution of this Agreement, the Debtors shall pay the Supplier $[●] on account of, and in full and final satisfaction of, its Prepetition Supplier Claim (the "<u>Agreed Supplier Payment</u>") (without interest, penalties, or other charges).  For the avoidance of doubt, any amounts that become due and owing by the Debtors to the Supplier for goods or services provided after the Petition Date shall continue to be due and owing and shall be paid in the ordinary course pursuant to the Parties' agreed-upon payment terms.

3.    <u>Agreement to Supply</u>.

a.    Supplier shall supply goods to and/or perform services for the Company, and the Company shall accept and pay for goods and/or services from Supplier, for the Duration of the Debtors' Chapter 11 Cases[3] based on the following terms (collectively, the "<u>Customary Trade Terms</u>"):  those trade terms at least as favorable to the Company as those practices and programs (including credit limits, pricing, cash discounts, promotional credits, timing of payments and payment terms, allowances (as may be incorporated or contemplated by any agreements between the Parties or based on historic practice, as applicable), product mix, availability, and other programs) in place in the 12 months prior to the Petition Date, or are otherwise acceptable to the Debtors in light of customary industry practices.

b.    The Customary Trade Terms may not be modified, adjusted, or reduced in a manner adverse to the Debtors except as agreed to in writing by the Parties (email being sufficient).

c.    The Supplier shall continue to honor any existing allowances, credits, contractual obligations, or balances that were accrued as of the Petition Date and shall apply all such allowances, credits, or balances towards future orders in the ordinary course of business.

d.    The Supplier shall continue all shipments of goods or performance of services in the ordinary course and shall fill orders for goods or services requested by the Debtors in the ordinary course of business pursuant to the Customary Trade Terms.

e.    The Supplier shall not be permitted to cancel any contract, agreement, or arrangement pursuant to which Supplier provides services to the Debtors for the Duration of the Debtors' Chapter 11 Cases.

---

[3]    "Duration of the Debtors' Chapter 11 Cases" means until the earlier of:  (i) the effective date of a chapter 11 plan in the Debtors' chapter 11 cases; (ii) the closing of a sale of all or substantially all of the Debtors' assets pursuant to section 363 of the Bankruptcy Code, resulting in a cessation of the Debtors' business operations; (iii) the liquidation of the Debtors or conversion of the Debtor's chapter 11 cases to cases under chapter 7 of the Bankruptcy Code; or (iv) a termination event occurs that results in the Debtors losing access to cash collateral.

4.      <u>Other Matters</u>.

As long as the Agreed Supplier Payment is made in accordance with this Agreement, the Company does not exercise its rights in Section 5(a), and this Agreement is not terminated by either Party:

a.      Supplier agrees that it shall not require a lump-sum payment upon the effective date of a plan in the Company's chapter 11 cases on account of any outstanding administrative claims Supplier may assert arising from the delivery of postpetition goods or services, to the extent that payment of such claims is not yet due.  Supplier agrees that such claims will be paid in the ordinary course of business after confirmation of a plan pursuant to the Customary Trade Terms then in effect.

b.      Supplier will not separately seek payment from the Company on account of any prepetition claim (including, without limitation, any reclamation claim or any claim pursuant to section 503(b)(9) of the Bankruptcy Code) outside the terms of this Agreement or a plan confirmed in the Debtors' chapter 11 cases; *provided* that nothing in this Agreement shall prohibit Supplier from (a) filing a proof of claim with the Court or the Court-appointed claims agent or (b) filing with the Court, or otherwise seeking, a request for payment of an administrative expense claim.

c.      During the Duration of the Debtors' Chapter 11 Cases, Supplier will not file or otherwise assert against the Company, its assets, or any other person or entity or any of their respective assets or property (real or personal) any lien, regardless of the statute or other legal authority upon which the lien is asserted, related in any way to any remaining prepetition amounts allegedly owed to Supplier by the Company arising solely from prepetition agreements or transactions.  If Supplier has taken steps to file or assert such a lien prior to entering into this Agreement, upon Supplier's receipt of the Agreed Supplier Payment, Supplier will promptly take all necessary actions to remove such lien.

