# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| CLAIRE'S HOLDINGS LLC, *et al.*, [1] | ) | Case No. 25-11454 (BLS) |
|  | ) |  |
| Debtors. | ) | (Jointly Administered) |
|  | ) |  |

## DISCLOSURE STATEMENT FOR THE JOINT CHAPTER 11 PLAN
## OF CLAIRE'S HOLDINGS LLC AND ITS DEBTOR AFFILIATES

---

**THIS IS A SOLICITATION OF VOTES TO ACCEPT OR REJECT THE PLAN IN ACCORDANCE WITH BANKRUPTCY CODE SECTION 1125 AND WITHIN THE MEANING OF BANKRUPTCY CODE SECTION 1126. 11 U.S.C. §§ 1125, 1126. THE INFORMATION IN THIS DISCLOSURE STATEMENT IS SUBJECT TO CHANGE. THIS DISCLOSURE STATEMENT IS NOT AN OFFER TO SELL ANY SECURITIES AND IS NOT SOLICITING AN OFFER TO BUY ANY SECURITIES.**

---

**RICHARDS, LAYTON & FINGER, P.A.**
Daniel J. DeFranceschi (No. 2732)
Paul N. Heath (No. 3704)
Zachary I Shapiro (No. 5103)
Clint M. Carlisle (No. 7313)
Colin A. Meehan (No. 7237)
One Rodney Square
920 N. King Street
Wilmington, Delaware 19801
Telephone:    (302) 651-7700
Facsimile:    (302) 651-7701
Email:    defranceschi@rlf.com
    heath@rlf.com
    shapiro@rlf.com
    carlisle@rlf.com
    meehan@rlf.com

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Joshua A. Sussberg, P.C. (admitted *pro hac vice*)
Allyson B. Smith (admitted *pro hac vice*)
601 Lexington Avenue
New York, New York 10022
Telephone:    (212) 446-4800
Facsimile:    (212) 446-4900
Email:    joshua.sussberg@kirkland.com
    allyson.smith@kirkland.com

- and -

Alexandra F. Schwarzman, P.C. (admitted *pro hac vice*)
Robert A. Jacobson (admitted *pro hac vice*)
333 West Wolf Point Plaza
Chicago, Illinois 60654
Telephone:    (312) 862-2000
Facsimile:    (312) 862-2200
Email:    alexandra.schwarzman@kirkland.com
Email:    rjacobson@kirkland.com

*Proposed Co-Counsel to the Debtors*
*and Debtors in Possession*

*Proposed Co-Counsel to the Debtors*
*and Debtors in Possession*

Dated:  August 19, 2025

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of their federal tax identification numbers, to the extent applicable, are:  Claire's Holdings LLC (9619); BMS Distributing Corp. (4117); CBI Distributing Corp. (5574); Claire's (Gibraltar) Holdings Limited (4273); Claire's Boutiques, Inc. (5307); Claire's Canada Corp. (7936); Claire's Intellectual LLC (5274); Claire's Puerto Rico Corp. (6113); Claire's Stores, Inc. (0416); Claire's Swiss Holdings II LLC (7980); Claire's Swiss Holdings LLC (2299); CLSIP Holdings LLC (1950); CLSIP LLC (9769); and CSI Canada LLC (2343).  The Debtors' mailing address is 2400 West Central Road, Hoffman Estates, IL 60192.

---

**IMPORTANT INFORMATION ABOUT THIS DISCLOSURE STATEMENT**

---

THE DEADLINE TO VOTE ON THE PLAN IS
[●], 2025, at 4:00 p.m. (prevailing Eastern Time)

FOR YOUR VOTE TO BE COUNTED, YOUR BALLOT MUST BE <u>ACTUALLY RECEIVED</u> BY
OMNI AGENT SOLUTIONS, INC. ON OR BEFORE THE VOTING
DEADLINE AS DESCRIBED HEREIN.

THE DEBTORS ARE PROVIDING THE INFORMATION IN THIS DISCLOSURE STATEMENT TO CERTAIN HOLDERS OF CLAIMS FOR PURPOSES OF SOLICITING VOTES TO ACCEPT OR REJECT THE *JOINT CHAPTER 11 PLAN OF CLAIRE'S HOLDINGS LLC AND ITS DEBTOR AFFILIATES*. NOTHING IN THIS DISCLOSURE STATEMENT MAY BE RELIED UPON OR USED BY ANY ENTITY FOR ANY OTHER PURPOSE. PRIOR TO DECIDING WHETHER TO VOTE FOR OR AGAINST THE PLAN, EACH HOLDER ENTITLED TO VOTE SHOULD CAREFULLY CONSIDER ALL OF THE INFORMATION IN THIS DISCLOSURE STATEMENT, INCLUDING THE RISK FACTORS DESCRIBED IN <u>ARTICLE VIII</u> HEREIN.

THE DEBTORS URGE HOLDERS OF CLAIMS WHOSE VOTES ARE BEING SOLICITED TO VOTE TO <u>ACCEPT</u> THE PLAN.

THE DEBTORS URGE EACH HOLDER OF A CLAIM TO CONSULT WITH ITS OWN ADVISORS WITH RESPECT TO ANY LEGAL, FINANCIAL, SECURITIES, TAX, OR BUSINESS ADVICE IN REVIEWING THIS DISCLOSURE STATEMENT, THE PLAN, AND THE TRANSACTIONS CONTEMPLATED THEREBY. FURTHER, THE BANKRUPTCY COURT'S APPROVAL OF THE ADEQUACY OF THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE THE BANKRUPTCY COURT'S APPROVAL OF THE PLAN.

THIS DISCLOSURE STATEMENT CONTAINS, AMONG OTHER THINGS, SUMMARIES OF THE PLAN, CERTAIN STATUTORY PROVISIONS, CERTAIN ANTICIPATED EVENTS IN THE CHAPTER 11 CASES, AND CERTAIN DOCUMENTS RELATED TO THE PLAN THAT ARE INCORPORATED BY REFERENCE HEREIN. ALTHOUGH THE DEBTORS BELIEVE THAT THESE SUMMARIES ARE FAIR AND ACCURATE, THESE SUMMARIES ARE QUALIFIED IN THEIR ENTIRETY TO THE EXTENT THAT THEY DO NOT SET FORTH THE ENTIRE TEXT OF SUCH DOCUMENTS OR STATUTORY PROVISIONS OR EVERY DETAIL OF SUCH ANTICIPATED EVENTS. IN THE EVENT OF ANY INCONSISTENCY OR DISCREPANCY BETWEEN A DESCRIPTION IN THIS DISCLOSURE STATEMENT AND THE TERMS AND PROVISIONS OF THE PLAN OR ANY OTHER DOCUMENTS INCORPORATED HEREIN BY REFERENCE, THE PLAN OR SUCH OTHER DOCUMENTS WILL GOVERN FOR ALL PURPOSES. FACTUAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT HAS BEEN PROVIDED BY THE DEBTORS' MANAGEMENT EXCEPT WHERE OTHERWISE SPECIFICALLY NOTED. THE DEBTORS DO NOT REPRESENT OR WARRANT THAT THE INFORMATION CONTAINED HEREIN OR ATTACHED HERETO IS WITHOUT ANY MATERIAL INACCURACY OR OMISSION.

IN PREPARING THIS DISCLOSURE STATEMENT, THE DEBTORS RELIED ON FINANCIAL DATA DERIVED FROM THEIR BOOKS AND RECORDS OR THAT WAS OTHERWISE MADE AVAILABLE TO THEM AT THE TIME OF SUCH PREPARATION AND ON VARIOUS ASSUMPTIONS REGARDING THE DEBTORS' BUSINESS. WHILE THE DEBTORS BELIEVE THAT SUCH FINANCIAL INFORMATION FAIRLY REFLECTS THE FINANCIAL CONDITION OF THE DEBTORS AS OF THE DATE HEREOF AND THAT THE ASSUMPTIONS REGARDING FUTURE EVENTS REFLECT REASONABLE BUSINESS JUDGMENTS, NO REPRESENTATIONS OR WARRANTIES ARE MADE AS TO THE ACCURACY OF THE FINANCIAL INFORMATION CONTAINED HEREIN OR ASSUMPTIONS REGARDING THE DEBTORS' BUSINESS. THE DEBTORS EXPRESSLY CAUTION READERS NOT TO PLACE UNDUE RELIANCE ON ANY FORWARD-LOOKING STATEMENTS CONTAINED HEREIN.

THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE, AND MAY NOT BE CONSTRUED AS, AN ADMISSION OF FACT, LIABILITY, STIPULATION, OR WAIVER. THE DEBTORS, THE WIND-DOWN DEBTORS, OR THE PLAN ADMINISTRATOR, AS APPLICABLE, MAY SEEK TO INVESTIGATE, FILE, AND PROSECUTE CLAIMS AND MAY OBJECT TO CLAIMS AFTER THE CONFIRMATION DATE OR EFFECTIVE DATE OF THE PLAN IRRESPECTIVE OF WHETHER THIS DISCLOSURE STATEMENT IDENTIFIES ANY SUCH CLAIMS OR OBJECTIONS TO CLAIMS.

THE DEBTORS ARE MAKING THE STATEMENTS AND PROVIDING THE FINANCIAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT AS OF THE DATE HEREOF, UNLESS OTHERWISE SPECIFICALLY NOTED, AND THERE IS NO ASSURANCE THAT THE STATEMENTS CONTAINED HEREIN WILL BE CORRECT AT ANY TIME AFTER SUCH DATE.  ALTHOUGH THE DEBTORS MAY SUBSEQUENTLY UPDATE THE INFORMATION IN THIS DISCLOSURE STATEMENT, THE DEBTORS HAVE NO AFFIRMATIVE DUTY TO DO SO, AND EXPRESSLY DISCLAIM ANY DUTY TO PUBLICLY UPDATE ANY FORWARD-LOOKING STATEMENTS, WHETHER AS A RESULT OF NEW INFORMATION, FUTURE EVENTS, OR OTHERWISE. HOLDERS OF CLAIMS AGAINST AND INTERESTS IN THE DEBTORS REVIEWING THIS DISCLOSURE STATEMENT SHOULD NOT INFER THAT, AT THE TIME OF THEIR REVIEW, THE FACTS SET FORTH HEREIN HAVE NOT CHANGED SINCE THIS DISCLOSURE STATEMENT WAS FILED.  INFORMATION CONTAINED HEREIN IS SUBJECT TO COMPLETION, MODIFICATION, OR AMENDMENT.  THE DEBTORS RESERVE THE RIGHT TO FILE AN AMENDED OR MODIFIED PLAN AND RELATED DISCLOSURE STATEMENT FROM TIME TO TIME, SUBJECT TO THE TERMS OF THE PLAN.

THE DEBTORS HAVE NOT AUTHORIZED ANY ENTITY TO GIVE ANY INFORMATION ABOUT OR CONCERNING THE PLAN OTHER THAN THAT WHICH IS CONTAINED IN THIS DISCLOSURE STATEMENT. THE DEBTORS HAVE NOT AUTHORIZED ANY REPRESENTATIONS CONCERNING THE DEBTORS OR THE VALUE OF THEIR PROPERTY OTHER THAN AS SET FORTH IN THIS DISCLOSURE STATEMENT.

IF THE PLAN IS CONFIRMED BY THE BANKRUPTCY COURT AND THE EFFECTIVE DATE OCCURS, ALL HOLDERS OF CLAIMS AND INTERESTS (INCLUDING THOSE HOLDERS OF CLAIMS OR INTERESTS WHO DO NOT SUBMIT BALLOTS TO ACCEPT OR REJECT THE PLAN, WHO VOTE TO REJECT THE PLAN, OR WHO ARE NOT ENTITLED TO VOTE ON THE PLAN) WILL BE BOUND BY THE TERMS OF THE PLAN.

THE CONFIRMATION AND EFFECTIVENESS OF THE PLAN ARE SUBJECT TO CERTAIN MATERIAL CONDITIONS PRECEDENT DESCRIBED HEREIN AND SET FORTH IN ARTICLE IX OF THE PLAN.  THERE IS NO ASSURANCE THAT THE PLAN WILL BE CONFIRMED, OR IF CONFIRMED, THAT THE CONDITIONS REQUIRED TO BE SATISFIED FOR THE PLAN TO GO EFFECTIVE WILL BE SATISFIED (OR WAIVED).

YOU ARE ENCOURAGED TO READ THE PLAN AND THIS DISCLOSURE STATEMENT IN ITS ENTIRETY, INCLUDING ARTICLE VIII OF THIS DISCLOSURE STATEMENT, ENTITLED "RISK FACTORS," BEFORE SUBMITTING YOUR BALLOT TO VOTE ON THE PLAN.

THE BANKRUPTCY COURT'S APPROVAL OF THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE A GUARANTEE BY THE BANKRUPTCY COURT OF THE ACCURACY OR COMPLETENESS OF THE INFORMATION CONTAINED HEREIN OR AN ENDORSEMENT BY THE BANKRUPTCY COURT OF THE MERITS OF THE PLAN.

<u>SPECIAL NOTICE REGARDING FEDERAL AND STATE SECURITIES LAWS AND ANY FINANCIAL INFORMATION CONTAINED HEREIN</u>

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND BANKRUPTCY RULE 3016(B) AND IS NOT NECESSARILY PREPARED IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER SIMILAR LAWS.  THIS DISCLOSURE STATEMENT HAS NOT BEEN FILED WITH THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION (THE "<u>SEC</u>").  THE PLAN OR DISCLOSURE STATEMENT HAS NOT BEEN APPROVED OR DISAPPROVED BY THE SEC OR ANY SIMILAR FEDERAL, STATE, LOCAL, OR FOREIGN REGULATORY AGENCY, NOR HAS THE SEC, ANY OTHER STATE SECURITIES COMMISSION OR OTHER AGENCY PASSED UPON THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT OR THE PLAN.  ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.

THE DEBTORS HAVE SOUGHT TO ENSURE THE ACCURACY, IN ALL MATERIAL RESPECTS, OF THE FINANCIAL INFORMATION PROVIDED IN THIS DISCLOSURE STATEMENT; HOWEVER, THE FINANCIAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT OR INCORPORATED HEREIN BY REFERENCE HAS NOT BEEN, AND WILL NOT BE, AUDITED OR REVIEWED BY THE DEBTORS' INDEPENDENT AUDITORS UNLESS EXPLICITLY PROVIDED OTHERWISE.

## FORWARD-LOOKING STATEMENTS

THE DEBTORS MAKE STATEMENTS IN THIS DISCLOSURE STATEMENT THAT ARE CONSIDERED FORWARD-LOOKING STATEMENTS UNDER FEDERAL SECURITIES LAWS. THE DEBTORS CONSIDER ALL STATEMENTS REGARDING ANTICIPATED OR FUTURE MATTERS TO BE FORWARD-LOOKING STATEMENTS. READERS ARE CAUTIONED THAT ANY FORWARD-LOOKING STATEMENTS IN THIS DISCLOSURE STATEMENT ARE BASED ON ASSUMPTIONS THAT ARE BELIEVED TO BE REASONABLE BUT ARE SUBJECT TO A WIDE RANGE OF RISKS. FORWARD-LOOKING STATEMENTS MAY INCLUDE STATEMENTS ABOUT THE DEBTORS':

- BUSINESS STRATEGY;

- FINANCIAL CONDITION, REVENUES, CASH FLOWS, AND EXPENSES;

- LEVELS OF INDEBTEDNESS, LIQUIDITY, AND COMPLIANCE WITH DEBT COVENANTS;

- FINANCIAL STRATEGY, BUDGET, PROJECTIONS, AND OPERATING RESULTS;

- SUCCESSFUL RESULTS FROM THE DEBTORS' OPERATIONS;

- GENERAL ECONOMIC AND BUSINESS CONDITIONS;

- ADVERSE TAX CHANGES OR CONSEQUENCES;

- AMOUNT, NATURE, AND TIMING OF CAPITAL EXPENDITURES;

- LIMITED ACCESS TO CAPITAL RESOURCES;

- ADEQUACY OF CAPITAL RESOURCES AND LIQUIDITY TO SATISFY LIQUIDITY NEEDS;

- COUNTERPARTY CREDIT RISK;

- OUTCOME OF PENDING AND FUTURE LITIGATION; AND

- PLANS, OBJECTIVES, AND EXPECTATIONS, INCLUDING THE CONSUMMATION OF ANY SALE TRANSACTIONS, WHICH MAY INCLUDE ANY SUBSEQUENT WIND-DOWN OF THE DEBTORS.

STATEMENTS CONCERNING THESE AND OTHER MATTERS ARE NOT GUARANTEES OF THE DEBTORS' OR THE WIND-DOWN DEBTORS' FUTURE PERFORMANCE. THERE ARE RISKS, UNCERTAINTIES, AND OTHER IMPORTANT FACTORS THAT COULD CAUSE THE DEBTORS' OR THE WIND-DOWN DEBTORS' ACTUAL PERFORMANCE OR ACHIEVEMENTS TO BE DIFFERENT FROM THOSE THEY MAY PROJECT, AND THE DEBTORS UNDERTAKE NO OBLIGATION TO UPDATE THE PROJECTIONS MADE HEREIN. THESE RISKS, UNCERTAINTIES, AND FACTORS MAY INCLUDE THE FOLLOWING: THE DEBTORS' ABILITY TO CONFIRM AND CONSUMMATE THE PLAN; THE POTENTIAL THAT THE DEBTORS MAY NEED TO PURSUE AN ALTERNATIVE TRANSACTION IF THE PLAN IS NOT CONFIRMED OR IF ANY SALE TRANSACTIONS ARE NOT CONSUMMATED; THE DEBTORS' ABILITY TO REDUCE OR ELIMINATE ANY DEBT OR OTHER OBLIGATIONS; THE POTENTIAL ADVERSE IMPACT OF THE CHAPTER 11 CASES ON THE DEBTORS' OPERATIONS, MANAGEMENT, AND EMPLOYEES; THE RISKS ASSOCIATED WITH OPERATING THE DEBTORS' BUSINESS DURING THE CHAPTER 11 CASES; CUSTOMER RESPONSES TO THE CHAPTER 11 CASES; THE DEBTORS' INABILITY TO DISCHARGE OR SETTLE CLAIMS DURING THE CHAPTER 11 CASES; GENERAL ECONOMIC, BUSINESS, AND MARKET CONDITIONS; EXPOSURE TO LITIGATION; THE DEBTORS' ABILITY TO DIVEST EXISTING BUSINESSES OR OTHERWISE MONETIZE ASSETS, INCLUDING THROUGH ANY SALE TRANSACTIONS; AND ADVERSE TAX CHANGES OR CONSEQUENCES.

THIS DISCLOSURE STATEMENT IS SUBJECT TO FURTHER REVISION AND MAY BE AMENDED TO, AMONG OTHER THINGS, TAKE INTO ACCOUNT FURTHER SPECIFICS OF ANY TRANSACTION TO BE CONSUMMATED PURSUANT TO THE PLAN, AND TO ACCOMMODATE ADDITIONAL REQUESTS FOR DISCLOSURE.

# TABLE OF CONTENTS

Page

I.      INTRODUCTION ............................................................................................................1

II.     PRELIMINARY STATEMENT ......................................................................................1

III.    QUESTIONS AND ANSWERS REGARDING THIS DISCLOSURE STATEMENT AND
THE PLAN ......................................................................................................................3

    A.      What is chapter 11? ...........................................................................................3
    B.      Why are the Debtors sending me this Disclosure Statement? ...........................3
    C.      Am I entitled to vote on the Plan? .....................................................................4
    D.      What will I receive from the Debtors if the Plan is consummated? ..................4
    E.      What happens to my recovery if the Plan is not confirmed or does not go effective? .....................7
    F.      If the Plan provides that I get a distribution, do I get it upon Confirmation or when the
Plan goes effective, and what is meant by "Confirmation," "Effective Date," and
"Consummation?" .............................................................................................7
    G.     What are the sources of Cash and other consideration required to fund the Plan? ...........................7
    H.     What is the wind-down under the Plan? .............................................................8
    I.      Is there potential litigation related to the Plan? ................................................9
    J.      Will the final amount of Allowed General Unsecured Claims affect the recovery of
Holders of Allowed General Unsecured Claims under the Plan? ......................9
    K.     Will there be releases and exculpation granted to parties in interest as part of the Plan? .................9
    L.      What is the deadline to vote on the Plan? ........................................................11
    M.    How do I vote for or against the Plan? .............................................................11
    N.     Why is the Bankruptcy Court holding a Combined Hearing? ..........................11
    O.     When is the Combined Hearing set to occur? ..................................................11
    P.      What is the purpose of the Combined Hearing? ...............................................12
    Q.     What is the effect of the Plan on the Debtors' ongoing business? ...................12
    R.     Whom do I contact if I have additional questions with respect to this Disclosure
Statement or the Plan? .....................................................................................12
    S.      Could subsequent events potentially affect recoveries under the Plan? ...........13
    T.      Do the Debtors recommend voting in favor of the Plan? .................................13

IV.    OVERVIEW OF THE PLAN.........................................................................................13

    A.      General Settlement of Claims and Interests. ....................................................13
    B.      Sale Transaction. ..............................................................................................13
    C.      Wind-Down Debtors. .......................................................................................14
    D.      Plan Administrator. ..........................................................................................14
    E.      Dissolution of the Wind-Down Debtors. ..........................................................14
    F.      Releases. ...........................................................................................................14

V.     THE DEBTORS' CORPORATE HISTORY, STRUCTURE, AND BUSINESS OVERVIEW...........18

    A.      Claire's Corporate History and Business Operations.......................................18
    B.      The Debtors' Prepetition Initiatives. ................................................................19
    C.      The Debtors' Prepetition Capital Structure. ....................................................20

VI.    EVENTS LEADING TO THE CHAPTER 11 FILINGS ............................................24

    A.      Retention of Advisors. .....................................................................................24
    B.      Credit Agreement Amendments........................................................................24
    C.      Governance Initiatives. .....................................................................................24
    D.      Subsequent Waiver Amendments. ....................................................................25
    E.      Imposition of Reserve Notices. ........................................................................25

|  |  |  |
|---|---|---|
| F. | Priority Term Loan Capital Raise. | 26 |
| G. | Formulation of Go-Forward Business Plan. | 26 |
| H. | Prepetition Marketing Process. | 26 |
| I. | Entry into Forbearance Agreement to Secure Necessary Liquidity Runway. | 26 |
| J. | CCAA Proceeding. | 27 |

**VII. MATERIAL DEVELOPMENTS AND ANTICIPATED EVENTS OF THE CHAPTER 11 CASES AND PATH FORWARD IN CHAPTER 11 ............................................. 27**

|  |  |  |
|---|---|---|
| A. | First Day Relief. | 27 |
| B. | Additional Motions Filed on the Petition Date. | 27 |
| C. | Continued Marketing Process, Store Closing Sales, and Going-Concern Sale Transaction. | 28 |
| D. | Access to the DIP Facility and Use of Cash Collateral. | 29 |
| E. | Assumption and Rejection of Executory Contracts and Unexpired Leases. | 29 |
| F. | Indemnification Obligations. | 32 |
| G. | Claims Based on Rejection of Executory Contracts or Unexpired Leases. | 32 |
| H. | Cure of Defaults for Assumed Executory Contracts and Unexpired Leases. | 32 |
| I. | Preexisting Obligations to the Debtors Under Executory Contracts and Unexpired Leases. | 33 |
| J. | Insurance Policies. | 33 |
| K. | Modifications, Amendments, Supplements, Restatements, or Other Agreements. | 34 |
| L. | Reservation of Rights. | 34 |
| M. | Nonoccurrence of Effective Date. | 34 |
| N. | Filing of Statements of Financial Affairs and Schedules of Assets and Liabilities. | 34 |

**VIII. RISK FACTORS ............................................................................................................. 34**

|  |  |  |
|---|---|---|
| A. | Certain Bankruptcy Law Considerations. | 35 |
| B. | Other Risks. | 38 |
| C. | Disclosure Statement Disclaimer. | 38 |

**IX. SOLICITATION AND VOTING PROCEDURES ......................................................... 40**

|  |  |  |
|---|---|---|
| A. | Holders of Claims Entitled to Vote on the Plan. | 40 |
| B. | Voting Record Date. | 41 |
| C. | Voting on the Plan. | 41 |
| D. | Ballots Not Counted. | 42 |

**X. CONFIRMATION OF THE PLAN ............................................................................... 42**

|  |  |  |
|---|---|---|
| A. | Requirements for Confirmation of the Plan. | 42 |
| B. | Best Interests of Creditors. | 42 |
| C. | Feasibility. | 43 |
| D. | Acceptance by Impaired Classes. | 44 |
| E. | Confirmation without Acceptance by All Impaired Classes. | 44 |

**XI. CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ............................................................................................................................ 45**

|  |  |  |
|---|---|---|
| A. | Introduction. | 45 |
| B. | Certain U.S. Federal Income Tax Consequences of the Plan to the Debtors and Wind-Down Debtors. | 47 |
| C. | Certain U.S. Federal Income Tax Consequences of the Plan to U.S. Holders of Allowed Claims Entitled to Vote. | 47 |
| D. | Certain U.S. Federal Income Tax Consequences of the Plan to Non-U.S. Holders of Allowed Claims. | 49 |
| E. | FATCA. | 50 |
| F. | Information Reporting and Backup Withholding. | 51 |

**XII.    RECOMMENDATION** ................................................................................................................................52

**EXHIBITS**

**EXHIBIT A**    Chapter 11 Plan

## I.    INTRODUCTION

Claire's Holdings LLC and the other above-captioned debtors and debtors in possession (collectively, the "Debtors," and together with their non-Debtor affiliates, "Claire's" or the "Company") hereby submit this disclosure statement (this "Disclosure Statement"), pursuant to section 1125 of the Bankruptcy Code, to Holders of Claims against and Interests in the Debtors in connection with the solicitation of votes for acceptance of the *Joint Chapter 11 Plan of Claire's Holdings LLC and its Debtor Affiliates*, Filed contemporaneously herewith (as may be amended, restated, supplemented, or modified from time to time, the "Plan").[1]  A copy of the Plan is attached hereto as **Exhibit A** and is incorporated herein by reference.  The Plan constitutes a separate chapter 11 plan for each of the other Debtors.  The rules of interpretation set forth in Article I.B of the Plan govern the interpretation of this Disclosure Statement.