5.      <u>Breach</u>.

a.      In the event that the Company pays Supplier its Agreed Supplier Payment and Supplier is determined by the Court to have breached this Agreement (a "<u>Supplier Breach</u>"), upon written notice to Supplier describing the nature of the Supplier's defaults hereunder (which the Supplier shall have the right to dispute in accordance with Section 7(d)) and the Supplier's failure to cure such default within five (5) business days of such notice, Supplier shall promptly pay to the Company immediately available funds in an amount equal to, at the election of the Company, the Agreed Supplier Payment or any portion of the Agreed Supplier Payment which cannot be recovered by the Company from the postpetition receivables then owing to Supplier from the Company.

b.      In the event that the Company recovers the Agreed Supplier Payment pursuant to Section 5(a) hereof or otherwise, the full Prepetition Supplier Claim shall be reinstated as if the Agreed Supplier Payment had not been made, and Supplier shall be authorized to file a proof of claim on account of the Agreed Supplier Claim by the later of (i) any bar date set in these chapter 11 cases or (ii) 30 calendar days following the return of the Agreed Supplier Payment.

c.    Supplier acknowledges and agrees that irreparable damage would occur in the event of a Supplier Breach and remedies at law would not be adequate to compensate the Company.  Accordingly, Supplier agrees that the Company shall have the right, in addition to any other rights and remedies existing in its favor, to seek an injunction or injunctions to prevent breaches of the provisions of this Agreement and to enforce its rights and obligations hereunder not only by an action or actions for damages but also by an action or actions for specific performance, injunctive relief and/or other equitable relief.  The right to equitable relief, including specific performance or injunctive relief, shall exist notwithstanding, and shall not be limited by, any other provision of this Agreement.  Supplier hereby waives any defense that a remedy at law is adequate and any requirement to post bond or other security in connection with actions instituted for injunctive relief, specific performance, or other equitable remedies.

d.    In the event the Company fails to pay for goods or services produced, shipped, or delivered postpetition in accordance with this Agreement, and the Company fails to cure such default within five business days (or such longer period if the purported breach cannot be cured within five days but the Company is diligently pursuing cure) after receiving written notice of such default (which the Company shall have the right to dispute in accordance with Section 7(d)), the Supplier (a) may terminate this Agreement and shall have no obligation to continue to supply goods or provide services to the Company and (b) is authorized to file a proof of claim in the amount of the Prepetition Supplier Claim less any amount of the Agreed Supplier Payment paid by the Company to the Supplier by the later of (i) any bar date set in these chapter 11 cases or (ii) 30 calendar days following expiration of the cure period contemplated in this paragraph. The Parties reserve all rights to dispute the relative priority of such claim.

6.    Notice.

If to Supplier, then to the person and address identified in the signature block hereto.

If to Company:

Claire's Holdings LLC
2400 West Central Road
Hoffman Estates, Illinois 60192
United States

Attention:  Brendan McKeough, Executive Vice President, Chief Legal Officer, and Secretary

with a copy (which shall not constitute notice) to:

Kirkland & Ellis LLP
601 Lexington Avenue, New York, New York 10022
Attn:   Allyson B. Smith
Email: allyson.smith@kirkland.com
Facsimile:  (212) 446-4900

and

Kirkland & Ellis LLP
333 West Wolf Point Plaza, Chicago, Illinois 60654
Attn:   Alexandra F. Schwarzman, P.C. and Robert A. Jacobson
Email: alexandra.schwarzman@kirkland.com
Email: rob.jacobson@kirkland.com
Facsimile:  (312) 862-2200

and

Richards, Layton & Finger, P.A.
One Rodney Square, 920 N. King Street, Wilmington, Delaware 19801
Attn:   Paul N. Heath and Zachary I. Shapiro
Email: heath@rlf.com
Email: shapiro@rlf.com
Facsimile:  (302) 651-7701

7.    <u>Representations and Acknowledgements</u>.   The Parties agree, acknowledge, and represent that:

a.    the Parties have reviewed the terms and provisions of the Final Order and this Agreement and consent to be bound by such terms and that this Agreement is expressly subject to the procedures approved pursuant to the Final Order;

b.    any payments made on account of the Prepetition Supplier Claim, including the Agreed Supplier Payment, shall be subject to the terms and conditions of the Final Order;

c.    if Supplier refuses to supply goods or services to the Company as provided herein or otherwise fails to perform any of its obligations hereunder, the Company may exercise all rights and remedies available under this Agreement, the Final Order, the Bankruptcy Code, or applicable law; and

d.    in the event of disagreement between the Parties regarding whether a breach has occurred, either Party may apply to the Court for a determination of their relative rights, in which event no action may be taken by either Party, including, but not limited to, the discontinuing of shipment of goods from Supplier to the Company, or the Company's payment to the Supplier for such goods and services, until a ruling of the Court is obtained.