**THE DEBTORS SUPPORT THE PLAN AND BELIEVE THAT THE COMPROMISES AND SETTLEMENTS CONTEMPLATED BY THE PLAN ARE FAIR AND EQUITABLE, MAXIMIZE THE VALUE OF THE DEBTORS' ESTATES, AND PROVIDE THE BEST RECOVERY TO HOLDERS OF CLAIMS AGAINST AND INTERESTS IN THE DEBTORS.  AT THIS TIME, THE DEBTORS BELIEVE THE PLAN REPRESENTS THE BEST AVAILABLE OPTION FOR COMPLETING THE CHAPTER 11 CASES.  THE DEBTORS RECOMMEND THAT YOU VOTE TO ACCEPT THE PLAN.**

## II.    PRELIMINARY STATEMENT

The Debtors commenced these Chapter 11 Cases with the support of their Prepetition Secured Lenders for the continued use of cash collateral on a path forward to maximize the value of the Debtors' estates.

In the months leading to the Petition Date, the Debtors launched a dual-track marketing process to solicit bids for (a) all or part of the Debtors' business operations as a going-concern or (b) a full-chain liquidation either on a fee-for-service or equity basis.  Pursuant to this process, the Debtors contacted over 160 potential buyers, executed over 60 confidentiality agreements, and conducted nine management presentations.  The Debtors executed a fee-for-service agency agreement (the "Agency Agreement") with Hilco Merchant Resources, LLC ("Hilco") on July 24, 2025, to liquidate all or a portion of the United States and U.S. territory stores in the event a going concern transaction is not achievable.[2]  The Debtors received three letters of intent prior to the Petition Date and two letters of intent after the Petition Date.  Two of the letters of intent were for a going-concern transaction and the others were primarily for the Debtors' intellectual property assets.

On August 8, 2025, the Court entered the *Interim Order (I) Authorizing the Debtors to Assume the Agency Agreement, (II) Authorizing and Approving the Conduct of Store Closing Sales, with Such Sales to Be Free and Clear of All Liens, Claims, and Encumbrances, (III) Modifying Customer Programs at the Closing Stores, and (IV) Granting Related Relief* (the "Interim Store Closing Order") and the Debtors commenced a full chain liquidation process for all of their brick-and-mortar stores.  Importantly, the Debtors maintained the flexibility under the Agency Agreement, subject to the consent of their lenders, to stop the liquidation sales in the event that an actionable going-concern transaction materialized.

---

[1]    Capitalized terms used but not otherwise defined in this Disclosure Statement have the meaning given to them in the Plan.

[2]    Claire's Stores Canada Corp. entered into a similar agreement with Hilco to liquidate all or a portion of the Company's Canadian stores.

During the initial weeks of the chapter 11 cases, the Debtors continued to work with potential purchasers to solidify one or more of the non-binding letters of intent into binding commitments to purchase some or all of the Debtors' assets. These efforts were successful. On August 18, 2025, the Debtors and AWS Claire's, LLC, (the "Purchaser"), an entity owned by a buyer group led by Ames Watson, LLC, entered into the Asset Purchase Agreement, pursuant to which the Purchaser will acquire certain assets as set forth in the Asset Purchase Agreement (the "Going-Concern Assets"), including: (i) certain leases for retail locations and distribution centers, (ii) all inventory and other tangible personalty and/or improvements to real property, associated with no less than 795 (and potentially as many as 975) of the Debtors retail locations and distribution centers (the "Go-Forward Stores"), (iii) the Debtors' intellectual property assets, and (iv) certain other assets and assumed liabilities, as described in the Asset Purchase Agreement (the "Sale Transaction"). The Purchaser agreed to provide postpetition financing, in addition to certain relief and concessions provided by the Prepetition Secured Parties, to provide the Debtors with necessary liquidity to bridge to close of the Sale Transaction. On August 16, 2025, the Debtors exercised their right to stop liquidation sales at approximately 950 stores to facilitate the execution of the Sale Transaction.

On August 19, 2025, the Debtors Filed the *Motion of Debtors for Entry of an Order (I) Authorizing and Approving the Sale of Going-Concern Assets Free and Clear of All Liens, Claims, Encumbrances and Other Interests and (II) Granting Related Relief* [Docket No. [●]] (the "Sale Motion"), seeking approval of and authorization to consummate the Sale Transaction and the *Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Obtain Postpetition Financing and (B) Utilize Cash Collateral, (II) Granting Liens and Superpriority Administrative Expense Claims, (III) Modifying the Automatic Stay, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief* [Docket No. [●]] (the "DIP Motion" and such order entered approving the DIP Motion on an interim basis, if any, the "Interim DIP Order"), seeking approval of the DIP Facility (as defined in the DIP Motion).

After running an extensive, months-long prepetition marketing process, the Asset Purchase Agreement represents best and the only viable offer for the Going-Concern Assets. The Debtors believe that the purchase consideration is the best available for the Going-Concern Assets, and the Debtors have not received a higher or otherwise better offer for the Going-Concern Assets. Importantly, the Sale Transaction will preserve thousands of jobs, provide continued business to hundreds of the Debtors' vendors and landlords, and will allow the Claire's brand to remain a prominent retailer for teens, tweens, and young girls around the world.

\*\*\*

Claire's is a global brand powerhouse for self-expression, creating exclusive, curated, and fun fashionable jewelry and accessories. Claire's is also a go-to establishment for ear piercing, having pierced over 100 million ears since 1978. Indeed, Claire's ear-piercing services are a renowned "rite of passage" for millions of girls across the world who trust Claire's with their first ear-piercing experience.

On August 6, 2025 (the "Petition Date"), the Debtors commenced the Chapter 11 Cases in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"). A comprehensive discussion of the events leading up to the commencement of the Chapter 11 Cases is included in the *Declaration of Chris Cramer, Chief Executive Officer, Chief Operating Officer, and Chief Financial Officer of Claire's Holdings LLC and Certain of its Affiliates, in Support of the Debtors' Chapter 11 Petitions and First Day Pleadings* [Docket No. 27] (the "First Day Declaration"), Filed on the Petition Date.

The principal objective of the Plan is to maximize value for all Holders of Allowed Claims and generally to distribute all property of the Estates that is or becomes available for distribution generally in accordance with the priorities established by the Bankruptcy Code. The Debtors believe that the Plan accomplishes this objective and is in the best interest of the Estates. Nevertheless, the Debtors continue to explore any viable paths that would further maximize recoveries.

Generally, the Plan:

- designates a Plan Administrator to wind-down the Debtors' affairs, pay and reconcile certain Claims, and administer the Plan in an efficient manner;

- contemplates cash distributions being made pursuant to a waterfall priority scheme in accordance with the Bankruptcy Code; and

- contemplates recoveries to Holders of Administrative Claims and Other Priority Claims as is necessary to satisfy section 1129 of the Bankruptcy Code.

The Debtors believe that Confirmation of the Plan will expedite distributions on account of Allowed Claims as quickly and efficiently as is practicable while avoiding the lengthy delay and significant cost of liquidation under chapter 7 of the Bankruptcy Code.

The Debtors believe that the Plan maximizes stakeholder recoveries in the Chapter 11 Cases as any currently actionable alternative to the transactions embodied in the Plan would be expected to materially reduce and delay recoveries to Holders of Claims. The Debtors urge all Holders of Claims entitled to vote to accept the Plan by returning their ballots so that Omni Agent Solutions, Inc., the Debtors' claims and noticing agent (the "Claims and Noticing Agent"), actually receives such ballots by [●], 2025, at 4:00 p.m. prevailing Eastern Time (the "Voting Deadline"). Assuming the Plan receives the requisite acceptances, the Debtors will seek the Bankruptcy Court's approval of the Plan at the Combined Hearing (as defined below).

## III.    QUESTIONS AND ANSWERS REGARDING THIS DISCLOSURE STATEMENT AND THE PLAN

### A.    What is chapter 11?

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code. In addition to permitting debtor rehabilitation, chapter 11 promotes equality of treatment for similarly-situated creditors and similarly-situated equity interest holders, subject to the priority of distributions prescribed by the Bankruptcy Code.

The commencement of a chapter 11 case creates an estate that comprises all of the legal and equitable interests of the debtor as of the date the chapter 11 case is commenced. The Bankruptcy Code provides that the debtor may continue to operate its business and remain in possession of its property as a "debtor in possession."

Consummating a chapter 11 plan is the principal objective of a chapter 11 case. A bankruptcy court's confirmation of a chapter 11 plan binds the debtor, any person acquiring property under the plan, any creditor or equity interest holder of the debtor (whether or not such creditor or equity interest holder voted to accept the plan), and any other entity as may be ordered by the bankruptcy court. Subject to certain limited exceptions, the order issued by a bankruptcy court confirming a plan provides for the treatment of the debtor's liabilities in accordance with the terms of the confirmed plan.

### B.    Why are the Debtors sending me this Disclosure Statement?

The Debtors are seeking Bankruptcy Court approval of the Plan. Before soliciting acceptances of the Plan, section 1125 of the Bankruptcy Code requires the Debtors to prepare a disclosure statement containing adequate information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment regarding acceptance of the Plan and to share such disclosure

statement with all holders of claims or interests whose votes on the Plan are being solicited. The Debtors will seek approval of this Disclosure Statement on a conditional basis, and this Disclosure Statement is being submitted in accordance with these requirements. The Bankruptcy Court will consider final approval of this Disclosure Statement and the Plan at the Combined Hearing, which is scheduled for [●], 2025, at [●] [a/p].m., prevailing Eastern Time (the "Combined Hearing").

### C.   Am I entitled to vote on the Plan?

Your ability to vote on, and your distribution (if any) under, the Plan depends on what type of Claim or Interest you hold and whether you held that Claim or Interest as of the Voting Record Date. Each category of Holders of Claims or Interests, as set forth in Article III of the Plan pursuant to section 1122(a) of the Bankruptcy Code, is referred to as a "Class." Each Class's respective voting status is set forth below:

| Class | Claim/Interest | Status | Voting Rights |
|---|---|---|---|
| 1 | Other Secured Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| 2 | Other Priority Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| 3 | Prepetition ABL Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| 4 | Prepetition Priority Term Loan Claims | Impaired | Entitled to Vote |
| 5 | Prepetition Existing Term Loan Claims | Impaired | Entitled to Vote |
| 6 | General Unsecured Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |
| 7 | Intercompany Claims | Unimpaired / Impaired | Not Entitled to Vote (Presumed to Accept or Deemed to Reject) |
| 8 | Intercompany Interests | Unimpaired / Impaired | Not Entitled to Vote (Presumed to Accept or Deemed to Reject) |
| 9 | Equity Interests in Claire's | Impaired | Not Entitled to Vote (Deemed to Reject) |
| 10 | Section 510(b) Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |

### D.   What will I receive from the Debtors if the Plan is consummated?

The following chart provides a summary of the anticipated recovery to Holders of Claims or Interests under the Plan. Any estimates of Claims or Interests in this Disclosure Statement may vary from the final amounts allowed by the Bankruptcy Court. Your ability to receive Plan Distributions depends on the ability of the Debtors to obtain Confirmation and meet the conditions necessary to consummate the Plan.

Each Holder of an Allowed Claim or Allowed Interest, as applicable, shall receive under the Plan, except to the extent that such Holder agrees to less favorable treatment, the treatment described below in full and final satisfaction, compromise, settlement, and release of, and in exchange for, such Holder's Allowed Claim or Allowed Interest. Unless otherwise indicated, the Holder of an Allowed Claim or Allowed Interest, as applicable, shall receive such treatment on the later of the Effective Date and the date such Holder's Claim or Interest becomes an Allowed Claim or Allowed Interest or as soon as reasonably practicable thereafter.

**THE PROJECTED RECOVERIES SET FORTH IN THE TABLE BELOW ARE ESTIMATES ONLY AND THEREFORE ARE SUBJECT TO CHANGE. FOR A COMPLETE DESCRIPTION OF THE DEBTORS' CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS, REFERENCE SHOULD BE MADE TO THE ENTIRE PLAN.**

| | | SUMMARY OF EXPECTED RECOVERIES | | |
|---|---|---|---|---|
| Class | Claim/Equity Interest | Treatment of Claim/Equity Interest | Projected Principal Amount of Claims (in millions) | Projected Plan Recovery[3] |
| 1 | Other Secured Claims | To the extent that either a Holder of an Allowed Other Secured Claim was not paid during the Chapter 11 Cases or a Holder's Allowed Other Secured Claim was not an Assumed Liability under the Transaction Documents, unless such Holder agrees to less favorable treatment, in exchange for such Allowed Other Secured Claim, on or as soon as reasonably practicable after the Effective Date, each Holder of an Allowed Other Secured Claim shall receive, at the option of the Debtors or Wind-Down Debtors, as applicable: (i) payment in full in Cash of such Holder's Allowed Other Secured Claim; (ii) the collateral securing such Holder's Allowed Other Secured Claim; or (iii) such other treatment rendering such Holder's Allowed Other Secured Claim Unimpaired in accordance with section 1124 of the Bankruptcy Code. | $[●] | [●]% |
| 2 | Other Priority Claims | To the extent that either a Holder of an Allowed Other Priority Claim was not paid during the Chapter 11 Cases or a Holder's Allowed Other Priority Claim was not an Assumed Liability under the Transaction Documents, unless such Holder agrees to less favorable treatment, in exchange for such Allowed Other Priority Claim, on or as soon as reasonably practicable after the later to occur of (i) the Effective Date and (ii) the date such Claim becomes Allowed (or as otherwise set forth in the Plan), each Holder of an Allowed Other Priority Claim shall receive, in full and final satisfaction of such Claim, Cash in an amount equal to such Allowed Other Priority Claim or such other treatment consistent with the provisions of section 1129(a)(9) of the Bankruptcy Code. | $[●] | [●]% |

---

[3]    The Plan contemplates distributions on account of Allowed Claims being made pursuant to a waterfall priority scheme pursuant to the Bankruptcy Code. Therefore, the projected recoveries for each class listed in this chart depend entirely on the extent to which classes senior to them are satisfied.

| | SUMMARY OF EXPECTED RECOVERIES | | | |
|---|---|---|---|---|
| Class | Claim/Equity Interest | Treatment of Claim/Equity Interest | Projected Principal Amount of Claims (in millions) | Projected Plan Recovery[3] |
| 3 | Prepetition ABL Claims | Except to the extent that a Holder of an Allowed Prepetition ABL Claim agrees to less favorable treatment, in full and final satisfaction of such Claim, on or as soon as reasonably practicable after the Effective Date, each Holder of an Allowed Prepetition ABL Claim shall receive its Pro Rata share of the Distributable Proceeds pursuant to the Waterfall Recovery. | $[63.9] | [●]% |
| 4 | Prepetition Priority Term Loan Claims | Except to the extent that each Holder of an Allowed Prepetition Priority Term Loan Claim agrees to less favorable treatment, on or as soon as reasonably practicable after the Effective Date, each Holder of an Allowed Prepetition Priority Term Loan Claim shall receive its Pro Rata share of the Distributable Proceeds pursuant to the Waterfall Recovery. | $[125.5] | [●]% |
| 5 | Prepetition Existing Term Loan Claims | Except to the extent that each Holder of an Allowed Prepetition Existing Term Loan Claim agrees to less favorable treatment, on or as soon as reasonably practicable after the Effective Date, each Holder of an Allowed Prepetition Existing Term Loan Claim shall receive its Pro Rata share of the Distributable Proceeds pursuant to the Waterfall Recovery. | $[522.5] | [●]% |
| 6 | General Unsecured Claims | On the Effective Date, each General Unsecured Claim shall be discharged and released, and each Holder of a General Unsecured Claim shall not receive or retain any distribution, property, or other value on account of such General Unsecured Claim. | $[●] | [●]% |
| 7 | Intercompany Claims | Allowed Intercompany Claims, to the extent not assumed pursuant to the terms of the Transaction Documents, shall, at the election of the applicable Debtors or Wind-Down Debtors, be either: (i) Reinstated; (ii) converted to equity; (iii) set off, settled, distributed, contributed, canceled, or released; or (iv) otherwise addressed at the option of the Debtors or Wind-Down Debtors without any distribution on account of such Claim, in each case, in accordance with the Wind-Down Transactions Memorandum. | $[●] | [●]% |
| 8 | Intercompany Interests | Allowed Intercompany Interests shall, at the election of the Debtors or Wind-Down Debtors, be either: (i) Reinstated; (ii) set off, settled, distributed, contributed, merged, cancelled, or released; or (iii) otherwise addressed at the option of the Debtors or Wind-Down Debtors without any distribution on account of such Claim, in each case, in accordance with the Wind-Down Transactions Memorandum. | N/A | N/A |
| 9 | Equity Interests in Claire's | Equity Interests in Claire's shall be cancelled, released, and extinguished as of the Effective Date, and will be of no further force or effect, and Holders of Equity | N/A | N/A |

| | | SUMMARY OF EXPECTED RECOVERIES | | |
|---|---|---|---|---|
| **Class** | **Claim/Equity Interest** | **Treatment of Claim/Equity Interest** | **Projected Principal Amount of Claims (in millions)** | **Projected Plan Recovery[3]** |
| | | Interests in Claire's will not receive any distribution on account of such Interests. | | |
| 10 | Section 510(b) Claims | Allowed Section 510(b) Claims, if any, shall be cancelled, released, and extinguished as of the Effective Date, and will be of no further force or effect, and Holders of Allowed Section 510(b) Claims will not receive any distribution on account of such Allowed Section 510(b) Claims. | N/A | N/A |

E.      **What happens to my recovery if the Plan is not confirmed or does not go effective?**

In the event that the Plan is not confirmed or does not go effective, the Chapter 11 Cases may be converted to cases under chapter 7 of the Bankruptcy Code, pursuant to which a trustee would be elected or appointed to liquidate the assets of the Debtors for distribution in accordance with the priorities established by the Bankruptcy Code.  Conversion to chapter 7 would require the Debtors to incur expenses related to the chapter 7 trustee and additional retained professionals, and such expenses may decrease recoveries for Holders of Allowed Claims in the Voting Classes (as defined herein). *See, e.g.*, 11 U.S.C. §§ 326(a); 503(b)(2).  The conversion to chapter 7 would require entry of a new bar date, which may increase the amount of Allowed Claims and thereby reduce Pro Rata recoveries.  *See* Fed. R. Bankr. P. 1019(2), 3002(c).

F.      **If the Plan provides that I get a distribution, do I get it upon Confirmation or when the Plan goes effective, and what is meant by "Confirmation," "Effective Date," and "Consummation?"**

"Confirmation" of the Plan refers to the Bankruptcy Court's entry of the Confirmation Order on the docket of the Chapter 11 Cases approving the Plan.  Confirmation of the Plan does not guarantee that you will receive the distribution indicated under the Plan.  After Confirmation of the Plan by the Bankruptcy Court, there are conditions that need to be satisfied or waived so that the Plan can "go effective." Distributions to Holders of Allowed Claims will only be made on the date the Plan becomes effective— the "Effective Date"—as soon as reasonably practicable thereafter, or as otherwise specified in the Plan. *See* Article X of this Disclosure Statement, entitled "Confirmation of the Plan," for a discussion of the conditions precedent to consummation of the Plan.  "Consummation" means the occurrence of the Effective Date.

G.      **What are the sources of Cash and other consideration required to fund the Plan?**

On or after the Effective Date, the Debtors, the Wind-Down Debtors, or the Plan Administrator, as applicable, shall fund the Plan Distributions with the Distributable Proceeds on account of Allowed Claims in accordance with the Waterfall Recovery.  The Distributable Proceeds shall be allocated and paid to the Holders of Claims, other than Allowed Professional Fee Claims, as applicable, until paid in full, in each case, on a Pro Rata basis, and subject in all respects to the terms of the Interim DIP Order, except as otherwise agreed to by such Holders of Claims or Interests, as follows:  (a) *first*, on account of Allowed Administrative Claims and Priority Tax Claims; (b) *second*, on account of Allowed Other Secured Claims

(solely to the extent such proceeds are collateral of such Allowed Other Secured Claim), if any; (c) *third*, on account of Allowed Other Priority Claims, if any; (d) *fourth*:

    (i)        to the extent such proceeds are ABL Priority Collateral,

        (1)        *first*, on account of Allowed Prepetition ABL Claims;

        (2)        *second*, on account of Allowed Prepetition Priority Term Loan Claims (once the Allowed Prepetition ABL Claims have been paid in full); and

        (3)        *third*, on account of Allowed Prepetition Existing Term Loan Claims (which Claims, for the avoidance of doubt and pursuant to the Prepetition Term Loan Intercreditor Agreement, shall not be entitled to receive any distribution or recovery until the Allowed Prepetition Priority Term Loan Claims are paid in full); or

    (ii)        to the extent such proceeds are Term Loan Priority Collateral,

        (1)        *first*, on account of Allowed Prepetition Priority Term Loan Claims,

        (2)        *second*, on account of Allowed Prepetition Existing Term Loan Claims (which Claims, for the avoidance of doubt and pursuant to the Prepetition Term Loan Intercreditor Agreement, shall not be entitled to receive any distribution or recovery until the Allowed Prepetition Priority Term Loan Claims are paid in full); and

        (3)        *third*, on account of Allowed Prepetition ABL Claims (once the Allowed Prepetition Priority Term Loan Claims and Allowed Prepetition Term Loan Claims have been paid in full);

and (e) *fifth*, on account of General Unsecured Claims.  For the avoidance of doubt, any Plan Distribution made on account of an Allowed Administrative Claim that is a 507(b) Claim shall be subject in all respects to the Prepetition Term Loan Intercreditor Agreement, the ABL Intercreditor Agreement, and the Interim DIP Order.