8.    <u>Confidentiality</u>.   In addition to any other obligations of confidentiality between Supplier and Company, Supplier agrees to hold in confidence and not disclose to any party: (a) this Agreement; (b) any and all payments made by the Company pursuant to this Agreement; (c) the terms of payment set forth herein; and (d) the Customary Trade Terms (collectively, the "<u>Confidential Information</u>"); *provided* that if any party seeks to compel Supplier's disclosure of any or all of the Confidential Information, through judicial action or otherwise, or Supplier intends to disclose any or all of the Confidential Information, Supplier shall immediately provide the Company with written notice so that the Company may seek an injunction, protective order or

any other available remedy to prevent such disclosure; *provided*, *further*, that if such remedy is not obtained, Supplier shall furnish only such information as Supplier is legally required to provide.

      9.    <u>Miscellaneous</u>.

      a.    The Parties hereby represent and warrant that:  (a) they have full authority to execute this Agreement on behalf of the respective Parties; (b) the respective Parties have full knowledge of, and have consented to, this Agreement; and (c) they are fully authorized to bind that Party to all of the terms and conditions of this Agreement.

      b.    This Agreement sets forth the entire understanding of the Parties regarding the subject matter hereof and supersedes all prior oral or written agreements between them.  This Agreement may not be changed, modified, amended, or supplemented, except in a writing signed by both Parties.

      c.    Signatures by facsimile or electronic signatures shall count as original signatures for all purposes.

      d.    This Agreement may be executed in counterparts, each of which shall be deemed to be an original, but all of which shall constitute one and the same agreement.

      e.    The Parties hereby submit to the exclusive jurisdiction of the Court to resolve any dispute with respect to or arising from this Agreement.  The terms of this Agreement shall be governed by the Bankruptcy Code and the laws of the State of Delaware, each as may be applicable.

      f.    This Agreement shall be deemed to have been drafted jointly by the Parties, and any uncertainty or omission shall not be construed as an attribution of drafting by any Party.

*[Signature Page Follows]*

6

AGREED AND ACCEPTED AS OF THE DATE SET FORTH BELOW:

**COMPANY**                                         **[SUPPLIER]**

_____          _____
By:                                                          By:
Title:                                                       Title:
                                                             Address for Notice:

                                                             Date:

## File a First Day Motion:

[25-11454 Claire's Holdings LLC](#)

Type: bk                    Chapter: 11 v                    Office: 1 (Delaware)

Assets: y                    Case Flag: VerifDue, PlnDue,
                            DsclsDue

### U.S. Bankruptcy Court

### District of Delaware

Notice of Electronic Filing

The following transaction was received from Zachary I Shapiro entered on 8/6/2025 at 3:23 AM EDT and filed on 8/6/2025

**Case Name:**          Claire's Holdings LLC

**Case Number:**        [25-11454](#)

**Document Number:** [8](#)

**Docket Text:**

Motion Regarding Chapter 11 First Day Motions *(Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing the Debtors to Pay Prepetition Claims of Certain (A) Critical Vendors, (B) Foreign Vendors, (C) 503(b)(9) Claimants, and (D) Lien Claimants, and (II) Granting Related Relief)* Filed By Claire's Holdings LLC (Shapiro, Zachary)

The following document(s) are associated with this transaction:

**Document description:**Main Document

**Original filename:**Claire's - Vendors Motion.pdf

**Electronic document Stamp:**

[STAMP bkecfStamp_ID=983460418 [Date=8/6/2025] [FileNumber=19359066-0]
[6abe38a6c7f64087c8ad43ef75eb66fe833684326eac48dc9b8a1b5bd177b9705a33
ce1ac7552ccfef12e0ab19a0d28d3ed108b438cb3ca0737ac48d6da487f2]]

**25-11454 Notice will be electronically mailed to:**

Zachary I Shapiro on behalf of Debtor Claire's Holdings LLC
shapiro@rlf.com, rbgroup@rlf.com;ann-jerominski-2390@ecf.pacerpro.com;rebecca--speaker-6328@ecf.pacerpro.com

U.S. Trustee
USTPRegion03.WL.ECF@USDOJ.GOV

**25-11454 Notice will not be electronically mailed to:**