Each Plan Distribution and issuance referred to in the Plan shall be governed by the terms and conditions set forth in the Plan applicable to such distribution or issuance and by the terms and conditions of the instruments or other documents evidencing or relating to such distribution or issuance, which terms and conditions shall bind each Entity receiving the Plan Distribution or issuance.

**H.**    **What is the wind-down under the Plan?**

On or before the Effective Date, the Debtors, the Wind-Down Debtors, or Plan Administrator, as applicable, shall take all actions as may be necessary or appropriate to effectuate the Wind-Down Transactions, including the steps set forth in the Wind-Down Transactions Memorandum, and any transaction described in, approved by, contemplated by, or necessary to effectuate the Wind-Down Transactions that are consistent with and pursuant to the terms and conditions of the Plan.  The Debtors, the Wind-Down Debtors, or Plan Administrator, as applicable, shall (a) cause the Debtors and the Wind-Down Debtors, as applicable, to comply with, and abide by, the terms of the Transaction Documents and any other documents contemplated thereby; (b) execute and deliver appropriate instruments of transfer, assignment, assumption, or delegation of any asset, property, right, liability, debt, or obligation on terms

consistent with the terms of the Plan, the Wind-Down Transactions Memorandum, and (as applicable) the Transaction Documents; (c) to the extent applicable, file a certificate of dissolution or equivalent document, together with all other necessary corporate and company documents, to effect the dissolution of the Debtors under the applicable laws of their state of incorporation or formation (as applicable); and (d) take such other actions as the Debtors, the Wind-Down Debtors, or Plan Administrator may determine to be necessary or desirable to carry out the purposes of the Plan.  On and after the Effective Date, the Wind-Down Debtors or the Plan Administrator, as applicable, will be authorized to implement the Plan (including the steps set forth in the Wind-Down Transactions Memorandum) and any applicable orders of the Bankruptcy Court, and the Plan Administrator shall have the power and authority to take any action necessary to wind down and dissolve the Debtors' Estates.  Any certificate of dissolution or equivalent document may be executed by the Plan Administrator without need for any action or approval by the shareholders or board of directors or managers of any Debtor.

**I.    Is there potential litigation related to the Plan?**

Parties in interest may object to Confirmation of the Plan, which objections potentially could give rise to litigation.

In the event that it becomes necessary to confirm the Plan over the rejection of certain Classes, the Debtors may seek confirmation of the Plan notwithstanding the dissent of such rejecting Classes.  The Bankruptcy Court may confirm the Plan pursuant to the "cramdown" provisions of the Bankruptcy Code, which allow the Bankruptcy Court to confirm a plan that has been rejected by an impaired Class if it determines that the Plan satisfies section 1129(b) of the Bankruptcy Code.  *See* Article VIII.A.5 of this Disclosure Statement, entitled "Nonconsensual Confirmation."

**J.    Will the final amount of Allowed General Unsecured Claims affect the recovery of Holders of Allowed General Unsecured Claims under the Plan?**

The Debtors' current estimate of aggregate Allowed General Unsecured Claims ranges from approximately $[●] to $[●].

Although the Debtors' estimate of Allowed General Unsecured Claims is generally the result of the Debtors' and their advisors' analysis of reasonably available information, the projected amount of Allowed General Unsecured Claims set forth herein is subject to material change (either higher or lower), which difference could materially affect Class 6 recoveries, and reflects the Debtors' current view on potential rejection damages.  The Debtors may also reject Executory Contracts and Unexpired Leases, which may result in parties asserting General Unsecured Claims for rejection damages.  Any change in the number, identity, or timing of actual rejected Executory Contracts and Unexpired Leases could have a material impact on the amount of Allowed General Unsecured Claims.  To the extent that the actual amount of rejection damages Claims changes, the value of recoveries to Holders of Allowed General Unsecured Claims could change as well, and such changes could be material.

Finally, the Debtors may also object to certain Proofs of Claim, and any such objections ultimately could cause the total amount of General Unsecured Claims to change.  These changes could affect recoveries to Holders of Allowed General Unsecured Claims, and such changes could be material.

**K.    Will there be releases and exculpation granted to parties in interest as part of the Plan?**

Yes.  The Plan proposes to release the Released Parties and to exculpate the Exculpated Parties. The Debtors' releases, third-party releases (which are solely applicable to parties that opt in to granting such release), and exculpation provisions included in the Plan are an integral part of the Debtors' chapter 11 efforts.

The Released Parties and the Exculpated Parties have made or are expected to make substantial and valuable contributions to the Debtors' chapter 11 process through efforts to negotiate and implement the Plan, which will maximize the value of the Debtors' estates for the benefit of all parties in interest. Accordingly, each of the Released Parties and the Exculpated Parties warrants the benefit of the release and exculpation provisions. Importantly, each of the Releasing Parties will be deemed to have expressly, unconditionally, generally, individually, and collectively released all Claims and Causes of Action against the Debtors and the Released Parties.

The Releasing Parties are each of, and in each case in its capacity as such: (a) the Debtors; (b) each of the Wind-Down Debtors; (c) the Plan Administrator; (d) the Prepetition ABL Lenders; (e) the Prepetition Priority Term Loan Lenders; (f) the Prepetition Existing Term Loan Lenders; (g) the Prepetition ABL Agent; (h) the Prepetition Priority Term Loan Agent; (i) the Prepetition Existing Term Loan Agent; (j) the Purchaser (if any); (k) all Holders of Claims against the Debtors who affirmatively opt in to the releases provided by the Plan; (l) all Holders of Interests in the Debtors who affirmatively opt in to the releases provided by the Plan; (m) the Initial Term Loan Agent; (n) each current and former Affiliate of each Entity in clause (a) through (m) for which such Entity is legally entitled to bind such Affiliate to the releases contained in the Plan under applicable non-bankruptcy law; and (o) each Related Party of each Entity in clause (a) through (n) for which such Affiliate or Entity is legally entitled to bind such Related Party to the releases contained in the Plan under applicable non-bankruptcy law.

The Released Parties are each of, and in each case in its capacity as such: (a) the Debtors; (b) each of the Wind-Down Debtors; (c) the Plan Administrator; (d) the Prepetition ABL Lenders; (e) the Prepetition Priority Term Loan Lenders; (f) the Prepetition Existing Term Loan Lenders; (g) the Prepetition ABL Agent; (h) the Prepetition Priority Term Loan Agent; (i) the Prepetition Existing Term Loan Agent; (j) the Initial Term Loan Agent; (k) the Releasing Parties; (l) each current and former Affiliate of each Entity in clause (a) through clause (k); and (m) each Related Party of each Entity in clause (a) through clause (l).[4]

The Exculpated Parties are, collectively, (a) each of the Debtors; (b) the Wind-Down Debtors; and (c) with respect to the Entities in clauses (a) through (b), each of their respective current and former directors, managers, officers, attorneys, financial advisors, consultants, or other professionals or advisors that served in such capacity between the Petition Date and Effective Date.

The Debtors believe that the releases and exculpations in the Plan are necessary and appropriate and meet the requisite legal standard promulgated by the United States Court of Appeals for the Third Circuit. Moreover, the Debtors will present evidence at the Combined Hearing to demonstrate the basis for and propriety of the release and exculpation provisions. The release, exculpation, and injunction provisions that are contained in the Plan are copied in Article IV.F of this Disclosure Statement, entitled "Wind-Down Debtors."

As more fully set forth in Article IV.F of the Plan, the Debtors shall continue in existence after the Effective Date as the Wind-Down Debtors for the purposes of (a) winding down the Debtors' business and affairs as expeditiously as reasonably possible and liquidating any Wind-Down Debtors' Assets held by the Wind-Down Debtors, if any, (b) resolving any Disputed Claims (other than Disputed General Unsecured Claims), (c) paying or otherwise satisfying Allowed Claims in accordance with the Waterfall Recovery, (d) filing appropriate tax returns (and, for the avoidance of doubt, may pursue any refunds, credits, or other tax benefits to which the Debtors and/or the Wind-Down Debtors are entitled and file any tax returns or other filings as are required in connection therewith), (e) winding down and dissolving any direct or indirect subsidiaries of the Wind-Down Debtors (solely to the extent the Wind-Down Debtors, in their sole and

---

[4]    For the avoidance of doubt, the releases provided for in the Plan remain subject in all respects to the Special Investigation (as defined in the First Day Declaration).

absolute discretion, elect to do so), (f) establishing and funding the Wind-Down Reserve; and (g) administering the Plan in an efficacious manner.

### L.    Plan Administrator.

On the Effective Date, as laid out in <u>Article IV.H</u> of the Plan, the authority, power, and incumbency of the persons acting as directors and officers of each of the Debtors shall be deemed to have been terminated and such persons shall be deemed to have resigned, solely in their capacities as such, and the Plan Administrator shall have the power and authority to implement the Plan and take any actions reasonably necessary to further such implementation.

### M.    Dissolution of the Wind-Down Debtors.

As laid out in <u>Article IV.K</u> of the Plan, upon a certification to be Filed with the Bankruptcy Court by the Plan Administrator of all Plan Distributions having been made and completion of all its duties under the Plan and entry of a final decree closing the last of the Chapter 11 Cases, each of the Wind-Down Debtors shall be deemed to be dissolved without any further action by such Wind-Down Debtor, including the filing of any documents with the secretary of state for the state in which each such Wind-Down Debtor is formed or any other jurisdiction.

Releases."

### N.    What is the deadline to vote on the Plan?

The Voting Deadline is [●], 2025, at 4:00 p.m. (prevailing Eastern Time).

### O.    How do I vote for or against the Plan?

Detailed instructions regarding how to vote on the Plan are contained on the ballots distributed to Holders of Claims that are entitled to vote on the Plan. For your vote to be counted, your ballot must be properly completed, executed, and delivered as directed, so that your ballot including your vote is **<u>actually received</u>** by the Debtors' Claims and Noticing Agent **on or before the Voting Deadline, which is [●], 2025, at 4:00 p.m. (prevailing Eastern Time)**. *See* <u>Article IX</u> of this Disclosure Statement, entitled "Solicitation and Voting Procedures."

### P.    Why is the Bankruptcy Court holding a Combined Hearing?

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court to hold a hearing on confirmation of the Plan and recognizes that any party in interest may object to Confirmation of the Plan.

### Q.    When is the Combined Hearing set to occur?

The Combined Hearing is scheduled for [●], 2025 at [●] [a/p].m., (prevailing Eastern Time). The Combined Hearing may be adjourned from time to time without further notice. Objections to the Plan and to final approval of this Disclosure Statement must be Filed and served on the Debtors, and certain other parties, by no later than [●], 2025, at 4:00 p.m. (prevailing Eastern Time) in accordance with the notice of the Combined Hearing that accompanies this Disclosure Statement and the Interim Disclosure Statement Order (as defined below) incorporated herein by reference.

R.    **What is the purpose of the Combined Hearing?**

The confirmation of a chapter 11 plan by a bankruptcy court binds the debtor, any person acquiring property under a chapter 11 plan, any creditor or equity interest holder of a debtor, and any other person or entity as may be ordered by the bankruptcy court in accordance with the applicable provisions of the Bankruptcy Code.  Subject to certain limited exceptions, the order issued by a bankruptcy court confirming a chapter 11 plan discharges a debtor from any debt that arose before the confirmation of such chapter 11 plan and provides for the treatment of such debt in accordance with the terms of the confirmed chapter 11 plan.  One of those exceptions, applicable here, provides that the confirmation of a plan does not discharge a debtor if (i) the plan provides for the liquidation of all or substantially all of the property of the estate, (ii) the debtor does not engage in business after consummation of the plan, and (iii) the debtor would be denied a discharge in a case under chapter 7 of the Bankruptcy Code.  Because the Debtors and the Plan satisfy each of the foregoing requirements, they will not receive discharges in these Chapter 11 Case.

S.    **What is the effect of the Plan on the Debtors' ongoing business?**

The Debtors are liquidating under chapter 11 of the Bankruptcy Code.  Following Confirmation, the Plan will be consummated on the Effective Date, which is the date that is the first Business Day after the Confirmation Date on which (i) no stay of the Confirmation Order is in effect and (ii) all conditions precedent to the occurrence of the Effective Date set forth in Article IX of the Plan have been satisfied or waived.  On or after the Effective Date, and unless otherwise provided in the Plan, the Plan Administrator will commence the wind-down of the Wind-Down Debtors in accordance with the terms of the Plan. Additionally, upon the Effective Date, all actions contemplated by the Plan will be deemed authorized and approved.

T.    **Whom do I contact if I have additional questions with respect to this Disclosure Statement or the Plan?**

If you have any questions regarding this Disclosure Statement or the Plan, please contact the Debtors' Claims and Noticing Agent, Omni Agent Solutions, Inc., via one of the following methods:

> *By regular mail, hand delivery, or overnight mail at:*
> Claire's Holdings LLC
> Ballot Processing Center
> c/o Omni Agent Solutions, Inc.
> 5955 De Soto Ave., Ste 100
> Woodland Hills, CA 91367
>
> *By electronic mail at:*
> ClairesInquiries@OmniAgnt.com (with "Claire's Holdings LLC Solicitation Inquiry" in the subject line)
>
> *By telephone (toll free) at:*
> (888) 202-5971 (U.S./Canada, toll-free) or +1 (747) 293-0183 (International, toll)

Copies of the Plan, this Disclosure Statement, and any other publicly Filed documents in the Chapter 11 Cases are available upon written request to the Claims and Noticing Agent at the addresses and telephone numbers above or by downloading the exhibits and documents from the website of the Claims and Noticing Agent at https://omniagentsolutions.com/Claires (free of charge) or the Bankruptcy Court's website at http://www.deb.uscourts.gov (for a fee).

**U.      Could subsequent events potentially affect recoveries under the Plan?**

Potentially, yes.  Recoveries under the Plan are only guaranteed after the Plan is Confirmed and the Effective Date is reached.  Any number of subsequent events may interfere with Plan recoveries.

**V.      Do the Debtors recommend voting in favor of the Plan?**

Yes.  The Debtors believe that the Plan provides for a larger distribution to Holders of Claims than would otherwise result from any other available alternative.  The Debtors believe that the Plan is in the best interest of all Holders of Claims or Interests, and that any other alternatives (to the extent they exist) fail to realize or recognize the value inherent under the Plan.

## IV.      OVERVIEW OF THE PLAN

As discussed herein, the Plan contemplates liquidating the Debtors' remaining business and assets following the consummation of the Restructuring Transactions under chapter 11 of the Bankruptcy Code. The Plan contemplates the following key terms, among others described herein and therein:

**A.      General Settlement of Claims and Interests.**

As discussed in detail herein and as otherwise provided in the Plan, to the extent provided by the Bankruptcy Code, and in consideration for the classification, distributions, releases, and other benefits provided under the Plan, upon the Effective Date, the provisions of the Plan shall constitute a good-faith compromise and settlement of all Claims, Interests, Causes of Action, and controversies released, settled, compromised, or otherwise resolved pursuant to the Plan.  The Plan shall be deemed a motion to approve the good-faith compromise and settlement of all such Claims, Interests, and Causes of Action, and the entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of such compromise and settlement, as well as a finding by the Bankruptcy Court that such settlement and compromise is fair, equitable, reasonable, and in the best interests of the Debtors and their Estates.  Subject to **Error! Reference source not found.** of the Plan, all distributions made to Holders of Allowed Claims and Allowed Interests (as applicable) in any Class are intended to be and shall be final.

The recoveries to Holders of Claims against and Interests in the Debtors are described in Article III.D of this Disclosure Statement, entitled "What will I receive from the Debtors if the Plan is consummated?"

**B.      Sale Transaction.**

On August 18, 2025, the Debtors and the Purchaser entered into the Asset Purchase Agreement for the sale of the Going-Concern Assets.  The Sale Transaction represents the most value-maximizing result in these chapter 11 cases.  The Sale Transaction will, among other things, provide consideration of $104 million  in cash *plus* a $36 million seller note (subject to Purchase Price adjustments) *plus* an amount equal to the aggregate Cure Costs of all Assigned Contracts.  Proceeds of the Sale Transaction will enable the Debtors to fully paydown the Prepetition ABL Facility at close, cure all assumed and assigned executory contracts and unexpired leases, and fund distributions under the Plan.  The Sale Transaction also provides for the assumption of numerous liabilities, including employee related liabilities at the Acquired Stores. Importantly, the Sale Transaction will preserve thousands of jobs, provide continued business to hundreds of the Debtors' vendors and landlords, and allow the Claire's brand to remain a prominent retailer for teens, tweens, and young girls around the world.  The Asset Purchase Agreement provides the Debtors with a fiduciary out if, in the Debtors' business judgment, a superior alternative arises prior to the hearing to approve the Sale Transaction (the "Sale Hearing").

Among other things, pursuant to the Sale Transaction, the Acquired Assets shall be transferred to and vest in the Purchaser free and clear of all Liens, Claims, charges, Interests, or other encumbrances (except for those Liens, Claims, charges, Interests, or other encumbrances expressly assumed by the Purchaser pursuant to the terms of the Transaction Documents) pursuant to sections 363 and 1141(c) of the Bankruptcy Code and in accordance with the terms of the Transaction Documents.  In exchange, the Purchaser shall pay to the Debtors the Sale Proceeds in accordance with the terms of the Transaction Documents.

Certain of the Going-Concern Assets are held by the Debtors' non-Debtor affiliate, Claire's Stores Canada Corp., which is currently the subject of the CCAA Proceedings.  Approval of the Sale Transaction with respect to the Canadian Going-Concern Assets will be sought in the CCAA Proceedings on substantially the same timeline as the Sale Hearing.

C.    **Wind-Down Debtors.**

As more fully set forth in Article IV.F of the Plan, the Debtors shall continue in existence after the Effective Date as the Wind-Down Debtors for the purposes of (a) winding down the Debtors' business and affairs as expeditiously as reasonably possible and liquidating any Wind-Down Debtors' Assets held by the Wind-Down Debtors, if any, (b) resolving any Disputed Claims (other than Disputed General Unsecured Claims), (c) paying or otherwise satisfying Allowed Claims in accordance with the Waterfall Recovery, (d) filing appropriate tax returns (and, for the avoidance of doubt, may pursue any refunds, credits, or other tax benefits to which the Debtors and/or the Wind-Down Debtors are entitled and file any tax returns or other filings as are required in connection therewith), (e) winding down and dissolving any direct or indirect subsidiaries of the Wind-Down Debtors (solely to the extent the Wind-Down Debtors, in their sole and absolute discretion, elect to do so), (f) establishing and funding the Wind-Down Reserve; and (g) administering the Plan in an efficacious manner.

D.    **Plan Administrator.**

On the Effective Date, as laid out in Article IV.H of the Plan, the authority, power, and incumbency of the persons acting as directors and officers of each of the Debtors shall be deemed to have been terminated and such persons shall be deemed to have resigned, solely in their capacities as such, and the Plan Administrator shall have the power and authority to implement the Plan and take any actions reasonably necessary to further such implementation.

E.    **Dissolution of the Wind-Down Debtors.**

As laid out in Article IV.K of the Plan, upon a certification to be Filed with the Bankruptcy Court by the Plan Administrator of all Plan Distributions having been made and completion of all its duties under the Plan and entry of a final decree closing the last of the Chapter 11 Cases, each of the Wind-Down Debtors shall be deemed to be dissolved without any further action by such Wind-Down Debtor, including the filing of any documents with the secretary of state for the state in which each such Wind-Down Debtor is formed or any other jurisdiction.

F.    **Releases.**

The Plan contains certain releases, as described in Article III.K of this Disclosure Statement, entitled "Will there be releases and exculpation granted to parties in interest as part of the Plan?"  The release, exculpation, and injunction provisions that are contained in the Plan are copied below.  For the avoidance of doubt, the releases provided for in the Plan remain subject in all respects to the Special Investigation (as defined in the First Day Declaration).

14

1.    **Release of Liens.**

Except as otherwise provided in the Plan, the Plan Supplement, Confirmation Order, or any contract, instrument, release, or other agreement or document created pursuant to the Plan or Confirmation Order, immediately following the making of all distributions to be made to an applicable Holder pursuant to the Plan and, in the case of a Secured Claim, satisfaction in full of the portion of the Secured Claim that is Allowed as of the Effective Date, except for Other Secured Claims that the Debtors elect to reinstate in accordance with <u>Article III.B.1</u> of the Plan, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be automatically, unconditionally, and fully released, settled, and compromised, and all of the right, title, and interest of any Holder of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert automatically and unconditionally to the applicable Debtor and its successors and assigns. Any Holder of such Secured Claim (and the applicable agents for such Holder) shall be authorized and directed to release any collateral or other property of any Debtor (including any cash collateral and possessory collateral) held by such Holder (and the applicable agents for such Holder), and to promptly take such actions as may be reasonably requested by the Wind-Down Debtors to evidence the release of such Lien and/or security interest, including the execution, delivery, and Filing or recording of such releases. The presentation or Filing of the Confirmation Order to or with any federal, state, provincial, or local agency, records office, or department shall constitute good and sufficient evidence of, but shall not be required to effect, the termination of such Liens.

If any Holder of a Secured Claim that has been satisfied or released in full pursuant to the Plan or the Confirmation Order, or any agent for such Holder, has filed or recorded publicly any Liens and/or security interests to secure such Holder's Secured Claim, then as soon as reasonably practicable on or after the Effective Date, such Holder (or the agent for such Holder) shall take any and all steps requested by the Debtors or the Wind-Down Debtors that are necessary or desirable to record or effectuate the cancelation and/or extinguishment of such Liens and/or security interests, including the making of any applicable filings or recordings, and the Wind-Down Debtors shall be entitled to make any such filings or recordings on such Holder's behalf.

2.    **Releases by the Debtors.**[5]

[Notwithstanding anything contained in the Plan or the Confirmation Order to the contrary, pursuant to section 1123(b) of the Bankruptcy Code, for good and valuable consideration, the adequacy of which is hereby confirmed, upon entry of the Confirmation Order and effective as of the Effective Date, to the fullest extent permitted by applicable law, each Released Party is, and is deemed hereby to be, fully, conclusively, absolutely, unconditionally, irrevocably, and forever released by each and all of the Debtors, the Wind-Down Debtors, and their Estates, in each case on behalf of themselves and their respective successors, assigns, and representatives, including any Estate representative appointed or selected pursuant to section 1123(b)(3) of the Bankruptcy Code, from any and all Claims, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever, whether known or unknown, including any derivative claims, asserted or assertable on behalf of any of the Debtors, the Wind-Down Debtors, or their Estates, that any such Entity would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim against or Interest in a Debtor, the Wind-Down Debtors, or other Entity, or that any Holder of any Claim against or Interest in a Debtor, the Wind-Down Debtors, or other Entity could have asserted on behalf of the Debtors or the Wind-Down Debtors, to the extent such Claim or Cause of Action (x) has not been sold pursuant to the Transaction Documents and

---

[5]    For the avoidance of doubt, the releases provided for in the Plan remain subject in all respects to the Special Investigation.

(y) is based on or relating to, or in any manner arising from, in whole or in part, the Debtors or the Wind-Down Debtors (including the Debtors' and the Wind-Down Debtors' capital structure, management, ownership, or operation thereof or otherwise), the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor or Wind-Down Debtor and any Released Party, the Debtors' in- or out-of-court restructuring efforts, the purchase, sale, or rescission of any security of the Debtors or the Wind-Down Debtors, any Avoidance Actions (but excluding Avoidance Actions brought as counterclaims or defenses to Claims asserted against the Debtors or the Wind-Down Debtors), intercompany transactions between or among a Debtor, the Wind-Down Debtors, or an Affiliate of a Debtor and another Debtor, the Wind-Down Debtors, or Affiliate of a Debtor, the Chapter 11 Cases, the formulation, preparation, dissemination, solicitation, negotiation, entry into, or filing of the Disclosure Statement, the Plan, the Plan Supplement, the Transaction Documents, any other Definitive Document or any Wind-Down Transaction, or any contract, instrument, release, or other agreement or document created or entered into in connection with the Disclosure Statement, the Plan, the Plan Supplement, the Transaction Documents, any other Definitive Document, any of the Wind-Down Transactions, the Chapter 11 Cases, the filing of the Chapter 11 Cases, the pursuit of the Sale Transaction or the Whole Portfolio Liquidation, as applicable, the pursuit of Confirmation, the administration and implementation of the Plan, including the issuance or distribution of securities pursuant to the Plan, or the distribution of property under the Plan, or upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date, except for any claims arising from or related to any act or omission that is determined in a Final Order by a court of competent jurisdiction to have constituted actual fraud, willful misconduct, or gross negligence.

Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release:  (1) any performance obligations of any party or Entity under the Plan, the Transaction Documents, the Confirmation Order, any post-Effective Date transaction contemplated by the Plan or the Wind-Down Transactions, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan, the Transaction Documents (including the Purchase Agreement and any documents in connection therewith), or the Wind-Down Transactions; or (2) any matters retained by the Wind-Down Debtors pursuant to the Schedule of Retained Causes of Action.]

3.    Releases by the Releasing Parties.[6]

[Except as otherwise expressly set forth in the Plan or the Confirmation Order, effective as of the Effective Date, in exchange for good and valuable consideration, the adequacy of which is hereby confirmed, each Released Party is, and is deemed hereby to be, fully, conclusively, absolutely, unconditionally, irrevocably, and forever released by each Releasing Party from any and all claims and Causes of Action, whether known or unknown, including any derivative claims, asserted or assertable on behalf of any of the Debtors, the Wind-Down Debtors, or their Estates, that such Entity would have been legally entitled to assert (whether individually or collectively), based on or relating to or in any manner arising from, in whole or in part, the Debtors or the Wind-Down Debtors (including the Debtors' and the Wind-Down Debtors' capital structure, management, ownership, or operation thereof or otherwise), the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor or Wind-Down Debtor and any Released Party, the Debtors' in- or out-of-court restructuring efforts, the purchase, sale, or rescission of any security of the Debtors or the Wind-Down Debtors,

---

[6]    For the avoidance of doubt, the releases provided for in the Plan remain subject in all respects to the Special Investigation.

any Avoidance Actions (but excluding Avoidance Actions brought as counterclaims or defenses to Claims asserted by the Debtors or the Wind-Down Debtors), intercompany transactions, the Chapter 11 Cases, the formulation, preparation, dissemination, solicitation, negotiation, entry into, or filing of the Disclosure Statement, the Plan, the Plan Supplement, the Transaction Documents, any other Definitive Document, or any Wind-Down Transaction, or any contract, instrument, release, or other agreement or document created or entered into in connection with the Disclosure Statement, the Plan, the Plan Supplement, the Transaction Documents, any other Definitive Document, any of the Wind-Down Transactions, the Chapter 11 Cases, the filing of the Chapter 11 Cases, the pursuit of the Sale Transaction or the Whole Portfolio Liquidation, as applicable, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of securities pursuant to the Plan, or the distribution of property under the Plan, or upon any other related act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date, except for any claims arising from or related to any act or omission that is determined in a Final Order by a court of competent jurisdiction to have constituted actual fraud, willful misconduct, or gross negligence.

Notwithstanding anything to the contrary in the foregoing, the Third-Party Release does not release (1) any obligations arising on or after the Effective Date (solely to the extent such obligation does not arise from any acts or omissions prior to the Effective Date) of any party or Entity under the Plan, the Confirmation Order, or any post-Effective Date transaction contemplated by the Plan or the Wind-Down Transactions, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan or the Wind-Down Transactions or (2) the rights of any Holder of Allowed Claims to receive distributions under the Plan.]

4.    **Exculpation.**

Except as otherwise specifically provided in the Plan or the Confirmation Order, no Exculpated Party shall have or incur any liability for, and each such party shall be exculpated from any Cause of Action for any claim related to any act or omission occurring between the Petition Date and the Effective Date in connection with, relating to or arising out of the Chapter 11 Cases prior to the Effective Date, the formulation, preparation, dissemination, negotiation, or filing of the Disclosure Statement, the Transaction Documents, the Plan, the Plan Supplement, any other Definitive Document, or any Wind-Down Transaction, or any contract, instrument, release, or other agreement or document created or entered into in connection with the Disclosure Statement, the Plan, the Plan Supplement, the Transaction Documents, any other Definitive Document, any of the Wind-Down Transactions, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of the Sale Transaction or the Whole Portfolio Liquidation, as applicable, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance of securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, except for claims related to any act or omission that is determined in a Final Order to have constituted gross negligence, willful misconduct, or actual fraud.  Notwithstanding anything to the contrary in the foregoing, the exculpation set forth above does not exculpate any obligations arising on or after the Effective Date of any Person or Entity under the Plan, any post-Effective Date transaction contemplated by the Wind-Down Transactions, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan.

Notwithstanding anything herein to the contrary, nothing in the Plan shall affect, limit, or release in any way any performance obligations of any party or Entity under the Plan, the Transaction Documents, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan or the Transaction Documents (including the Purchase Agreement and any documents in connection therewith).

**5.    Injunction.**

**In accordance with Bankruptcy Code section 1141(d)(3), the Plan does not discharge the Debtors.  Section 1141(c) of the Bankruptcy Code nevertheless provides, among other things, that the property dealt with by the Plan is free and clear of all Claims and Interests against the Debtors.  Except as otherwise expressly provided in the Plan or for obligations issued or required to be paid pursuant to the Plan or the Confirmation Order, all Persons or Entities who have held, hold, or may hold Claims, Interests, or Causes of Action in the Debtors and the Wind-Down Debtors, shall be precluded and permanently enjoined on and after the Effective Date, from taking any of the following actions against the Debtors, the Wind-Down Debtors (but solely to the extent such action is brought against the Debtors or the Wind-Down Debtors to directly or indirectly recover upon any property of the Estates, upon the Effective Date), the Exculpated Parties, the Released Parties, and any successors, assigns, or representatives of such Persons or Entities, solely with respect to any Claims, Interests, or Causes of Action that will be or are treated by the Plan:  (a) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims or Interests; (b) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against such Entities on account of or in connection with or with respect to any such Claims or Interests; (c) creating, perfecting, or enforcing any encumbrance of any kind against such Entities or the property or the Estates of such Entities on account of or in connection with or with respect to any such Claims or Interests; (d) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from such Entities or against the property of such Entities on account of or in connection with or with respect to any such Claims or Interests unless such holder has Filed a motion requesting the right to perform such setoff on or before the Effective Date, and notwithstanding an indication of a Claim or Interest or otherwise that such Holder asserts, has, or intends to preserve any right of setoff pursuant to applicable law or otherwise; and (e) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims or Interests released, compromised, or settled pursuant to the Plan.**

**Upon entry of the Confirmation Order, all Holders of Claims and Interests and their respective current and former employees, agents, officers, directors, managers, principals, and direct and indirect Affiliates, in their capacities as such, shall be enjoined from taking any actions to interfere with the implementation or Consummation of the Plan.  Each Holder of an Allowed Claim, by accepting, or being eligible to accept, distributions under or Reinstatement of such Claim or Interest, as applicable, pursuant to the Plan, shall be deemed to have consented to the injunction provisions set forth in <u>Article VIII.E</u> of the Plan.**

## V.    THE DEBTORS' CORPORATE HISTORY, STRUCTURE, AND BUSINESS OVERVIEW

### A.    Claire's Corporate History and Business Operations.

Headquartered in Hoffman Estates, Illinois, Claire's is a go-to establishment for ear piercing, having pierced over 100 million ears since 1978.  Customers visiting a *Claire's*® store will find colorful and trendy earrings, necklaces, bracelets, purses, hair accessories, fashion accessories, stuffed animals, makeup, perfumes, and licensed merchandise targeted towards girls, tweens, and teens, in addition to ear-piercing services provided in-store through fully-trained staff.  The Company has attracted loyal customers for more than 40 years through generational relationships.  As *Claire's*® customers mature through their teenage years into young adulthood, *Icing*® branded stores offer a sophisticated line of jewelry, beauty products, and fashion accessories, as well as ear-piercing services.

The Company operates (a) approximately 2,300 brick-and-mortar stores, consisting of (i) approximately 1,970 *Claire's*® stores located in 17 countries throughout North America and Europe,

(ii) approximately 210 *Claire's*® "Store-in-Store" ("SiS") locations inside Walmart stores in North America, and (iii) approximately 120 *Icing*® stores in North America, and (b) approximately 9,000 Concessions locations throughout North America and Europe.  In addition, Claire's franchisees operate approximately 230 franchised stores, primarily located in the Middle East and South Africa.[7]  Globally, the Company employs approximately 13,000 employees.  As of the Petition Date, the Debtors employ approximately 7,000 employees who work in their retail stores, corporate offices, and distribution centers, and who are essential to the Debtors' ordinary course business operations.

The Company has been a staple in the retail industry since its inception, providing its customers with opportunities for fun, fashion, and flair.  The Company operates under two distinct brands: (i) *Claire's*®, the fun fashion destination for jewelry, cosmetics, accessories, and ear piercing primarily targeted to tweens, teens, and young girls and (ii) *Icing*®, the jewelry, accessories, and cosmetics "it" store for young women.

As more fully described in the First Day Declaration, the Company's business is divided into four main business lines:  (i) Brick & Mortar; (ii) Concessions;  (iii) E-commerce;  and  (iv) Franchise. Geographically, the Company's operations are organized in two divisions: (i) the North American division, which encompasses the Debtors' operations in the United States (including Puerto Rico) and non-Debtor Claire's Stores Canada Corp.'s Canadian operations; and (ii) the European division, which encompasses the Company's operations in the UK, the Republic of Ireland, and continental Europe.  The Company primarily derives its revenue from its world-leading ear-piercing services and merchandise sold in its brick-and-mortar and Concessions retail locations across North America and Europe.

Debtor Claire's Holdings LLC is the ultimate parent company of the 13 other Debtors in these Chapter 11 Cases, along with 28 non-Debtor affiliates.

Claire's emerged from its prior prearranged chapter 11 cases in 2018 (the "Prior Cases") with a reorganized balance sheet that eliminated $1.9 billion of funded debt, a right-sized lease portfolio commensurate with the 2018 retail environment, and a business that was poised to succeed in a highly competitive retail environment.  While Claire's experienced a slump in sales during the initial approximately three months of the COVID-19 pandemic, Claire's was well positioned to capitalize on pent-up demand when it reopened the majority of its stores in May 2020, as state and local governments began to ease COVID-19 related restrictions.  As further described in the First Day Declaration, the Company expanded its physical locations beyond its core brand identity and business, however, this strategy did not comprehensively offset the decline in in-person shopping, the rise of e-commerce across the board, and increased costs, first from labor and other inflation, and then from tariffs.

B.      The Debtors' Prepetition Initiatives.

Claire's undertook numerous prepetition initiatives to address its liquidity challenges, create runway to advance its prepetition marketing process, and facilitate a smooth landing into chapter 11.  As a part of these initiatives, the Company responded to the operational and business performance challenges described above, and in greater detail in the First Day Declaration, by making certain key changes to its management team.  The new management team implemented additional structure to the ongoing process of developing and implementing a comprehensive turnaround plan focused on improving all areas of the Company's business (the "Turnaround Plan").  The Turnaround Plan focused on foundational retail pillars, including the Company's product offerings, promotions, and marketing, pricing, and in store experience. Specifically, the Turnaround Plan was focused on:  (a) strengthening the Company's management team;

---

[7]     The Company's foreign entities, other than Debtor Claire's (Gibraltar) Holdings Limited, are not debtors in these Chapter 11 Cases.

(b) renewing the Company's focus on "fresh" product offerings and cosmetic and beauty products; (c) improving the in-store experience that Claire's offers its customers, including by conducting customer tests on various floor sets and product launches; (d) implementing pricing adjustments to improve competitiveness; (e) improving inventory management and systems, (f) overhauling the Company's product design and production teams and processes; (g) clearing out inventory build ups; and (h) enhancing the Company's marketing and promotions strategy.

Adjunct to the Company's turnaround plan efforts, the Company also cleared out overstocked inventory to unlock working capital and free up physical space at the Company's stores and distribution centers for new, vibrant product offerings in line with current trends.  In addition to these efforts, the Company also adjusted its pricing to be more competitive with its market peers and developed internal processes to evaluate leading performance indicators with respect to, among other things, gross margin return, product turnover, customer acquisition and retention, savings from non-merchandise procurement, and sales penetration from new products.

The Company raised incremental financing in the form of the $50 million Priority Term Loan Facility in September 2024 to fund the Company's turnaround efforts and working capital needs.  The Priority Term Loan Facility was subsequently upsized by an additional $50 million in February 2025. While Claire's was confident that the Turnaround Plan would position Claire's for future success, implementing a turnaround takes time.  Despite green shoots in the business as a result of the Turnaround Plan, the Company simply ran out of time.

### C.    The Debtors' Prepetition Capital Structure.

As of the Petition Date, the Debtors have approximately $690.8 million in principal amount of total funded debt obligations.  The following table depicts the Debtors' prepetition capital structure.

| Debt Facility | Maturity | Approximate Principal Outstanding |
|---|---|---|
| *Secured Debt* | | |
| **ABL Facility** | September 30, 2027[8] | $63.5 million[9] |
| **Priority Term Loan Facility** | May 15, 2026 | $121.2 million |
| **Existing Term Loan Facility** | December 18, 2026 | $506.2.0 million |
| | **Total:** | **$690.8 million** |

### 6.    The ABL Facility.

The Debtors are party to that certain ABL Credit Agreement, dated as of September 30, 2022 (as amended, restated, amended and restated, supplemented, or otherwise modified from time to time, including as amended by that certain First Amendment, dated as of May 31, 2024, and that certain Second Amendment, dated as of May 2, 2025, that certain Third Amendment and Limited Waiver, dated as of June

---

[8]    If (a) more than $50 million of Existing Term Loan is outstanding and (b) unrestricted cash *plus* excess availability is less than the amount of outstanding Existing Term Loan, then the ABL Facility maturity date occurs 91 days before the Existing Term Loan Facility maturity date.

[9]    The Company also has approximately $5.7 million of undrawn letters of credit issued and outstanding under the ABL Facility supporting workers compensation and general liability insurance, among other obligations.

25, 2025, and that certain Fourth Amendment, dated as July 2, 2025, the "ABL Credit Agreement") by and among Claire's Holdings LLC, as the parent guarantor, Claire's Stores, Inc. and other domestic borrowers party thereto from time to time, Claire's (Gibraltar) Holdings Limited, and U.K. borrowers party thereto from time to time, certain financial institutions party thereto from time to time as lenders, and JPMorgan Chase Bank, N.A. as administrative agent, collateral agent, lender, letter of credit issuer and swingline lender.  The ABL Credit Agreement provides for an asset based revolving credit facility with commitments of $150 million (the "ABL Facility," the lenders thereunder, the "ABL Lenders," and the secured parties thereunder, the "ABL Secured Parties"), with borrowings subject to capacity under the U.S. Borrowing Base and U.K. Borrowing Base (as defined in the ABL Credit Agreement).  For loans in U.S. dollars, the ABL Facility bears interest at SOFR + 1.25-1.75%.[10]   All loans under the ABL Facility mature on September 30, 2027.

The guarantors under the ABL Credit Agreement are, in each case other than with respect to their own borrowing obligations:  Claire's Holdings LLC, the Existing Term Loan Guarantors,[11] the Priority Term Loan Guarantors,[12] Claire's (Gibraltar) Holdings Limited, Claire's European Services Limited, Claire's Accessories UK Ltd, and Claire's European Distribution Limited.  Claire's (Gibraltar) Holdings Limited and the U.K. Borrowers[13] guarantee the borrowings of Claire's (Gibraltar) Holdings Limited and U.K. Borrowers only, in each case other than with respect to their own borrowing obligations.  The ABL Facility is secured by liens on substantially all of the Debtors' assets, including a first-priority lien on, among other things, inventory, accounts, and certain receivables (the "ABL Priority Collateral"), and a second-priority lien on substantially all other assets, including, among other things, intellectual property and certain stock pledges (the "Term Loan Priority Collateral").  As of the Petition Date, $63.5 million in borrowings remain outstanding under the ABL Facility as well as approximately $5.7 million of undrawn letters of credit issued and outstanding under the ABL Facility that support workers compensation and general liability insurance, among other obligations.

### 7.  The Term Loan Facilities.

#### i.    The Priority Term Loan Facility.

Claire's Boutiques, Inc. is party to that certain Priority Term Loan Credit Agreement, dated as of September 23, 2024 (as amended, restated, amended and restated, supplemented, or otherwise modified from time to time, including as amended by that certain Amendment No. 1 to Priority Term Loan Credit Agreement, dated as of February 20, 2025, that certain Amendment No. 2 to Priority Term Loan Credit Agreement, dated as of February 27, 2025, that certain Amendment No. 3 to Priority Term Loan Credit Agreement, dated as of May 2, 2025, that certain Amendment No. 4 to Priority Term Loan Credit Agreement and Amendment No. 1 to Guarantee and Collateral Agreement, dated as of June 2, 2025, that certain Amendment No. 5 to Priority Term Loan Credit Agreement and Amendment No. 2 to Guarantee

---

[10]   The ABL Credit Agreement contains 0.10% credit spread adjustment on Term SOFR loans.  The ABL Credit Facility includes a SOFR "floor" (including the credit spread adjustment) of 0.00%.

[11]   The "Existing Term Loan Guarantors" are:  (i) Claire's Holdings LLC; (ii) Claire's Puerto Rico Corp.; (iii) Claire's Boutiques, Inc.; (iv) Claire's Canada Corp.; (v) Claire's Swiss Holdings LLC; (vi) Claire's Swiss Holdings II LLC; (vii) CSI Canada LLC; (viii) CBI Distributing Corp.; (ix) CLSIP Holdings LLC; (x) BMS Distributing Corp.; (xi) CLSIP LLC; and (xii) Claire's Intellectual LLC.

[12]   The "Priority Term Loan Guarantors" are:  (i) all of the Existing Term Loan Guarantors, other than Claire's Boutiques, Inc. (the borrower under the Priority Term Loan Facility); and (ii) Claire's Stores, Inc.

[13]   The "U.K. Borrowers" are:  (i) Claire's European Services Limited; (ii) Claire's Accessories UK Ltd.; and (iii) Claire's European Distribution Limited.

and Collateral Agreement, dated as June 25, 2025, and that certain Amendment No. 6 to Priority Term Loan Credit Agreement, dated as July 1, 2025 the "Priority Term Loan Credit Agreement"), by and among Claire's Holdings LLC, as the parent guarantor, Claire's Boutiques, Inc., as borrower, certain financial institutions party thereto from time to time as lenders, and Ankura Trust Company LLC, as administrative and collateral agent (the "Priority Term Loan Agent"). The obligations under the Priority Term Loan Credit Agreement are guaranteed by the Priority Term Loan Guarantors.

The Priority Term Loan Credit Agreement provides for a secured term loan facility (the "Priority Term Loan Facility," the loans thereunder, the "Priority Term Loans," and the lenders thereunder, the "Priority Term Loan Lenders") secured by liens on substantially all of the Debtors' assets, including a first-priority lien on Term Loan Priority Collateral, and a second-priority lien on ABL Priority Collateral, subject to exclusions for certain excluded collateral and limitations on perfection steps as set forth in the Priority Term Loan Credit Agreement. The Priority Term Loan Facility bears interest at SOFR[14] + 7.25%, and such interest is paid in-kind. The Priority Term Loan Facility matures on May 15, 2026. As of the Petition Date, the outstanding principal amount of the Priority Term Loan Facility is approximately $121.2 million.

The Company initially entered into the Priority Term Loan Facility in September 2024, borrowing $50 million in an effort to address the Company's working capital needs and provide runway for the Company to refine and implement its Turnaround Plan. While the Priority Term Loan Facility provided the Company with time to formulate and begin to execute on its Turnaround Plan, by the first quarter of 2025, it became clear that the Company would need incremental financing. The Company obtained an additional $50 million in the form of incremental Priority Term Loans pursuant to the Amendment No. 3 to Priority Term Loan Credit Agreement, which was executed on February 27, 2025.

As set forth in greater detail in the First Day Declaration, the Debtors subsequently raised an incremental $16 million of Priority Term Loans in June 2025. The Debtors continued to reach out to the Term Lenders in June and July 2025 to raise additional incremental Priority Term Loans, but the Term Lenders ultimately elected not to contribute additional capital.

### ii.  The Existing Term Loan Facility.

Claire's Stores, Inc. is party to that certain Term Loan Credit Agreement, dated as of December 18, 2019 (as amended, restated, amended and restated, supplemented, or otherwise modified from time to time, including as amended by that certain Amendment No. 1 to Term Loan Credit Agreement, dated as of March 17. 2023, that certain Amendment No. 2 to Term Loan Credit Agreement, dated as of September 23, 2024, that certain Amendment No. 3 to Term Loan Credit Agreement, dated as of February 27, 2025, that certain Amendment No. 4 to Term Loan Credit Agreement, dated as of April 28, 2025, and that certain Amendment No. 5 to Term Loan Credit Agreement, dated as of July 1, 2025, the "Existing Term Loan Credit Agreement"), by and among Claire's Holdings LLC, as the parent guarantor, Claire's Stores, Inc., as borrower, certain financial institutions party thereto from time to time as lenders, and Ankura Trust Company, LLC, as administrative and collateral agent. The Existing Term Loan Credit Agreement provides for a secured term loan facility (the "Existing Term Loan Facility," the lenders thereunder, the "Existing Term Loan Lenders," together with the Priority Term Loan Lenders, the "Term Lenders," and together with the Priority Term Loan Lenders and ABL Lenders, the "Prepetition Secured Lenders"). The Existing Term

---

[14]   The Priority Term Loan Facility includes a SOFR "floor" of 1.00%.

Loan Facility bears interest at SOFR + 6.50%,[15] with such interest paid in-kind at the option of the Debtors and matures on December 18, 2026.

The Existing Term Loan Credit Agreement is guaranteed by the Existing Term Loan Guarantors. Like the Priority Term Loan Facility, the Existing Term Loan Facility is secured by liens on substantially all of the Debtors' assets, including a first-priority lien on Term Loan Priority Collateral, and a second-priority lien on ABL Priority Collateral, subject to exclusions for certain excluded collateral and limitations on perfection steps as set forth in the Existing Term Loan Credit Agreement. As of the Petition Date, the outstanding principal amount of the Existing Term Loan Facility is approximately $506.2 million.

### a.        Intercreditor Arrangements.

The relationship between the Priority Term Loan Facility and the Existing Term Loan Facility (collectively, the "Term Facilities") is governed by that certain Priority First Lien Intercreditor Agreement, dated as of September 23, 2024, (as amended, restated, amended and restated, supplemented, or otherwise modified from time to time) between, *inter alios*, Ankura Trust Company, LLC, as the priority first lien administrative agent and Ankura Trust Company, LLC, as the existing credit agreement administrative agent (the "Term Loan Priority Intercreditor Agreement"). Pursuant to the Term Loan Priority Intercreditor Agreement, the Priority Term Loan Facility is senior in right of payment vis-à-vis the Existing Term Loan Facility. The Term Loan Priority Intercreditor Agreement also provides that, notwithstanding the date, time, manner or order of grant, attachment, or perfection of the liens securing the Priority Term Loan Facility and Existing Term Loan Facility, such liens are of equal priority.

The relationship between the Term Facilities and the ABL Facility is governed by that certain ABL Intercreditor Agreement, dated as of December 18, 2019 (as amended, restated, amended and restated, supplemented, or otherwise modified from time to time, including as supplemented by that certain Lien Sharing and Priority Confirmation Joinder, dated as of September 23, 2024, the "ABL Intercreditor Agreement") among, *inter alios*, JPMorgan Chase Bank, N.A., as ABL agent (the "ABL Agent"), and Ankura Trust Company, LLC, as existing administrative agent and priority first lien administrative agent. The ABL Intercreditor Agreement provides that the ABL Facility has a senior lien on ABL Priority Collateral vis-à-vis the Term Facilities and a junior lien on non-ABL Priority Collateral vis-à-vis the Term Facilities, irrespective of the time, order or method of creation, attachment or perfection of the liens securing the ABL Facility and Term Facilities.

### b.        Common and Preferred Equity Interests.

The equity of parent Debtor Claire's Holdings LLC ("Claire's Holdings") consists of preferred equity units and common equity units. As of the Petition Date, approximately 835,200 of Claire's Holdings' Series A preferred units (the "Series A Preferred Units")[16] and 782,658 common units (the "Common Units") were issued and outstanding.[17] The Series A Preferred Units and Common Units are not listed on a national securities exchange.

---

[15]   Lenders under the Existing Term Loan Facility benefit from a 0.10% credit spread adjustment. The Existing Term Loan Facility includes a SOFR "floor" (including the credit spread adjustment) of 0.00%.

[16]   As of the Petition Date, of the Series A Preferred Units, approximately 708 are Reduced-Voting Series A Preferred Units.

[17]   As of the Petition Date, of the Common Units, approximately 679 are Reduced-Voting Common Units.

## VI.    EVENTS LEADING TO THE CHAPTER 11 FILINGS

### A.    Retention of Advisors.

The Company initially engaged Kirkland & Ellis LLP ("K&E") in April 2025 in connection with the Credit Agreement Amendments, and formally retained K&E on May 9, 2025, as restructuring counsel. The Company subsequently retained Alvarez & Marsal North America LLC, as financial advisor for its North American operations, on May 2, 2025, Houlihan Lokey ("Houlihan"), as investment banker, on May 13, 2025, and Interpath Ltd ("Interpath"), as financial and operational advisor for its European operations, on May 30, 2025.

The Debtors also retained Omni Agent Solutions, Inc. as claims and noticing agent and as a consulting and administrative services provider on June 20, 2025, and Richards, Layton & Finger, PA as Delaware co-counsel, on July 7, 2025.

### B.    Credit Agreement Amendments.

The Debtors engaged with their Prepetition Secured Lenders for months in advance of the Petition Date as the Debtors sought to raise incremental liquidity and secure sufficient time to implement the Turnaround Plan and conduct the prepetition marketing process. In April 2025, the Debtors approached the ABL Lenders regarding an extension of the June 30, 2025 deadline under the ABL Facility to deliver audited fiscal 2024 annual financials to July 1, 2025, and fiscal 2025 quarter one financials to July 2, 2025. In consideration for this extension and the runway provided by the same, the Debtors agreed to provide the ABL Lenders with, among other things, additional on-going reporting, including 13-week cash forecasts, weekly variance reports, and weekly borrowing base certificates, additional financial covenants (including a fixed charge coverage ratio), and certain restrictive covenants prohibiting certain liability management transactions that would prime ABL Priority Collateral.  Following weeks of good-faith, arm's-length negotiations, the Company executed an amendment of the ABL Credit Agreement on June 25, 2025.

Simultaneously, the Debtors engaged with the Priority Term Loan Lenders and Existing Term Loan Lenders regarding an extension of the deadline to provide audited financials under the Term Loan Facilities and conversion of cash interest under the Existing Term Loan Facility to be paid-in-kind.  The Priority Term Loan Lenders and Existing Term Loan Lenders each provided an extension of the deadline to deliver audited financials.  Additionally, the Existing Term Lenders agreed to the conversion of cash interest under the Existing Term Loan Facility to be paid-in-kind in consideration for a 5.00% PIK fee payable upon each interest payment date during a PIK election (together with the ABL Credit Agreement amendment described in the preceding paragraph, the "Credit Agreement Amendments").

These amendments provided the Debtors with incremental liquidity and critical breathing room for the Debtors to explore strategic alternatives, including the prepetition marketing process.

### C.    Governance Initiatives.

On May 14, 2025, the Company appointed David Barse and William Transier as independent and disinterested managers (the "Independent Managers") to assist the Claire's Holdings Board[18] in exploring, negotiating, evaluating, and executing potential strategic value-maximizing transactions. Contemporaneously with the appointment of the Independent Managers, the Claire's Holdings Board

---

[18]    On June 1, 2025, Independent Managers were appointed to the boards of the following Debtor entities and were appointed to special committees of such boards:  (i) Claire's Stores, Inc.; (ii) Claire's Puerto Rico Corp.; (iii) CBI Distributing Corp.; (iv) Claire's Boutiques, Inc.; (v) Claire's Canada Corp.; (vi) BMS Distributing Corp.; (vii) CSI Canada LLC; (viii) CLSIP Holdings LLC; (ix) CLSIP LLC; (x) Claire's Swiss Holdings LLC; and (xi) Claire's Swiss Holdings II LLC.

formed a special committee consisting solely of the Independent Managers (the "Special Committee") and delegated to it, among other things: (a) the authority to, on behalf of the entire Board and as it deems appropriate or desirable in its discretion, take any action with respect to conflicts matters and (b) without limiting the authority of the Board other than with respect to conflicts matters, the authority to review, discuss, consider, negotiate, approve, and authorize the Company's entry into and consummation of a transaction.

### 1. Investigation.

As of July 23, 2025, the Company, at the sole direction of the Independent Managers, engaged Katten Muchin Rosenman LLP ("Katten") as independent counsel to assist in, among other things, conducting an independent investigation (the "Special Investigation") into any and all potential estate claims and causes of action against various related parties arising from the Company's prepetition transactions. The Independent Managers, with the assistance of Katten, have begun conducting the Special Investigation. In connection with the Special Investigation to date, the Independent Managers, with the assistance of Katten have, among other things, issued document and information requests to the Company seeking, among other things, board materials and minutes, corporate governance documents, transaction documents, financial and accounting information, and other documents and information relevant to the Special Investigation. As of the date hereof, the Company has responded and continues to respond to all document and information requests. The Independent Managers, with the assistance of Katten, are continuing to investigate all matters relevant to the Special Investigation in accordance with their delegated authority and fiduciary obligations. Accordingly, the Special Investigation remains ongoing as of the date hereof.

### D. Subsequent Waiver Amendments.

As the deadline approached to deliver financial reporting to the Prepetition Secured Lenders, the Company negotiated and executed amendments to the Priority Term Loan Credit Agreement and Existing Term Loan Credit Agreement on July 1, 2025, waiving, among other things, the requirement to deliver audited fiscal 2024 annual financials, fiscal 2025 quarter one financials and fiscal 2025 quarter two financials. After the deadline to deliver certain financial reporting pursuant to the ABL Credit Agreement, the Company executed an amendment to the ABL Credit Agreement, on July 2, 2025, that waived defaults for failure to provide such financial reporting and extended the deadline to deliver audited fiscal 2024 annual financials and fiscal 2025 quarter one financials to July 7, 2025, in consideration for, among other things, a pause on borrowing under the ABL Facility. These amendments provided further flexibility for the Company to continue refining a go-forward business plan and continue its efforts with respect to the prepetition marketing process.

### E. Imposition of Reserve Notices.

In accordance with the ABL Credit Agreement, on May 28, 2025, the ABL Agent delivered a $5 million reserve notice for upcoming professional fees and other expenses that may arise in the event of a restructuring. Around the same time, the ABL Agent requested additional field exam reserves, which had a net availability impact of approximately $5 million. The ABL Agent subsequently delivered an additional $5 million reserve notice on June 7, 2025, also for upcoming professional fees, as well as a notice of default related to failure to execute deposit control accounts in respect of certain accounts.

The ABL Agent further delivered a reserve notice for $12.5 million on June 29, 2025 (the "June 29 Reserve Notice"), stating that it was imposed as a result of the decline in the value of Eligible Inventory in the U.S. Borrowing Base as outlined in the latest inventory appraisal (each as defined in the ABL Credit Agreement).

### F.    Priority Term Loan Capital Raise.

The Debtors reached out to the Term Lenders in May 2025 to raise incremental Priority Term Loans to fund the business while the Company continued to pursue strategic alternatives.  The Debtors raised approximately $16 million of incremental Priority Term Loans in June 2025, which were funded into an escrow account outside of the Debtors' cash management system.

### G.    Formulation of Go-Forward Business Plan.

Following execution of the Credit Agreement Amendments, the Debtors, with the assistance of their advisors, developed a go-forward business plan (the "Go-Forward Business Plan") centered on a smaller, more profitable footprint with rationalized overhead cost.  The plan considered three key structural changes to the business:  (i) closure of approximately 700 stores in North America (including the closure of all Walmart SiS and *Icing*® locations) to remove drag on four-wall profitability and reduce operational complexity across the brick-and-mortar channel, (ii) reduction of corporate selling, general, and administrative ("SG&A") expenses driven by targeted assessment of go-forward requirements as well as renegotiated contract savings, and (iii) winddown of the Debtors' North America Concessions business due to weak inventory turnover and return on capital.

### H.    Prepetition Marketing Process.

The Company, with the assistance of Houlihan and Interpath, launched a third-party marketing process on June 2, 2025, to sell some or all of its assets in North America and abroad.  The Go-Forward Business Plan was provided to all marketing process participants that executed NDAs and served as the basis for such parties to evaluate the opportunity to purchase some or all of the Company's assets.  The Company contacted over 150 prospective transaction parties, including a broad range of strategic and financial buyers, and executed confidentiality agreements with approximately 60 parties.  The Debtors received multiple letters of intent prior to the Petition Date.

The Debtors simultaneously solicited, received, and evaluated partial- and whole-portfolio liquidation equity and fee-for-service bids from two parties (the "Liquidation Bidders," and such bids, the "Liquidation Bids").  The Liquidation Bids contemplated:  (a) liquidation of a portion of the Debtors' North American portfolio comprised of approximately 400 standalone stores and 210 SiS locations ("Exited Stores"); (b) liquidation of all of the Debtors' North American portfolio, comprised of approximately 1,260 standalone stores and approximately 210 SiS locations ("Total Portfolio"); and (c) in a going-concern scenario, renegotiation and/or restructuring of lease terms for a portion of a the Debtors' North American portfolio comprised of approximately 800 stores.  The Liquidation Bidders were asked to provide equity and agency bids, as well as an expected timeline for completion, for each of the Exited Stores and Total Portfolio liquidation scenarios.  After several weeks of negotiations, the Debtors determined that Hilco's bid represented the highest or otherwise best Liquidation Bid and executed a fee-for-service agreement with Hilco on July 24, 2025.

### I.    Entry into Forbearance Agreement to Secure Necessary Liquidity Runway.

Following the June 29 Reserve Notice, the Company and the ABL Agent negotiated the terms of a forbearance agreement that would de risk the ABL lenders in consideration for time and stability to allow the marketing process to proceed on an out of court basis.  The Company and the ABL Lenders executed that certain Forbearance and Amendment Agreement (the "Forbearance Agreement") on July 16, 2025, which provided, among other things, that the ABL Lenders would suspend further reserves and not implement cash dominion in exchange for the Company (i) transferring the incremental Priority Term Loans into a controlled account, (ii) making weekly paydowns of the ABL Facility during the forbearance period, and (iii) complying with certain parallel path Going-Concern Scenario and Liquidation Scenario

milestones (as subsequently extended by agreement of the parties).[19]  The Forbearance Agreement paved the path for the Debtors to advance their marketing process on a prepetition basis and facilitated an orderly and organized transition into chapter 11.

###### J.    CCAA Proceeding.

On August 6, 2025, the Debtors' non-Debtor affiliate, Claire's Stores Canada Corp., made an application to the Ontario Superior Court of Justice (Commercial List) seeking protection pursuant to the *Companies' Creditors Arrangement Act*, R.S.C. 1985, c. C-36, as amended (the "CCAA" and the related proceedings, the "CCAA Proceedings").  Claire's Stores Canada Corp. intends to use the breathing space afforded by the CCAA Proceedings to pursue various avenues of restructuring on an expedited basis, including approval of the Sale Transaction with respect to the Canadian Go-Forward Assets.  Following such approval, Claire's Stores Canada Corp. will conduct an orderly liquidation and wind-down of its operations.

Claire's Stores Canada Corp. funds its own day-to-day operations, including payroll, rent, and local vendor expenses.  The Debtors do not anticipate the need to transfer funds to Claire's Stores Canada Corp. during these Chapter 11 Cases.

## VII.    MATERIAL DEVELOPMENTS AND ANTICIPATED EVENTS OF THE CHAPTER 11 CASES AND PATH FORWARD IN CHAPTER 11

###### A.    First Day Relief.

On the Petition Date, along with their voluntary petitions for relief under chapter 11 of the Bankruptcy Code (the "Petitions"), the Debtors Filed several motions (the "First Day Motions") intended to facilitate the Debtors' transition into chapter 11, facilitate the efficient administration of these Chapter 11 Cases, and maximize the value of the Debtors' estates for the benefit of all interested parties.

A brief description of each of the First Day Motions and the evidence in support thereof is set forth in the First Day Declaration, Filed on the Petition Date.  The First Day Motions, the First Day Declaration, and all orders for relief granted in these Chapter 11 Cases, can be viewed free of charge at https://omniagentsolutions.com/Claires.  On August 7 and 8, 2025, the Bankruptcy Court entered orders approving the First Day Motions on either an interim or final basis.

###### B.    Additional Motions Filed on the Petition Date.

On the Petition Date, the Debtors also Filed several other motions to further facilitate the smooth and efficient administration of the Chapter 11 Cases and reduce the administrative burdens associated therewith, including:

- Assumption and Rejection Procedures Motion.  The *Motion of Debtors for Entry of an Order (I) Authorizing and Approving Procedures to Reject or Assume Executory Contracts and Unexpired Leases, and (II) Granting Related Relief* [Docket No. 15] seeks authorization and approval of procedures for rejecting, assuming, or assuming and assigning executory contracts and unexpired leases.

---

[19]   This summary of the Forbearance Agreement milestones is provided for the convenience of the Court and parties in interest. To the extent there is any conflict between this summary and the Forbearance Agreement, the Forbearance Agreement shall govern in all respects.

- Omnibus Rejection Motion.  The *Omnibus Motion of Debtors for Entry of an Order (I) Authorizing the Rejection of Certain Unexpired Leases, (II) Authorizing the Abandonment of Certain Personal Property, Each Effective as of the Petition Date, and (III) Granting Related Relief* [Docket No. 14] seeks authorization of (a) the rejection of certain unexpired leases for nonresidential real property and (b) the abandonment of certain equipment, fixtures, furniture, or other personal property.

- Schedules and Statements Extension Motion.  The *Motion of Debtors for Entry of an Order (I) Extending Time to File Schedules of Assets and Liabilities, Schedules of Current Income and Expenditures, Schedules of Executory Contracts and Unexpired Leases, Statements of Financial Affairs, and Rule 2015.3 Financial Reports and (II) Granting Related Relief* [Docket No. 11] seeks, among other things, an extension of the Debtors' deadline to file Schedules and Statements to the date that is 58 days from the Petition Date.

**C.    Continued Marketing Process, Store Closing Sales, and Going-Concern Sale Transaction.**

As described in the Preliminary Statement, the Debtors launched a dual-track prepetition marketing process to sell their business as a going-concern or, in the absence of any going-concern transaction, commence a full chain liquidation.  On August 8, 2025, the Court entered the Interim Store Closing Order pursuant to which the Debtors commenced a full chain liquidation process for all of their brick-and-mortar stores.  Importantly, the Debtors maintained the flexibility under the Agency Agreement, subject to the consent of their lenders, to stop the liquidation sales in the event that an actionable going-concern transaction materialized.

The Debtors continued their marking process on a postpetition basis.  The Debtors worked with potential purchasers in the initial weeks of these chapter 11 cases to solidify one or more of the non-binding letters of intent into binding commitments to purchase some or all of the Debtors' assets.  As a result, the Debtors engaged with the Purchaser on the terms of the Asset Purchase Agreement.  Simultaneously therewith, the Debtors continued to progress the other letters of intent in the event that the Sale Transaction did not come to fruition.

On August 18, 2025, the Debtors and the Purchaser entered into the Asset Purchase Agreement, pursuant to which the Purchaser would acquire the Going-Concern Assets.  The Purchaser agreed to provide postpetition financing, which, in addition to certain relief and concessions provided by the Prepetition Secured Parties, will provide the Debtors with the liquidity necessary to bridge to close of the Sale Transaction.  The Debtors exercised their right to stop liquidation sales at approximately 950 stores on August 16, 2025 to facilitate execution of the Sale Transaction.

The Sale Transaction will, among other things, provide consideration of $104 million in cash *plus* a $36 million seller note (subject to Purchase Price adjustments) *plus* an amount equal to the aggregate Cure Costs of all Assigned Contracts.  Proceeds of the Sale Transaction will enable the Debtors to fully paydown the Prepetition ABL Facility at close, cure all assumed and assigned executory contracts and unexpired leases, and fund distributions under the Debtors' chapter 11 plan.  The Sale Transaction also provides for the assumption of numerous liabilities, including employee related liabilities at the Acquired Stores.

After running an extensive, months-long prepetition marketing process, the Asset Purchase Agreement represents the best and the only viable offer for the Going-Concern Assets.  The Debtors believe that the purchase consideration is the best available for the Going-Concern Assets, and the Debtors have not received a higher or otherwise better offer for the Going-Concern Assets.  Importantly, the Sale Transaction will preserve thousands of jobs, provide continued business to hundreds of the Debtors'

vendors and landlords, and allow the Claire's brand to remain a prominent retailer for teens, tweens, and young girls around the world.

### D.    Access to the DIP Facility and Use of Cash Collateral.

The Debtors and the Prepetition Secured Parties negotiated in good faith in the lead up to the Petition Date regarding the consensual use of cash collateral (the "Cash Collateral"). On August 7, 2025, the Court entered the *Interim Order (I) Authorizing the Debtors to (A) Use Cash Collateral, and (B) Grant Liens and Provide Superpriority Administrative Expense Claims, (II) Granting Adequate Protection to Certain Prepetition Secured Parties, (III) Modifying the Automatic Stay, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief* [Docket No. 82] (the "Interim Cash Collateral Order"). The Budget pursuant to the Interim Cash Collateral Order was grounded in assumptions based around the asset monetization process pursuant to the Agency Agreement and did not provide the Debtors with sufficient liquidity to execute the Sale Transaction.

On August 19, 2025, in connection with the Sale Transaction, the Debtors filed the DIP Motion, pursuant to which the Debtors seek access to $22.5 million of incremental liquidity to bridge to close of the Sale Transaction and continued use of Cash Collateral to fund the orderly administration of these Chapter 11 Cases. The DIP Facility is provided on a junior lien basis with respect to the prepetition and adequate protection liens of the ABL Secured Parties on the ABL Priority Collateral and on a senior lien basis with respect to the prepetition and adequate protection liens of the Term Lenders on the Term Loan Priority Collateral and does not provide for the payment of any interest or any fees unless the Debtors determine in their business judgment to not close the Sale Transaction. Upon close of the Sale Transaction, all of the DIP Facility will be credited against the purchase price of the Sale Transaction in full and final release, cancellation, and termination of all DIP Obligations (as defined in the Interim DIP Order) and any funds left in escrow will be funded to the Debtors' Estates.

Access to the DIP Facility will maximize the value of the Debtors' Estates for the benefit of all stakeholders by providing funding necessary to ensure going-concern operations and adequate inventory levels, as required to consummate the Sale Transaction. Continued use of Cash Collateral pursuant to the Interim DIP Order will provide the Debtors the liquidity necessary to administer their Chapter 11 Cases, including by satisfying payroll obligations and any other payments that are essential for the continued management, operation, and preservation of the Debtors' Estates as the Debtors pursue the Sale Transaction and implement an orderly wind-down thereafter. In exchange for access to Cash Collateral, the Debtors agreed to provide to the Prepetition Secured Parties customary forms of adequate protection, including payment of interest and certain fees and expenses and ongoing reporting obligations.

### E.    Assumption and Rejection of Executory Contracts and Unexpired Leases.

The Debtors are party to a substantial number of executory contracts. The Debtors, with the assistance of their advisors, have reviewed and will continue to review the Executory Contracts and Unexpired Leases to identify contracts and leases to either assume or reject pursuant to sections 365 or 1123 of the Bankruptcy Code.

Certain Executory Contracts and Unexpired Leases will be assumed by the Debtors and assigned to the Purchaser in connection with the Sale Transaction.

On the Effective Date, except as otherwise provided herein, each Executory Contract or Unexpired Lease not previously assumed, assumed and assigned, or rejected shall be deemed automatically rejected by the applicable Debtor, unless otherwise agreed by the applicable counterparty, in accordance with the provisions and requirements of sections 365 and 1123 of the Bankruptcy Code, other than those that: (1) are specifically described in the Plan as to be assumed in connection with Confirmation of the Plan, or are

identified on the Assumed Executory Contracts and Unexpired Leases Schedule; (2) have been previously assumed or rejected by the Debtors pursuant to the Bidding Procedures Order or any other Bankruptcy Court order; (3) are the subject of a Filed motion to assume, assume and assign, or reject such Executory Contract or Unexpired Lease (or of a Filed objection with respect thereto) that is pending on the Confirmation Date; (4) are to be assumed by the Debtors or assumed by the Debtors and assigned to another third party, as applicable, through a Purchase Agreement in connection with any Sale Transaction, including in a Sale Transaction that is pending on the Confirmation Date; (5) are a contract, release, or other agreement or document entered into in connection with the Plan; or (6) are an Insurance Policy (including, for the avoidance of doubt, any D&O Liability Insurance Policies).

For the avoidance of doubt and notwithstanding anything to the contrary herein, the Debtors shall make all assumption and rejection determinations for their Executory Contracts and Unexpired Leases either through the Filing of a motion or identification in the Plan Supplement, in each case prior to the applicable deadlines set forth in sections 365(d)(2) and 365(d)(4) of the Bankruptcy Code. To the extent any provision of the Bankruptcy Code or the Bankruptcy Rules requires the Debtors to assume or reject an Executory Contract or Unexpired Lease by a deadline, including section 365(d) of the Bankruptcy Code, such requirement shall be satisfied if the Debtors make an election, either through the Filing of a motion or identification in the Plan Supplement or similar schedule in connection with a Sale Transaction, to assume or reject such Executory Contract or Unexpired Lease prior to the applicable deadline, regardless of whether or not the Bankruptcy Court has actually ruled on such proposed assumption or rejection prior to such deadline. Entry of the Confirmation Order shall constitute an order of the Bankruptcy Court approving, subject to and upon the occurrence of the Effective Date, the assumptions, assumptions and assignments, or rejections of the Executory Contracts and Unexpired Leases as set forth in the Plan or the Assumed Executory Contracts and Unexpired Leases Schedule, pursuant to sections 365(a) and 1123 of the Bankruptcy Code; *provided* that neither the Plan nor the Confirmation Order is intended to or shall be construed as limiting the Debtors' authority under the Sale Order to assume and assign Executory Contracts and Unexpired Leases to the Purchaser pursuant to the Purchase Agreement. Except as otherwise specifically set forth herein or in the Confirmation Order or any Transaction Documents approved pursuant to the Sale Order, assumptions or rejections of Executory Contracts and Unexpired Leases pursuant to the Plan are effective as of the Effective Date. Notwithstanding anything herein to the contrary, with respect to any Unexpired Lease that is not assumed on the Effective Date pursuant to Article V.A of the Plan, the effective date of rejection of such Unexpired Leases shall be the later of: (A) the Effective Date, except if agreed by the applicable counterparty, and (B) the date upon which the Debtors notify the landlord in writing (e-mail being sufficient) that they have surrendered the premises to the landlord and returned the keys, key codes, or security codes, as applicable; provided that on the date the Debtors surrender the premises as set forth in subsection (B) above, all property remaining in the premises will be deemed abandoned and landlords may dispose of such property without further notice or court order, unless otherwise agreed by the applicable lessor or pursuant to an order of the Bankruptcy Court. If the effective date of any rejection of an Unexpired Lease is after the Confirmation Date pursuant to the terms herein, the Debtors or the Wind-Down Debtors, as applicable, shall provide notice of such rejection to the applicable landlord no later than the applicable deadlines set forth in section 365(d)(4), setting forth the deadline for Filing any Claims arising from such rejection.

Notwithstanding anything to the contrary in the Plan or the Confirmation Order, the rights of counterparties to Unexpired Leases of nonresidential real property to object to the continued possession of such leased property, including the ability to conduct sales on the properties, or failure to comply with any other lease terms or obligations, including payment of rents and charges and insurance obligations, in each case related to such Unexpired Lease following entry of the Confirmation Order are expressly preserved, and the rights of such counterparties to request such objection be heard on shortened notice are preserved. Each Executory Contract or Unexpired Lease assumed pursuant to the Plan or by Bankruptcy Court order but not assigned to a third party before the Effective Date shall revest in, and be fully enforceable by the

applicable Debtor or Wind-Down Debtor, as applicable, in accordance with its terms, except as such terms may have been modified by agreement of the parties thereto, subject to Article V.A of the Plan. Notwithstanding anything to the contrary to the Plan or the Confirmation Order, the Debtors may amend or otherwise modify the Assumed Executory Contracts and Unexpired Leases Schedule prior to the Effective Date to designate an Executory Contract previously included on the Assumed Executory Contracts and Unexpired Leases Schedule for assumption and assignment.  Any motions to assume Executory Contracts or Unexpired Leases pending on the Confirmation Date shall be subject to a Final Order on or after the Confirmation Date but may be withdrawn, settled, or otherwise prosecuted by the applicable Debtor or Wind-Down Debtor, as applicable.

Subject to any Purchase Agreement and Sale Order, to the maximum extent permitted by law, the transactions contemplated by the Plan shall not constitute a "change of control" or "assignment" (or terms with similar effect) under any Executory Contract or Unexpired Lease assumed or assumed and assigned pursuant to the Plan, or any other transaction, event, or matter that would (A) result in a violation, breach, or default under such Executory Contract or Unexpired Lease, (B) increase, accelerate, or otherwise alter any obligations, rights, or liabilities of the Debtors or the Wind-Down Debtors under such Executory Contract or Unexpired Lease, or (C) result in the creation or imposition of a Lien upon any property or asset of the Debtors, the Reorganized Debtors, or the Wind-Down Debtors pursuant to the applicable Executory Contract or Unexpired Lease, and to the extent any provision in any such Executory Contract or Unexpired Lease restricts or prevents, or purports to restrict or prevent, or is breached or deemed breached by, the transactions contemplated by the Plan, the transactions contemplated by the Plan shall not entitle the non-Debtor party thereto to terminate such Executory Contract or Unexpired Lease or to exercise any other default-related rights with respect thereto, and any consent or advance notice required under such Executory Contract or Unexpired Lease in connection with assumption thereof (subject to the other provisions of Article V.A of the Plan) shall be deemed satisfied by Confirmation.

Notwithstanding anything to the contrary in the Plan, after the Effective Date, an Unexpired Lease on the Assumed Executory Contracts and Unexpired Leases Schedule as of the Effective Date may not be rejected by the applicable Debtor(s), other than as provided for in the Plan, unless the applicable lessor has (x) consented to such rejection, (y) objected to the assumption of such Unexpired Lease and such objection remains outstanding, or (z) consented to an extension of the time period in which the applicable Debtor(s) must assume or reject such Unexpired Lease pursuant to section 365(d)(4) of the Bankruptcy Code (as extended with the applicable lessor's consent, the "Deferred Deadline"), in which case for purposes of clause (z) the applicable Debtor(s) shall have until the Deferred Deadline to assume or reject such Unexpired Lease, subject to the applicable lessor's right to object to such assumption or rejection.  For any Unexpired Lease assumed pursuant to this paragraph, all costs required to cure an Executory Contract or Unexpired Lease shall be paid on the Effective Date or as soon as reasonably practicable thereafter, unless subject to a dispute with respect to Cure Cost, such dispute shall be addressed in accordance with Article V.D of the Plan.  Any guaranty of an Unexpired Lease that is assumed pursuant to the Plan, the Confirmation Order, or any other order of the Bankruptcy Court shall be reaffirmed by the applicable Debtor or Wind-Down Debtor and remain in full force and effect as of the Effective Date, unless otherwise agreed in writing by the Debtor or Wind-Down Debtor, as applicable, and the applicable counterparty.

Notwithstanding anything to the contrary in the Plan, the Debtors or the Wind-Down Debtors, as applicable, reserve the right to alter, amend, modify, or supplement (i) the Assumed Executory Contracts and Unexpired Leases Schedule and (ii) any schedule of Executory Contracts and Unexpired Leases that is attached to any Transaction Documents, with the consent of the Purchaser, at any time up to the earlier of (x) 90 days following the closing date of a Sale Transaction, and (y) solely with respect to Unexpired Leases of nonresidential real property, the deadline set forth in section 365(d)(4) of the Bankruptcy Code, as such date may be extended with the consent of the applicable landlord counterparty, consistent with any Transaction Documents, as applicable.

### F.    Indemnification Obligations.

Consistent with applicable law, all indemnification provisions in place as of the Effective Date (whether in the by-laws, certificates of incorporation or formation, limited liability company agreements, other organizational documents, board resolutions, indemnification agreements, employment contracts, D&O Liability Insurance Policies, or otherwise) for current and former members of any Governing Body, directors, officers, managers, employees, attorneys, accountants, investment bankers, and other professionals of the Debtors, as applicable, shall (i) not be discharged, impaired, or otherwise affected in any way, including by the Plan, the Plan Supplement, or the Confirmation Order; (ii) remain intact, in full force and effect, and irrevocable; (iii) not be limited, reduced, or terminated after the Effective Date; and (iv) survive the effectiveness of the Plan on terms no less favorable to such current and former directors, officers, managers, employees, attorneys, accountants, investment bankers, and other professionals of the Debtors than the indemnification provisions in place prior to the Effective Date irrespective of whether such indemnification obligation is owed for an act or event occurring before, on, or after the Petition Date. All such obligations shall be deemed and treated as Executory Contracts to be assumed by the Debtors under the Plan and shall continue as obligations of the Wind-Down Debtors.  For the avoidance of doubt, if the Sale Transaction is consummated, no such obligations shall be enforceable against the Purchaser or any of its affiliates.  Notwithstanding the foregoing, such obligations shall be subject and subordinate in all respects to any Secured Claims that remain outstanding against the Wind-Down Debtors after the Effective Date.

### G.    Claims Based on Rejection of Executory Contracts or Unexpired Leases.

Unless otherwise provided by a Final Order of the Bankruptcy Court, all Proofs of Claim with respect to Claims arising from the rejection of Executory Contracts or Unexpired Leases, pursuant to the Plan or the Confirmation Order, if any, must be Filed with the Bankruptcy Court within thirty days after the later of (1) the date of service of notice of entry of an order of the Bankruptcy Court (including the Confirmation Order) approving such rejection, (2) the effective date of such rejection, or (3) the Effective Date.  All Allowed Claims arising from the rejection of the Debtors' Executory Contracts or Unexpired Leases shall be classified as General Unsecured Claims and shall be treated in accordance with **Error! Reference source not found.** of the Plan or such other treatment as agreed to by the Wind-Down Debtors and the Holder of such Claim.

### H.    Cure of Defaults for Assumed Executory Contracts and Unexpired Leases.

On the Effective Date or as soon as reasonably practicable thereafter, the Debtors or the Wind-Down Debtors, as applicable (it being understood that the assumption and assignment of the Executory Contracts or Unexpired Leases pursuant to the Purchase Agreement shall be authorized and governed by the Sale Order, and, in the event of any inconsistency between the Plan and the Sale Order concerning the assumption and assignment of such Executory Contracts or Unexpired Leases and related Cure Claims, the terms of the Sale Order shall govern and control) shall pay any monetary defaults under an assumed Executory Contract or Unexpired Lease, as reflected on the Cure Notice, which amounts shall be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by payment of the Cure Claim in Cash, subject to the limitations described below, or on such other terms as the parties to such Executory Contracts or Unexpired Leases may otherwise agree.  In the event of a dispute regarding (1) the amount of any payments to cure such a default, (2) the ability of the Wind-Down Debtors or any assignee, as applicable, to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the Executory Contract or Unexpired Lease to be assumed, or (3) any other matter pertaining to assumption, the cure payments required by section 365(b)(1) of the Bankruptcy Code shall be made following the entry of a Final Order resolving the dispute and approving the assumption.

If the Bankruptcy Court determines that the Allowed Cure Claim with respect to any Executory Contract or Unexpired Lease is greater than the amount set forth in the applicable Cure Notice, the Debtors or Wind-Down Debtors, as applicable, may remove such Executory Contract or Unexpired Lease from the Assumed Executory Contracts and Unexpired Leases Schedule, in which case such Executory Contract or Unexpired Lease will be deemed rejected as the Effective Date.

Assumption of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall result in the full release and satisfaction of any Claims or defaults, whether monetary or nonmonetary (solely to the extent agreed between the Debtors and the counterparty to an applicable Executory Contract or Unexpired Lease), including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed Executory Contract or Unexpired Lease at any time before the date that the Debtors assume such Executory Contract or Unexpired Lease. Any Proofs of Claim Filed with respect to an Executory Contract or Unexpired Lease that has been assumed shall be deemed disallowed and expunged, without further notice to or action, order, or approval of the Bankruptcy Court.

I.    **Preexisting Obligations to the Debtors Under Executory Contracts and Unexpired Leases.**

Rejection of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall not constitute a termination of preexisting obligations owed to the Debtors or the Wind-Down Debtors, as applicable, under such Executory Contracts or Unexpired Leases. In particular, notwithstanding any non-bankruptcy law to the contrary, the Wind-Down Debtors expressly reserve and do not waive any right to receive, or any continuing obligation of a counterparty to provide, warranties or continued maintenance obligations with respect to goods previously purchased by the Debtors pursuant to rejected Executory Contracts or Unexpired Leases.

J.    **Insurance Policies.**

Each of the Debtors' Insurance Policies and any agreements, documents, or instruments relating thereto, are treated as Executory Contracts under the Plan. Unless otherwise provided in the Plan, on the Effective Date, (a) the Debtors shall be deemed to have assumed all Insurance Policies and any agreements, documents, and instruments relating to coverage of all insured Claims, including all D&O Liability Insurance Policies, and (b) all such Insurance Policies and any agreements, documents, or instruments relating thereto, including all D&O Liability Insurance Policies, shall revest, unaltered and in their entireties, in the Wind-Down Debtors. Coverage for defense and indemnity under the D&O Liability Insurance Policies shall remain available to all individuals insured thereunder.

Nothing in the Plan, the Plan Supplement, the Disclosure Statement, the Confirmation Order, or any other order of the Bankruptcy Court (including any other provision that purports to be preemptory or supervening), (i) alters, modifies, or otherwise amends the terms and conditions of (or any coverage or benefits provided under) any Insurance Policies or (ii) alters or modifies the duty, if any, that the Insurers or third party administrators have to pay claims covered by such Insurance Policies and their right to seek payment or reimbursement from the Debtors or the Plan Administrator, as applicable, or draw on any collateral or security therefor.

In addition, after the Effective Date, none of the Wind-Down Debtors, as applicable, shall terminate or otherwise reduce the coverage under any D&O Liability Insurance Policies (including any "tail policy") in effect on or after the Petition Date, with respect to conduct or events occurring prior to the Effective Date, and all directors, managers, and/or officers, as applicable, of the Debtors who served in such capacity at any time prior to the Effective Date shall be entitled to the full benefits of any such policy for the full term of such policy, to the extent set forth therein, regardless of whether such directors, managers, and/or

officers, as applicable, remain in such positions after the Effective Date.  Notwithstanding anything herein to the contrary, the Debtors shall retain the ability to supplement the D&O Liability Insurance Policies as the Debtors deem necessary, including purchasing any tail coverage.

The Wind-Down Debtors shall maintain tail coverage under any D&O Liability Insurance Policies for the six-year period following the Effective Date on terms no less favorable than under, and with an aggregate limit of liability no less than the aggregate limit of liability under, the D&O Liability Insurance Policies.  In addition to such tail coverage, the D&O Liability Insurance Policies shall remain in place in the ordinary course during the Chapter 11 Cases.

### K.    Modifications, Amendments, Supplements, Restatements, or Other Agreements.

Unless otherwise provided in the Plan, each Executory Contract or Unexpired Lease that is assumed shall include all modifications, amendments, supplements, restatements, or other agreements that in any manner affect such Executory Contract or Unexpired Lease, and Executory Contracts and Unexpired Leases related thereto, if any, including easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, and any other interests, unless any of the foregoing agreements has been previously rejected or repudiated or is rejected or repudiated under the Plan.

Modifications, amendments, supplements, and restatements to prepetition Executory Contracts and Unexpired Leases that have been executed by the Debtors during the Chapter 11 Cases shall not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease, or the validity, priority, or amount of any Claims that may arise in connection therewith.

### L.    Reservation of Rights.

Neither the exclusion nor inclusion of any Executory Contract or Unexpired Lease on the Assumed Executory Contracts and Unexpired Leases Schedule, or any other exhibit, schedule or annex, nor anything contained in the Plan or Plan Supplement, shall constitute an admission by the Debtors that any such contract or lease is in fact an Executory Contract or Unexpired Lease or that the Wind-Down Debtors has any liability thereunder.  If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption or rejection, the Debtors or the Wind-Down Debtors, as applicable, shall have thirty days following entry of a Final Order resolving such dispute to alter their treatment of such contract or lease under the Plan.

### M.    Nonoccurrence of Effective Date.

In the event that the Effective Date does not occur, the Bankruptcy Court shall retain jurisdiction with respect to any request to extend the deadline for assuming or rejecting Unexpired Leases pursuant to section 365(d)(4) of the Bankruptcy Code.

### N.    Filing of Statements of Financial Affairs and Schedules of Assets and Liabilities.

The Debtors intend to file their Schedules and Statements before [●].  Copies of the Schedules and Statements will be available free of charge at the website of the Claims and Noticing Agent at https://omniagentsolutions.com/Claires or the Bankruptcy Court's website at http://www.deb.uscourts.gov (for a fee).

## VIII.    RISK FACTORS

Holders of Claims should read and carefully consider the risk factors set forth, as well as the other information set forth in this Disclosure Statement and the documents delivered together with this

Disclosure Statement, referred to or incorporated by reference in this Disclosure Statement, below before voting to accept or reject the Plan.  Although there are many risk factors discussed below, these factors should not be regarded as constituting the only risks present in connection with the Debtors' business or the Plan and its implementation.

### A.    Certain Bankruptcy Law Considerations.

The occurrence or nonoccurrence of any or all of the following contingencies, and any others, may affect distributions available to Holders of Allowed Claims and Allowed Interests under the Plan but will not necessarily affect the validity of the vote of any Impaired Classes to accept or reject the Plan or necessarily require a re-solicitation of the votes of Holders of Claims in such Impaired Classes.

### 1.    Parties in Interest May Object to the Plan's Classification of Claims and Interests.

Section 1122 of the Bankruptcy Code provides that a plan may place a claim or an equity interest in a particular class only if such claim or equity interest is substantially similar to the other claims or equity interests in such class.  The Debtors believe that the classification of the Claims and Interests under the Plan complies with the requirements set forth in the Bankruptcy Code because the Debtors created Classes of Claims and Interests each encompassing Claims or Interests, as applicable, that are substantially similar to the other Claims or Interests, as applicable, in each such Class.  Nevertheless, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

### 2.    The Conditions Precedent to the Effective Date of the Plan May Not Occur.

As more fully set forth in Article IX.A of the Plan, the Effective Date of the Plan is subject to a number of conditions precedent.  If such conditions precedent are not waived, or not met, the Effective Date will not take place.

### 3.    The Debtors May Fail to Satisfy Vote Requirements.

If votes are received in number and amount sufficient to enable the Bankruptcy Court to confirm the Plan, the Debtors intend to seek, as promptly as practicable thereafter, Confirmation of the Plan.  In the event that sufficient votes are not received, the Debtors may seek to pursue another strategy, such as confirmation of an alternative chapter 11 plan, a dismissal of the Chapter 11 Cases and an out-of-court dissolution, an assignment for the benefit of creditors, a conversion to a chapter 7 case, or other strategies.  There can be no assurance that the terms of any such alternative strategies would be similar or as favorable to the Holders of Interests and Allowed Claims as those proposed in the Plan.

### 4.    The Debtors May Not Be Able to Secure Confirmation of the Plan.

Section 1129 of the Bankruptcy Code sets forth the requirements for confirmation of a chapter 11 plan, and requires, among other things, a finding by the Bankruptcy Court that:  (a) such plan "does not unfairly discriminate" and is "fair and equitable" with respect to any non-accepting classes; (b) confirmation of such plan is not likely to be followed by a liquidation or a need for further financial reorganization unless such liquidation or reorganization is contemplated by the plan; and (c) the value of distributions to non-accepting holders of claims or equity interests within a particular class under such plan will not be less than the value of distributions such holders would receive if the debtors were liquidated under chapter 7 of the Bankruptcy Code.

There can be no assurance that the requisite acceptances to confirm the Plan will be received.  Even if the requisite acceptances are received, there can be no assurance that the Bankruptcy Court will confirm

the Plan. A non-accepting Holder of an Allowed Claim might challenge either the adequacy of this Disclosure Statement or whether the balloting procedures and the voting results satisfy the requirements of the Bankruptcy Code or Bankruptcy Rules. Even if the Bankruptcy Court determines that this Disclosure Statement, the balloting procedures, and voting results are appropriate, the Bankruptcy Court could still decline to confirm the Plan if it finds that any of the statutory requirements for Confirmation are not met. If the Plan is not confirmed by the Bankruptcy Court, it is unclear what distributions, if any, Holders of Allowed Claims and Allowed Interests will receive with respect to their Allowed Claims and Allowed Interests. The Bankruptcy Court, as a court of equity, may exercise substantial discretion.

The Debtors reserve the right to modify the terms and conditions of the Plan as necessary for Confirmation. Any such modifications may result in a less favorable treatment of any Class, as well as any class junior to such non-accepting class, than the treatment currently provided in the Plan. Such a less favorable treatment may include a distribution of property to the Class affected by the modification of a lesser value than currently provided in the Plan or no distribution of property whatsoever under the Plan.

### 5. Nonconsensual Confirmation.

In the event that any impaired class of claims or interests does not accept a chapter 11 plan, a bankruptcy court may nevertheless confirm a plan at the proponents' request if at least one impaired class (as defined under section 1124 of the Bankruptcy Code) has accepted the plan (with such acceptance being determined without including the vote of any "insider" in such class), and, as to each impaired class that has not accepted the plan, the bankruptcy court determines that the plan "does not discriminate unfairly" and is "fair and equitable" with respect to the dissenting impaired class(es). The Debtors believe that the Plan satisfies these requirements, and the Debtors may request such nonconsensual Confirmation in accordance with subsection 1129(b) of the Bankruptcy Code. Nevertheless, there can be no assurance that the Bankruptcy Court will reach this conclusion. In addition, the pursuit of nonconsensual Confirmation or Consummation of the Plan may result in, among other things, increased expenses relating to professional compensation.

### 6. Plan Exclusivity Period.

In addition, at the outset of the Chapter 11 Cases, the Bankruptcy Code provides the Debtors with the exclusive right to propose the Plan and prohibits creditors and others from proposing a plan. The Debtors will have retained the exclusive right to propose the Plan upon filing their Petitions. If the Bankruptcy Court terminates that right, however, or the exclusivity period expires, there could be a material adverse effect on the Debtors' ability to achieve confirmation of the Plan in order to achieve the Debtors' stated goals.

### 7. The Chapter 11 Cases May Be Converted to Cases under Chapter 7 of the Bankruptcy Code.

If a bankruptcy court finds that it would be in the best interest of creditors and/or the debtor in a chapter 11 case, the bankruptcy court may convert a chapter 11 bankruptcy case to a case under chapter 7 of the Bankruptcy Code. In such event, a chapter 7 trustee would be appointed or elected to liquidate the debtor's assets for distribution in accordance with the priorities established by the Bankruptcy Code. The Debtors believe that liquidation under chapter 7 would result in significantly smaller distributions being made to creditors than those provided for in a chapter 11 plan because of the additional expenses the Debtors would necessarily incur related to the chapter 7 trustee and additional retained professionals. Such expenses may decrease recoveries for Holders of Allowed Claims in the Voting Classes. *See, e.g.*, 11 U.S.C. §§ 326(a) and 503(b)(2). The conversion to chapter 7 would require entry of a new bar date, which may increase the amount of Allowed Claims and thereby reduce Pro Rata recoveries. *See* Fed. R. Bankr. P. 1019(2), 3002(c).

8. **The Debtors May Object to the Amount or Classification of a Claim.**

Except as otherwise provided in the Plan, the Debtors reserve the right to object to the amount or classification of any Claim under the Plan.  The estimates set forth in this Disclosure Statement cannot be relied upon by any Holder of a Claim where such Claim is subject to an objection.  Any Holder of a Claim that is subject to an objection thus may not receive its expected share of the estimated distributions described in this Disclosure Statement.

9. **Risk of Non-Occurrence of the Effective Date.**

Although the Debtors believe that the Effective Date may occur quickly after the Confirmation Date, there can be no assurance as to such timing or as to whether the Effective Date will, in fact, occur.

10. **Contingencies May Affect Votes of Impaired Classes to Accept or Reject the Plan.**

The distributions available to Holders of Allowed Claims under the Plan can be affected by a variety of contingencies, including, without limitation, whether the Bankruptcy Court orders certain Allowed Claims to be subordinated to other Allowed Claims.  The occurrence of any and all such contingencies, which may affect distributions available to Holders of Allowed Claims under the Plan, will not affect the validity of the vote taken by the Impaired Classes to accept or reject the Plan or require any sort of revote by the Impaired Classes.

The estimated Claims and creditor recoveries set forth in this Disclosure Statement are based on various assumptions, and the actual Allowed amounts of Claims may significantly differ from the estimates. Should one or more of the underlying assumptions ultimately prove to be incorrect, the actual Allowed amounts of Claims may vary from the estimated Claims contained in this Disclosure Statement.  Moreover, the Debtors cannot determine with any certainty at this time, the number or amount of Claims that will ultimately be Allowed.  Such differences may materially and adversely affect, among other things, the percentage recoveries to Holders of Allowed Claims under the Plan.

11. **Releases, Injunctions, and Exculpations Provisions May Not Be Approved.**

Article VIII of the Plan provides for certain releases, injunctions, and exculpations, including a release of liens and third-party releases that may otherwise be asserted against the Debtors, Wind-Down Debtors, or Released Parties, as applicable.  The releases, injunctions, and exculpations provided in the Plan are subject to objection by parties in interest and may not be approved.

12. **The Total Amount of General Unsecured Claims May Be Higher Than Anticipated by the Debtors.**

With respect to Holders of General Unsecured Claims, the Claims Filed against the Debtors' Estates may be materially higher than the Debtors have estimated.  As of the date of the Disclosure Statement, the Debtors have yet to determine whether they will be assuming or rejecting the leases they are party to.  The ultimate rejection of any such leases may result in additional General Unsecured Claims being filed by landlords for rejection damages.

13. **Certain Tax Implications of the Plan.**

Holders of Allowed Claims should carefully review Article XI of this Disclosure Statement, entitled "CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN,"

which provides a summary of certain tax implications of the Plan and the Chapter 11 Cases that may adversely affect the Wind-Down Debtors and Holders of Claims against the Debtors.

### B.    Other Risks.

#### 1.    The Wind-Down Debtors May be Adversely Affected by Potential Litigation, Including Litigation Arising Out of the Chapter 11 Cases.

The Debtors are currently subject to or interested in certain legal proceedings, which may adversely affect the Debtors. In the future, the Wind-Down Debtors may become party to litigation. In general, litigation can be expensive and time-consuming to bring or defend against. Such litigation could result in settlements or judgments that could significantly affect the Wind-Down Debtors' financial results. It is also possible that certain parties will commence litigation with respect to the treatment of their Claims under the Plan. It is not possible to predict the potential litigation that the Wind-Down Debtors may become party to, nor the final resolution of any such litigation. The impact of any such litigation on the Wind-Down Debtors' businesses and financial stability, however, could be material.

#### 2.    Even if Wind-Down Transactions are Implemented, the Debtors Will Continue to Face Risks.

Even if the Wind-Down Transactions are implemented, the Debtors will continue to face a number of risks, including certain risks that are beyond the Debtors' control, such as changes in economic conditions, bank instability, and changes in the Debtors' industry. As a result of these risks and others, there is no guarantee that the Wind-Down Transactions will achieve the Debtors' stated goals.

### C.    Disclosure Statement Disclaimer.

#### 1.    The Financial Information Contained in this Disclosure Statement Has Not Been Audited.

In preparing this Disclosure Statement, the Debtors and their advisors relied on financial data derived from their books and records that was available at the time of such preparation. Although the Debtors have used their reasonable business judgment to ensure the accuracy of the financial information, and any conclusions or estimates drawn from such financial information, provided in this Disclosure Statement, and while the Debtors believe that such financial information fairly reflects the financial condition of the Debtors, the Debtors are unable to warrant that the financial information contained herein, or any such conclusions or estimates drawn therefrom, is without inaccuracies.

#### 2.    Information Contained in this Disclosure Statement Is for Soliciting Votes.

The information contained in this Disclosure Statement is for the purposes of soliciting acceptances of the Plan and may not be relied upon for any other purpose.

#### 3.    This Disclosure Statement Was Not Reviewed or Approved by the United States Securities and Exchange Commission.

This Disclosure Statement was not filed with the SEC under the Securities Act or applicable state securities laws. Neither the SEC nor any state regulatory authority has passed upon the accuracy or adequacy of this Disclosure Statement, or the exhibit or the statements contained in this Disclosure Statement.

**4.   This Disclosure Statement May Contain Forward Looking Statements.**

This Disclosure Statement may contain "forward looking statements" within the meaning of the Private Securities Litigation Reform Act of 1995.  Such statements consist of any statement other than a recitation of historical fact and can be identified by the use of forward-looking terminology such as "may," "will," "might," "expect," "believe," "anticipate," "could," "would," "estimate," "continue," "pursue," or the negative thereof or comparable terminology.  All forward-looking statements are necessarily speculative, and there are certain risks and uncertainties that could cause actual events or results to differ materially from those referred to in such forward looking statements.  The information contained herein is an estimate only, based upon information currently available to the Debtors.

**5.   No Legal or Tax Advice Is Provided to You by this Disclosure Statement.**

***This Disclosure Statement does not constitute legal advice to you.***  The contents of this Disclosure Statement should not be construed as legal, business, or tax advice.  Each Holder of a Claim or an Interest should consult his or her own legal counsel, accountant, or other applicable advisor with regard to any legal, tax, and other matters concerning his or her Claim or Interest.  This Disclosure Statement may not be relied upon for any purpose other than to determine how to vote on the Plan or object to Confirmation of the Plan.

**6.   No Admissions Made.**

The information and statements contained in this Disclosure Statement will neither (a) constitute an admission of any fact or liability by any entity (including, without limitation, the Debtors) nor (b) be deemed evidence of the tax or other legal effects of the Plan on the Debtors, Holders of Allowed Claims or Allowed Interests, or any other parties in interest.

**7.   Failure to Identify Litigation Claims or Projected Objections.**

No reliance should be placed on the fact that a particular litigation claim or projected objection to a particular Claim or Interest is, or is not, identified in this Disclosure Statement.  After the Confirmation or Effective Date of the Plan, (i) the Debtors or the Plan Administrator may seek to investigate, File, and prosecute Claims and Interests and (ii) the Debtors or the Plan Administrator, as applicable, may object to Claims or Interests, irrespective of whether this Disclosure Statement identifies such Claims or Interests or objections to such Claims or Interests.

**8.   No Waiver of Right to Object to Claim or Interest.**

The vote by a Holder of a Claim or Interest for or against the Plan does not constitute a waiver or release of any claims, causes of action, or rights of the Debtors (or any entity, as the case may be) to object to that Holder's Claim or Interest, regardless of whether any claims or causes of action of the Debtors or their respective Estates are specifically or generally identified in this Disclosure Statement.

**9.   Information Was Provided by the Debtors and Was Relied Upon by the Debtors' Advisors.**

The Debtors' advisors have relied upon information provided by the Debtors in connection with the preparation of this Disclosure Statement.  Although the Debtors' advisors have performed certain limited due diligence in connection with the preparation of this Disclosure Statement, they have not independently verified the information contained in this Disclosure Statement.

**10. Potential Exists for Inaccuracies, and the Debtors Have No Duty to Update.**

The statements contained in this Disclosure Statement are made by the Debtors as of the date of this Disclosure Statement, unless otherwise specified in this Disclosure Statement, and the delivery of this Disclosure Statement after the date of this Disclosure Statement does not imply that there has not been a change in the information set forth in this Disclosure Statement since that date. While the Debtors have used their reasonable business judgment to ensure the accuracy of all of the information provided in this Disclosure Statement and in the Plan, the Debtors nonetheless cannot, and do not, confirm the current accuracy of all statements appearing in this Disclosure Statement. Further, although the Debtors may subsequently update the information in this Disclosure Statement, the Debtors have no affirmative duty to do so unless ordered to do so by the Bankruptcy Court.

**11. No Representations Outside this Disclosure Statement Are Authorized.**

No representations concerning or relating to the Debtors, the Chapter 11 Cases, or the Plan are authorized by the Bankruptcy Court or the Bankruptcy Code, other than as set forth in this Disclosure Statement. Any representations or inducements made to secure your acceptance or rejection of the Plan that are other than as contained in, or included with, this Disclosure Statement, should not be relied upon by you in arriving at your decision. You should promptly report unauthorized representations or inducements to the counsel to the Debtors and the U.S. Trustee.

## IX.    SOLICITATION AND VOTING PROCEDURES

This Disclosure Statement, which is accompanied by a ballot or ballots to be used for voting on the Plan, is being distributed to the Holders of Claims or Interests in the Class that is entitled to vote to accept or reject the Plan. The procedures and instructions for voting and related deadlines are set forth in the *Order (I) Conditionally Approving the Adequacy of the Disclosure Statement, (II) Approving (A) the Solicitation and Voting Procedures and (B) the Forms of Ballots and Notices in Connection Therewith, (III) Scheduling a Combined Hearing and Setting Related Dates and Deadlines, and (IV) Granting Related Relief* (the "Interim Disclosure Statement Order") and the exhibits annexed thereto [Docket No. [●]].

***The Interim Disclosure Statement Order is incorporated herein by reference and should be read in conjunction with this Disclosure Statement in formulating a decision to vote to accept or reject the Plan.***

> **THE DISCUSSION OF THE SOLICITATION AND VOTING PROCESS SET FORTH IN THIS DISCLOSURE STATEMENT IS ONLY A SUMMARY.**
>
> PLEASE REFER TO THE INTERIM DISCLOSURE STATEMENT ORDER FOR A MORE COMPREHENSIVE DESCRIPTION OF THE SOLICITATION AND VOTING PROCESS.

### A.    Holders of Claims Entitled to Vote on the Plan.

Under the provisions of the Bankruptcy Code, not all Holders of Claims against or Interests in a debtor are entitled to vote on a chapter 11 plan. Article II.C of this Disclosure Statement, entitled "Am I entitled to vote on the Plan?", provides a summary of the status and voting rights of each Class (and, therefore, of each Holder within such Class absent an objection to the Holder's Claim or Interest) under the Plan.

The Debtors are soliciting votes to accept or reject the Plan only from Holders of Claims in Class 4 and Class 5 (the "Voting Classes"). The Holders of Claims in the Voting Classes are Impaired under the

40

Plan and may, in certain circumstances, receive a Plan Distribution.  Accordingly, Holders of Claims in the Voting Classes have the right to vote to accept or reject the Plan.

The Debtors are ***not*** soliciting votes from Holders of Claims or Interests in Classes 1 through 3 and 6 through 10.  Additionally, the Interim Disclosure Statement Order provides that certain Holders of Claims in the Voting Classes, such as those Holders whose Claims have been disallowed or are subject to a pending objection, are not entitled to vote to accept or reject the Plan.

### B.    Voting Record Date.

**The Voting Record Date is [●], 2025**.  The Voting Record Date is the date on which it was determined which Holders of Claims or Interests in the Voting Classes are entitled to vote to accept or reject the Plan and whether Claims or Interests have been properly assigned or transferred under Bankruptcy Rule 3001(e) such that an assignee or transferee, as applicable, can vote to accept or reject the Plan as the Holder of a Claim or Interest.

### C.    Voting on the Plan.

**The Voting Deadline is [●], 2025, at 4:00 p.m. (prevailing Eastern Time)**.  To be counted as votes to accept or reject the Plan, all ballots must be properly executed, completed, and delivered as directed, so that your ballot containing your vote is **<u>actually received</u>** by the Claims and Noticing Agent on or before the Voting Deadline.

To vote, complete, sign, and date your ballot and return it (with a signature) ***promptly*** to one of the below addresses.

| **If by First Class Mail, Hand Delivery, or Overnight Mail:** |
| --- |
| Claire's Holdings LLC Ballot Processing Center<br>c/o Omni Agent Solutions, Inc.<br>5955 De Soto Ave., Ste 100<br>Woodland Hills, CA 91367<br><br>To arrange hand delivery of your Ballot, please email the Claims and Noticing Agent at ClairesInquiries@OmniAgnt.com (with "Claire's Holdings LLC Ballot Delivery" in the subject line) at least 24 hours prior to your arrival at the Omni address above and provide the anticipated date and time of delivery. |

**OR**

**SUBMIT VIA AN ELECTRONIC BALLOT THROUGH THE CLAIMS AND NOTICING AGENT'S ONLINE ELECTRONIC BALLOT SUBMISSION PORTAL AT <u>HTTPS://OMNIAGENTSOLUTIONS.COM/CLAIRES.</u>**

**PLEASE SELECT JUST ONE OPTION TO VOTE.**

**IF YOU HAVE ANY QUESTIONS REGARDING THIS BALLOT, THESE VOTING INSTRUCTIONS, OR THE PROCEDURES FOR VOTING, PLEASE CALL THE RESTRUCTURING HOTLINE AT:**

**U.S./CANADA TOLL FREE:  (888) 202-5971**
**INTERNATIONAL, TOLL:  +1 (747) 293-0183**

**OR BY EMAILING CLAIRESINQUIRIES@OMNIAGNT.COM (WITH "CLAIRE'S HOLDINGS LLC SOLICITATION INQUIRY" IN THE SUBJECT LINE).**

> **D.      Ballots Not Counted.**

**No ballot will be counted toward Confirmation if, among other things**:  (1) it is illegible or contains insufficient information to permit the identification of the Holder of the Claim or Interest; (2) it was transmitted by means other than as specifically set forth in the ballots; (3) it was cast by an entity that is not entitled to vote on the Plan; (4) it was cast for a Claim listed in the Debtors' schedules as contingent, unliquidated, or disputed for which the applicable bar date has passed and no proof of claim was Filed; (5) it was cast for a Claim that is subject to an objection pending as of the Voting Record Date (unless temporarily allowed in accordance with the Interim Disclosure Statement Order); (6) it was sent to the Debtors, the Debtors' agents/representatives (other than the Claims and Noticing Agent), or the Debtors' financial or legal advisors instead of the Claims and Noticing Agent; (7) it is unsigned; or (8) it is not clearly marked to either accept or reject the Plan or it is marked both to accept and reject the Plan.  **Please refer to the Interim Disclosure Statement Order for additional requirements with respect to voting to accept or reject the Plan.**

**ANY BALLOT RECEIVED AFTER THE VOTING DEADLINE OR THAT IS OTHERWISE NOT IN COMPLIANCE WITH THE INTERIM DISCLOSURE STATEMENT ORDER WILL NOT BE COUNTED.**

**X.      CONFIRMATION OF THE PLAN**

> **A.      Requirements for Confirmation of the Plan.**

Among the requirements for Confirmation of the Plan pursuant to section 1129 of the Bankruptcy Code are:  (1) the Plan is accepted by all Impaired Classes of Claims or Interests, or if rejected by an Impaired Class, the Plan "does not discriminate unfairly" and is "fair and equitable" as to the rejecting Impaired Class; (2) the Plan is feasible; and (3) the Plan is in the "best interests" of Holders of Claims or Interests.

At the Combined Hearing, the Bankruptcy Court will determine whether the Plan satisfies all of the requirements of section 1129 of the Bankruptcy Code.  The Debtors believe that:  (1) the Plan satisfies, or will satisfy, all of the necessary statutory requirements of chapter 11 for plan confirmation; (2) the Debtors have complied, or will have complied, with all of the necessary requirements of chapter 11 for plan confirmation; and (3) the Plan has been proposed in good faith.

> **B.      Best Interests of Creditors.**

Often called the "best interests" test, section 1129(a)(7) of the Bankruptcy Code requires that a bankruptcy court find, as a condition to confirmation, that a chapter 11 plan provides, with respect to each impaired class, that each holder of a claim or an equity interest in such impaired class either (1) has accepted the plan or (2) will receive or retain under the plan property of a value that is not less than the amount that the non-accepting holder would receive or retain if the debtors liquidated under chapter 7.

The Debtors believe that liquidation of the Debtors' business under chapter 7 of the Bankruptcy Code would result in substantial diminution in the value to be realized by Holders of Allowed Claims or Interests as compared to distributions contemplated under the Plan.  While the Debtors do not anticipate, as of the date of filing this Disclosure Statement, that any Holders of Claims against the Debtors in Class 6 (General Unsecured Claims) will receive a distribution or recovery on account of their Claim(s), the Debtors

believe that proceeding under the Plan avoids the incremental costs, delays, and uncertainties associated with a chapter 7 liquidation. Consequently, the Debtors and their management believe that Confirmation of the Plan will provide a substantially greater return to Holders of Allowed Claims or Interests than would a liquidation under chapter 7 of the Bankruptcy Code.

In a typical chapter 7 case, a trustee is elected or appointed to liquidate a debtor's assets and to make distributions to creditors in accordance with the priorities established in the Bankruptcy Code. Generally, secured creditors are paid first from the proceeds of sales of their collateral. If any assets remain in the bankruptcy estate after satisfaction of secured creditors' claims from their collateral, administrative expenses are next to be paid. Unsecured creditors are paid from any remaining sale proceeds, according to their respective priorities. Unsecured creditors with the same priority share in proportion to the amount of their allowed claims in relationship to the total amount of allowed claims held by all unsecured creditors with the same priority. Finally, interest holders receive the balance that remains, if any, after all creditors are paid.

All or substantially all of the assets of the Debtors' business will have been liquidated through these Chapter 11 Cases, and the Plan effects a wind-down of the Debtors' remaining assets not otherwise sold prior to Confirmation. Although a chapter 7 liquidation would achieve the same goal, the Debtors believe that the Plan provides a greater recovery to Holders of Allowed Claims than would a chapter 7 liquidation.

Liquidating the Debtors' Estates under the Plan likely provides Holders of Allowed Claims with a larger, more timely recovery in part because of the increased expenses that would be incurred in a chapter 7 liquidation, with the appointment of a chapter 7 trustee. The delay of the chapter 7 trustee becoming familiar with the assets could easily cause bids already obtained to be lost, and the chapter 7 trustee will not have the technical expertise and knowledge of the Debtors' business that the Debtors had when they proposed to sell their assets pursuant to the Plan. Moreover, the distributable proceeds under a chapter 7 liquidation will be lower because of the chapter 7 trustee's fees and expenses. Therefore, the appointment of a chapter 7 trustee would potentially delay distributions to creditors and reduce the present value of any recover for Holders. *See, e.g.*, 11 U.S.C. § 326(a) (providing for compensation of a chapter 7 trustee); 11 U.S.C. § 503(b)(2) (providing administrative expense status for compensation and expenses of a chapter 7 trustee and such trustee's professionals). Additionally, the Debtors' Estates would continue to be obligated to pay all unpaid expenses incurred by the Debtors during the Chapter 11 Cases (such as compensation for Professionals), which may constitute Allowed Claims in any chapter 11 case.

The conversion to chapter 7 would also require entry of a new bar date. *See* Fed. R. Bankr. P. 1019(2); 3002(c). Thus, the amount of Claims ultimately Filed and Allowed against the Debtors could materially increase, thereby further reducing creditor recoveries versus those available under the Plan.

In light of the foregoing, the Debtors submit that a chapter 7 liquidation would result in reduced sale proceeds and recoveries, increased expenses, delayed distributions, and the prospect of additional claims that were not asserted in the Chapter 11 Cases. Accordingly, the Debtors believe that the Plan provides an opportunity to bring the highest return for creditors.

**C.    Feasibility.**

Section 1129(a)(11) of the Bankruptcy Code requires that confirmation of a chapter 11 plan is not likely to be followed by the liquidation, or the need for further financial reorganization of the debtor, or any successor to the debtor (unless such liquidation or reorganization is proposed in such plan of reorganization).

The Plan provides for the liquidation and distribution of the Debtors' assets pursuant to the terms of the Plan.  Accordingly, the Debtors believe that all Plan obligations will be satisfied without the need for further reorganization of the Debtors.

### D.    Acceptance by Impaired Classes.

The Bankruptcy Code requires, as a condition to confirmation, except as described in the following section, that each class of claims or equity interests impaired under a plan, accept the plan.  A class that is not "impaired" under a plan is deemed to have accepted the plan and, therefore, solicitation of acceptances with respect to such a class is not required.

Section 1126(c) of the Bankruptcy Code defines acceptance of a plan by a class of impaired claims as acceptance by holders of at least two-thirds in dollar amount and more than one-half in a number of allowed claims in that class, counting only those claims that have *actually* voted to accept or to reject the plan.  Thus, a class of Claims will have voted to accept the Plan only if two-thirds in amount and a majority in number of the Allowed Claims in such class that vote on the Plan actually cast their ballots in favor of acceptance.

Section 1126(d) of the Bankruptcy Code defines acceptance of a plan by a class of impaired equity interests as acceptance by holders of at least two-thirds in amount of allowed interests in that class, counting only those interests that have *actually* voted to accept or to reject the plan.  Thus, a Class of Interests will have voted to accept the Plan only if two-thirds in amount of the Allowed Interests in such class that vote on the Plan actually cast their ballots in favor of acceptance.

Pursuant to Article III.F of the Plan, if a Class contains Claims or Interests eligible to vote and no Holders of Claims or Interests eligible to vote in such Class vote to accept or reject the Plan, the Holders of such Claims or Interests in such Class shall be deemed to have accepted the Plan.

### E.    Confirmation without Acceptance by All Impaired Classes.

Section 1129(b) of the Bankruptcy Code allows a bankruptcy court to confirm a plan even if all impaired classes have not accepted it; *provided* that the plan has been accepted by at least one impaired class.  Pursuant to section 1129(b) of the Bankruptcy Code, notwithstanding an impaired class's rejection or deemed rejection of the plan, the plan will be confirmed, at the plan proponent's request, in a procedure commonly known as a "cramdown" so long as the plan does not "discriminate unfairly" and is "fair and equitable" with respect to each class of claims or equity interests that is impaired under, and has not accepted, the plan.

If any Impaired Class rejects the Plan, the Debtors reserve the right to seek to confirm the Plan utilizing the "cramdown" provision of section 1129(b) of the Bankruptcy Code.  To the extent that any Impaired Class rejects the Plan or is deemed to have rejected the Plan, the Debtors may request Confirmation of the Plan, as it may be modified from time to time, under section 1129(b) of the Bankruptcy Code.  The Debtors reserve the right to alter, amend, modify, revoke, or withdraw the Plan or any Plan Supplement document, including the right to amend or modify the Plan or any Plan Supplement document to satisfy the requirements of section 1129(b) of the Bankruptcy Code.

### 1.    No Unfair Discrimination.

The "unfair discrimination" test applies to classes of claims or interests that are of equal priority and are receiving different treatment under a plan.  The test does not require that the treatment be the same or equivalent, but that treatment be "fair."  In general, bankruptcy courts consider whether a plan

discriminates unfairly in its treatment of classes of claims or interests of equal rank (*e.g.*, classes of the same legal character). Bankruptcy courts will take into account a number of factors in determining whether a plan discriminates unfairly. A plan could treat two classes of unsecured creditors differently without unfairly discriminating against either class.

### 2. Fair and Equitable Test.

The "fair and equitable" test applies to classes of different priority and status (*e.g.*, secured versus unsecured) and includes the general requirement that no class of claims receive more than 100 percent of the amount of the allowed claims in the class. As to the dissenting class, the test sets different standards depending upon the type of claims or equity interests in the class.

The Debtors submit that if the Debtors "cramdown" the Plan pursuant to section 1129(b) of the Bankruptcy Code, the Plan is structured so that it does not "discriminate unfairly" and satisfies the "fair and equitable" requirement. With respect to the unfair discrimination requirement, all Classes under the Plan are provided treatment that is substantially equivalent to the treatment that is provided to other classes that have equal rank. With respect to the fair and equitable requirement, no Class under the Plan will receive more than 100 percent of the amount of Allowed Claims or Interests in that Class. The Debtors believe that the Plan and the treatment of all Classes of Claims or Interests under the Plan satisfy the foregoing requirements for nonconsensual Confirmation of the Plan.

## XI.    CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

### A.    Introduction.

The following discussion is a summary of certain U.S. federal income tax consequences of the consummation of the Plan to the Debtors, the Wind-Down Debtors, and certain beneficial owners of Claims (for the purposes of this section only, each such beneficial owner, a "Holder"). The following summary does not address the U.S. federal income tax consequences to Holders not entitled to vote to accept or reject the Plan. This summary is based on the U.S. Internal Revenue Code of 1986, as amended ("IRC"), the U.S. Treasury Regulations promulgated thereunder (the "Treasury Regulations"), judicial authorities, published administrative positions of the U.S. Internal Revenue Service (the "IRS"), and other applicable authorities (collectively, "Applicable Tax Law"), all as in effect on the date of this Disclosure Statement and all of which are subject to change or differing interpretations, possibly with retroactive effect. Changes in these rules or new interpretations of the rules with retroactive effect could significantly affect the U.S. federal income tax consequences described herein. Due to the lack of definitive judicial and administrative authority in a number of areas, substantial uncertainty may exist with respect to some of the tax consequences described below. No opinion of counsel has been obtained and the Debtors have not requested, and do not intend to seek, a ruling or determination from the IRS as to any of the tax consequences of the Plan discussed below. The discussion below is not binding upon the IRS or the courts. No assurance can be given that the IRS would not assert, or that a court would not sustain, a different position than any position discussed herein.

This discussion does not purport to address all aspects of U.S. federal income taxation that may be relevant to certain Holders in light of their individual circumstances. This discussion also does not address tax issues with respect to Holders that are subject to special treatment under the U.S. federal income tax laws (including, for example, accrual-method U.S. Holders (as defined below) that prepare an "applicable financial statement" (as defined in Section 451 of the IRC), banks, mutual funds, governmental authorities or agencies, pass-through entities, beneficial owners of pass-through entities, subchapter S corporations, dealers and traders in securities, insurance companies, financial institutions, tax-exempt organizations,

controlled foreign corporations, passive foreign investment companies, Persons whose functional currency is not the U.S. dollar, U.S. expatriates, broker-dealers, small business investment companies, Persons who are related to the Debtors within the meaning of the IRC, Persons liable for alternative minimum tax, Persons using a mark-to-market method of accounting, Persons who are themselves in bankruptcy, real estate investment companies and regulated investment companies and those holding, or who will hold, consideration received pursuant to the Plan as part of a hedge, straddle, conversion, or other integrated transaction). No aspect of state, local, non-income, or non-U.S. taxation is addressed. Furthermore, this summary assumes that a Holder holds only Claims in a single Class and holds such Claims only as "capital assets" (within the meaning of section 1221 of the IRC). This summary also assumes that the Holder has not taken a bad debt deduction with respect to a Claim (or any portion thereof) in the current or any prior year and such Claim did not become completely or partially worthless in a prior taxable year, and that various debt and other arrangements to which the Debtors and Wind-Down Debtors are or will be a party will be respected for U.S. federal income tax purposes in accordance with their form, and, to the extent relevant, that the Claims constitute interests in the Debtors "solely as a creditor" for purposes of section 897 of the IRC. This summary does not discuss differences in tax consequences to Holders that act or receive consideration in a capacity other than any other Holder of a Claim of the same Class or Classes, and the tax consequences for such Holders may differ materially from those described below. The U.S. federal income tax consequences of the implementation of the Plan to the Debtors, Wind-Down Debtors, and Holders of Claims against the Debtors described below also may vary depending on the nature of any Wind-Down Transactions that the Debtors and/or Wind-Down Debtors engage in. This summary also does not address the U.S. federal income tax consequences to Holders (a) whose Claims are Unimpaired or otherwise entitled to payment in full under the Plan or (b) that are deemed to reject the Plan.

For purposes of this discussion, a "U.S. Holder" is a Holder of a Claim that for U.S. federal income tax purposes is: (1) an individual who is a citizen or resident of the United States; (2) a corporation (or other entity treated as a corporation for U.S. federal income tax purposes) created or organized under the laws of the United States, any state thereof or the District of Columbia; (3) an estate the income of which is subject to U.S. federal income taxation regardless of the source of such income; or (4) a trust (a) if a court within the United States is able to exercise primary jurisdiction over the trust's administration and one or more United States persons (within the meaning of section 7701(a)(30) of the IRC) has authority to control all substantial decisions of the trust or (b) that has a valid election in effect under applicable Treasury Regulations to be treated as a United States person (within the meaning of section 7701(a)(30) of the IRC). For purposes of this discussion, a "Non-U.S. Holder" is any Holder that is neither a U.S. Holder nor a partnership (or other entity treated as a partnership or other pass-through entity for U.S. federal income tax purposes).

If a partnership (or other entity treated as a partnership or other pass-through entity for U.S. federal income tax purposes) is a Holder, the tax treatment of a partner (or other beneficial owner) generally will depend upon the status of the partner (or other beneficial owner) and the activities of the partner (or other beneficial owner) and the entity. Partnerships (or other pass-through entities) and partners (or other beneficial owners) of partnerships (or other pass-through entities) that are Holders are urged to consult their own respective tax advisors regarding the U.S. federal income tax consequences of the Plan.

**ACCORDINGLY, THE FOLLOWING SUMMARY OF CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED UPON THE INDIVIDUAL CIRCUMSTANCES PERTAINING TO A HOLDER. ALL HOLDERS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS FOR THE U.S. FEDERAL, STATE, LOCAL, AND NON-U.S. TAX CONSEQUENCES OF THE PLAN.**

B.    **Certain U.S. Federal Income Tax Consequences of the Plan to the Debtors and Wind-Down Debtors.**

The Plan is being structured as a taxable sale of the assets of the Debtors, together with the wind-down, dissolution, and liquidation of the Debtors' Estates after the Effective Date. The Debtors will realize gain or loss in an amount equal to the difference between the value of the consideration received in the Sale Transaction (including, for this purpose, the amount of any liabilities assumed) and the adjusted tax basis in the sold assets. Realized gains, if any, may be offset by current-year losses and other available tax attributes of the Debtors. While the Debtors continue to study the issue, it is not yet possible to determine whether such transactions are in the aggregate expected to result in a cash tax liability of the Debtors. Any of the Debtors' tax attributes that are not utilized to offset such realized gains (if any) will not survive the implementation of the Plan. Accordingly, the rules regarding cancellation of indebtedness income and the rules regarding section 382 of the IRC generally are not expected to be applicable and, in each case, are not discussed herein.

C.    **Certain U.S. Federal Income Tax Consequences of the Plan to U.S. Holders of Allowed Claims Entitled to Vote.**

The following discussion assumes that the Debtors and the Wind-Down Debtors will undertake the Wind-Down Transactions currently contemplated by the Plan. U.S. Holders are urged to consult their own tax advisors regarding the tax consequences of the Wind-Down Transactions.

1.    **Consequences to Holders of Class 4 Prepetition Priority Term Loan Claims and Class 5 Prepetition Existing Term Loan Claims.**

Except to the extent that a Holder of an Allowed Prepetition Priority Term Loan Claim or an Allowed Prepetition Existing Term Loan Claim agrees to less favorable treatment, each Holder of Prepetition Priority Term Loan Claims and Prepetition Existing Term Loan Claims shall receive its Pro Rata share of the Distributable Proceeds pursuant to the Waterfall Recovery.

Each such Holder will be treated as exchanging their Claim in a taxable exchange under section 1001 of the IRC for their Pro Rata share of the Distributable Proceeds pursuant to the Waterfall Recovery. Accordingly, subject to the rules regarding accrued but untaxed interest, each such Holder should recognize gain or loss equal to the difference between (a) the amount of Distributable Proceeds received by such Holder in exchange for such Claim, and (b) such Holder's adjusted tax basis in such Claim. The character of such gain or loss as capital gain or loss or as ordinary income or loss will be determined by a number of factors, including, among others, the tax status of the Holder, the nature of the Claim in such Holder's hands and how long such Holder has held the Claim, whether the Claim was purchased at a market discount (discussed below) and the nature and tax treatment of any fees, costs or expense reimbursements to which consideration is allocated. If recognized gain is capital gain, it generally would be long-term capital gain if a Holder held its Claim for more than one year at the time of the exchange. The deductibility of capital losses is subject to certain limitations as discussed below. Each Holder of an Allowed Prepetition Priority Term Loan Claim or Allowed Prepetition Existing Term Loan Claim is urged to consult its own tax advisor to determine the character of any gain or loss recognized with respect to the satisfaction of its such Claim.

2.    **Accrued Interest.**

To the extent that any amount received by a U.S. Holder of a Claim under the Plan is attributable to accrued but untaxed interest or original issue discount ("OID") during its holding period on the debt instruments constituting the surrendered Claim, the receipt of such amount should be taxable to the U.S.

47

Holder as ordinary interest income (to the extent not already taken into income by the U.S. Holder). Conversely, a U.S. Holder of a Claim may be able to recognize a deductible loss to the extent that any accrued interest on the debt instruments constituting such Claim was previously included in the U.S. Holder's gross income but was not paid in full by the Debtors. Such loss may be ordinary, but the tax law is unclear on this point.

If the fair market value of the consideration received by a U.S. Holder is not sufficient to fully satisfy all principal and interest on Claims, the extent to which such consideration will be attributable to accrued but untaxed interest is unclear. Under the Plan, the aggregate consideration to be distributed to Holders of Claims in each Class will be allocated first to the principal amount of such Claims, with any excess allocated to unpaid interest that accrued on these Claims, if any. Certain legislative history indicates that an allocation of consideration as between principal and interest provided in a chapter 11 plan of reorganization is binding for U.S. federal income tax purposes, and certain case law generally indicates that a final payment on a distressed debt instrument that is insufficient to repay outstanding principal and interest will first be allocated to principal, rather than interest. Certain Treasury Regulations treat payments as allocated first to any accrued but untaxed interest. There can be no assurance that the IRS will not take the position that the consideration received by the U.S. Holder should be allocated in a manner that differs from the allocation as provided in the Plan. U.S. Holders of Claims should consult their own tax advisors regarding the proper allocation of the consideration received by them under the Plan and the U.S. federal income tax treatment of accrued interest.

### 3. Market Discount.

In the case of a U.S. Holder that acquired its Claim with market discount, any gain recognized on the sale or exchange of such Claim generally will be treated as ordinary income to the extent of the market discount treated as accruing during such U.S. Holder's holding period for such Claim. Any such market discount is generally the excess of (A) (i) the "revised issue price" of such Claim if the Claim is issued with OID or (ii) the stated redemption price at maturity of such Claim if the Claim is not issued with OID over (B) such U.S. Holder's initial tax basis in such Claim upon acquisition, if such excess equals or exceeds a statutory de minimis amount. Such market discount is generally treated as accruing during such U.S. Holder's holding period for such Claim on a straight-line basis or, at the election of such U.S. Holder, on a constant yield basis, unless such U.S. Holder has previously elected to include such market discount in income as it accrues. For this purpose, the "revised issue price" of a Claim generally equals its issue price, increased by the amount of OID that has accrued over the term of the Claim. U.S. Holders who acquired their Claims other than at original issuance should consult their own tax advisors regarding the possible application of the market discount rules to the Wind-Down Transactions.

### 4. Limitation on Use of Capital Losses.

A U.S. Holder of a Claim who recognizes capital losses as a result of the transactions undertaken pursuant to the Plan may be subject to limits on their use of such capital losses. For a non-corporate U.S. Holder, capital losses may be used to offset any capital gains (without regard to holding periods) and ordinary income to the extent of the lesser of (a) $3,000 ($1,500 for married individuals filing separate returns) or (b) the excess of the capital losses over the capital gains. A non-corporate U.S. Holder may carry over unused capital losses and apply them to capital gains and a portion of their ordinary income for an unlimited number of years. For corporate U.S. Holders, losses from the sale or exchange of capital assets may only be used to offset capital gains. A corporate U.S. Holder who has more capital losses than can be used in a tax year may be allowed to carry over the excess capital losses for use in succeeding tax years. Corporate U.S. Holders may only carry over unused capital losses for the five years following the capital loss year but are allowed to carry back unused capital losses to the three years preceding the capital loss year.

### 5.    Medicare Tax.

Certain U.S. Holders that are individuals, estates, or trusts are required to pay an additional 3.8 percent tax on, among other things, interest, dividends and gains from the sale or other disposition of capital assets.  U.S. Holders that are individuals, estates, or trusts should consult their own tax advisors regarding the effect, if any, of this tax provision on their ownership and disposition of any consideration to be received under the Plan.

### D.    Certain U.S. Federal Income Tax Consequences of the Plan to Non-U.S. Holders of Allowed Claims.

The following discussion assumes that the Debtors and the Wind-Down Debtors will undertake the Wind-Down Transactions currently contemplated by the Plan and includes only certain U.S. federal income tax consequences of the Plan to Non-U.S. Holders.  This discussion does not include any non-U.S. tax considerations.  The rules governing the U.S. federal income tax consequences to Non-U.S. Holders are complex.  Each Non-U.S. Holder is urged to consult its own tax advisor regarding the U.S. federal, state, local, non-U.S., and non-income tax consequences of the consummation of the Plan and the Wind-Down Transactions to such Non-U.S. Holder.

### 1.    Gain Recognition.

Subject to the discussion of backup withholding and FATCA (as defined below) gain, if any, recognized by a Non-U.S. Holder on the exchange of its Claim generally will not be subject to U.S. federal income tax taxation unless (a) the Non-U.S. Holder is an individual who was present in the United States for 183 days or more during the taxable year in which the Wind-Down Transactions occur and certain other conditions are met or (b) such gain is effectively connected with the conduct by such Non-U.S. Holder of a trade or business in the United States ("ECI") (and, if an income tax treaty applies, such gain is attributable to a permanent establishment maintained by such Non-U.S. Holder in the United States).  If the first exception applies, the Non-U.S. Holder generally will be subject to U.S. federal income tax at a rate of 30 percent (or such lower rate as may be specified by an applicable income tax treaty) on the amount by which such Non-U.S. Holder's capital gains allocable to U.S. sources exceed capital losses allocable to U.S. sources during the taxable year of the exchange.  If the second exception applies, the Non-U.S. Holder generally will be subject to U.S. federal income tax with respect to any gain that is ECI realized on the exchange in the same manner as a U.S. Holder described above (except that the Medicare tax generally would not apply).  In order to claim an exemption from withholding tax, such Non-U.S. Holder will be required to provide a properly completed and duly executed IRS Form W-8ECI (or such successor form as the IRS designates).  In addition, if such a Non-U.S. Holder is a corporation, it may also be subject to an additional "branch profits tax" at a 30 percent rate (or such lower rate as may be specified by an applicable income tax treaty) on its effectively connected earnings and profits for the taxable year, subject to certain adjustments.

### 2.    U.S. Federal Income Tax Consequences to Non-U.S. Holders of Payments of Interest (Including OID and Interest Attributable to Accrued but Untaxed Interest) under the Plan.

Subject to the discussion of backup withholding and FATCA (as defined below), interest income (which, for purposes of this discussion of Non-U.S. Holders, includes OID and accrued but untaxed interest under the Plan) of a Non-U.S. Holder that is not ECI will qualify for the portfolio interest exemption and, therefore, will not be subject to U.S. federal income tax or withholding, provided that:

49

- the Non-U.S. Holder does not own, actually or constructively, 10 percent or more of the total combined voting power in the issuer with respect to a Claim within the meaning of Section 871(h)(3) of the IRC and Treasury Regulations thereunder;

- the Non-U.S. Holder is not a controlled foreign corporation related to the issuer, actually or constructively through the ownership rules under Section 864(d)(4) of the IRC;

- the Non-U.S. Holder is not a bank that is receiving the interest on an extension of credit made pursuant to a loan agreement entered into in the ordinary course of its trade or business; and

- the beneficial owner gives the issuer or the issuer's paying agent or other withholding agent an appropriate IRS Form W-8 (or suitable substitute or successor form or such other form as the IRS may prescribe) that has been properly completed and duly executed establishing its status as a Non-U.S. Holder.

If not all of these conditions are met, interest paid to a Non-U.S. Holder pursuant to the Plan that is not ECI generally will be subject to U.S. federal income tax and withholding at a 30 percent rate, unless an applicable income tax treaty reduces or eliminates such withholding and the Non-U.S. Holder claims the benefit of that treaty by providing an appropriate IRS Form W-8 (or a suitable substitute or successor form or such other form as the IRS may prescribe) that has been properly completed and duly executed.

If interest paid to a Non-U.S. Holder pursuant to the Plan is ECI, the Non-U.S. Holder will be required to pay U.S. federal income tax on that interest on a net income basis generally in the same manner as a U.S. Holder (and the 30 percent withholding tax described above will not apply, provided the appropriate statement (generally a properly completed and duly executed IRS Form W-8ECI or suitable substitute or successor form or such other form as the IRS may prescribe) is provided to the issuer or the issuer's paying agent or other withholding agent) unless an applicable income tax treaty provides otherwise. If a Non-U.S. Holder is eligible for the benefits of any income tax treaty between the United States and its country of residence, any interest income that is ECI will be subject to U.S. federal income tax in the manner specified by the treaty if the Non-U.S. Holder claims the benefit of the treaty by providing an appropriate IRS Form W-8 (or a suitable substitute or successor form or such other form as the IRS may prescribe) that has been properly completed and duly executed. In addition, a corporate Non-U.S. Holder may, under certain circumstances, be subject to an additional "branch profits tax" at a 30 percent rate (or such lower rate as may be specified by an applicable income tax treaty) on its effectively connected earnings and profits attributable to such interest for the taxable year, subject to certain adjustments.

The certifications described above must be provided to the applicable withholding agent prior to the payment of interest and, as applicable, must be updated periodically. Non-U.S. Holders that do not timely provide the applicable withholding agent with the required certification, but that qualify for a reduced rate under an applicable income tax treaty, may obtain a refund of any excess amounts withheld by timely filing an appropriate claim for refund with the IRS. Non-U.S. Holders should consult their own tax advisors regarding their entitlement to benefits under any applicable income tax treaty.

### E.    FATCA.

Under legislation commonly referred to as the Foreign Account Tax Compliance Act ("FATCA"), foreign financial institutions and certain other foreign entities must report certain information with respect to their U.S. account holders and investors or be subject to withholding at a rate of 30 percent on the receipt of "withholdable payments." For this purpose, "withholdable payments" generally are U.S. source payments of fixed or determinable, annual or periodical income, and, subject to information reporting and

backup withholding (discussed below), also include gross proceeds from the sale of any property of a type which can produce U.S. source interest or dividends. FATCA withholding will apply even if the applicable payment would not otherwise be subject to U.S. federal withholding. FATCA withholding rules that would have applied to payments of gross proceeds from the sale or other disposition of property of a type that can produce U.S. source interest or dividends were previously scheduled to take effect on January 1, 2019. However, such withholding has effectively been suspended under proposed Treasury Regulations that may be relied on until final regulations become effective. Nonetheless, there can be no assurance that a similar rule will not go into effect in the future. Each Non-U.S. Holder should consult its own tax advisor regarding the possible impact of FATCA withholding rules on such Non-U.S. Holder.

**BOTH U.S. HOLDERS AND NON-U.S. HOLDERS SHOULD CONSULT THEIR OWN TAX ADVISORS REGARDING THE POSSIBLE IMPACT OF THESE RULES ON SUCH HOLDERS' EXCHANGE OF ANY OF ITS CLAIMS PURSUANT TO THE PLAN.**

F.    **Information Reporting and Backup Withholding.**

The Debtors, Wind-Down Debtors, and applicable withholding agents will withhold all amounts required by law to be withheld from payments of interest and dividends, whether in connection with Plan Distributions or in connection with payments made on account of consideration received pursuant to the Plan and will comply with all applicable information reporting requirements. The IRS may make the information returns reporting such interest and dividends and withholding available to the tax authorities in the country in which a Non-U.S. Holder is resident. In general, information reporting requirements may apply to distributions or payments under the Plan. Additionally, under the backup withholding rules, a Holder may be subject to backup withholding (currently at a rate of 24 percent) with respect to distributions or payments made pursuant to the Plan unless that Holder: (a) comes within certain exempt categories (which generally include corporations) and, when required, demonstrates that fact; or (b) timely provides a correct taxpayer identification number and certifies under penalty of perjury that the taxpayer identification number is correct and that the Holder is not subject to backup withholding (generally in the form of a properly completed and duly executed IRS Form W-9 for a U.S. Holder, and, for a Non-U.S. Holder, in the form of a properly completed and duly executed applicable IRS Form W-8 (or otherwise establishes such Non-U.S. Holder's eligibility for an exemption)). Backup withholding is not an additional tax but is, instead, an advance payment that may be refunded to the extent it results in an overpayment of tax, provided that the required information is timely provided to the IRS. In addition, with respect to information reporting, Treasury Regulations generally require disclosure by a taxpayer on its U.S. federal income tax return of certain types of transactions in which the taxpayer participated, including, among other types of transactions, certain transactions that result in the taxpayer's claiming a loss in excess of specified thresholds. Holders subject to the Plan are urged to consult their own tax advisors regarding these regulations and whether the transactions contemplated by the Plan would be subject to these regulations and require disclosure on the Holders' tax returns.

**THE U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ARE COMPLEX. THE FOREGOING SUMMARY DOES NOT DISCUSS ALL ASPECTS OF U.S. FEDERAL INCOME TAXATION THAT MAY BE RELEVANT TO A PARTICULAR HOLDER IN LIGHT OF SUCH HOLDER'S CIRCUMSTANCES AND INCOME TAX SITUATION. ALL HOLDERS OF CLAIMS AGAINST THE DEBTORS ARE URGED TO CONSULT WITH THEIR OWN TAX ADVISORS AS TO THE PARTICULAR TAX CONSEQUENCES TO THEM OF THE TRANSACTIONS CONTEMPLATED BY THE PLAN, INCLUDING THE APPLICABILITY AND EFFECT OF ANY STATE, LOCAL, NON-INCOME OR NON-U.S. TAX LAWS, AND OF ANY CHANGE IN APPLICABLE TAX LAWS.**

## XII.    RECOMMENDATION

In the opinion of the Debtors, the Plan is preferable to all other available alternatives and provides for a larger distribution to the Debtors' creditors than would otherwise result in any other scenario. Accordingly, the Debtors recommend that Holders of Claims entitled to vote on the Plan vote to accept the Plan and support Confirmation of the Plan.

Dated: August 19, 2025

Claire's Holdings LLC
on behalf of itself and its debtor affiliates

By:     */s/  Christopher T. Cramer*
Name:     Christopher T. Cramer
Title:     Chief Executive Officer, Chief Operating Officer, and Chief Financial Officer

Claire's Holdings LLC

**<u>EXHIBIT A</u>**

**Chapter 11 Plan**

[Filed Separately]